STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
TIMOTHY S. KLINE (#319227)
tk@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAN CLARKE**, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| **PACIFIC GAS AND ELECTRIC COMPANY**; and **PG&E CORPORATION**, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PARTIES ....................................................................................................................... 3

I.      Plaintiff ............................................................................................................. 3

II.     Defendants ........................................................................................................ 5

JURISDICTION ............................................................................................................ 6

VENUE ......................................................................................................................... 6

INTRADISTRICT ASSIGNMENT ............................................................................... 6

FACTUAL BACKGROUND ......................................................................................... 6

I.      PG&E's Former Operation of MGPs Along the Northern Waterfront of San Francisco .... 6

        A.  Background - MGPs and Toxic and Solid Waste Associated Therewith ..................... 6

        B.  Overview of the Cannery MGP ........................................................................ 10

        C.  Investigations of the Additional MGPs Operated by PG&E at the Same Time and in the Same Area as the Cannery MGP Further Corroborate the Contamination of the Cannery MGP Site ............................................................................................ 14

                1.  North Beach MGP ................................................................................. 14

                2.  Fillmore MGP ....................................................................................... 15

                3.  Beach Street MGP ................................................................................. 16

II.     PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous MGP Wastes at the Cannery MGP Sites and/or in the Vicinity Thereof ...................... 17

III.    The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or Disposed of by PG&E at the Cannery MGP Site and/or in the Vicinity thereof Present, and/or May Present, an Imminent and Substantial Endangerment to Health and/or the Environment .................................................................................................... 18

        D.  MGP Waste Disposed by PG&E on and/or in the Vicinity of the Cannery MGP Site Has Contaminated the Sediment of Tidal and Submerged Lands in the Bay and Groundwater that Is Hydrologically Connected to the Bay .......................................... 19

        E.  MGP Wastes Cause Direct Harm to Herring in the Vicinity of the Cannery MGP Site, Causing Cascading Negative Impacts to the Many Other Marine Species that Rely on Herring as a Food Source ................................................................................ 21

IV.     PG&E's Conduct with Regards to the SF Waterfront MGPs Requires the Establishment of an Environmental Remediation Trust to Manage the Investigation and Remediation of the Cannery MGP Site ...................................................................................... 24

A. In 1991, PG&E Took Advantage of Divided and Weak State Regulatory Agencies to Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Marina Substation ................................................................................. 25

B. In 1997, PG&E Used Questionable Means to Skirt State Regulatory Agencies and Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Gaslight Building ........................................................................... 26

C. Since 1977, PG&E Has Purposefully Ignored Indications of a Large Plume of MGP Waste from the Fillmore MGP and Failed to Report It to Regulatory Agencies or Initiate an Investigation of It ....................................................................... 28

D. PG&E Has Grossly Misled Plaintiff and the Public About Oversight on Past Investigations of MGP Waste ................................................................. 30

E. PG&E Has Ignored and Denied Responsibility for Contamination from the Cannery MGP, Which Remains Only Minimally Investigated and Completely Unremediated Due to PG&E's Willful Neglect ......................................................... 31

V.      Plaintiff Has Complied with Applicable Notice Requirements under RCRA and the Clean Water Act ................................................................................. 33

CLAIM FOR RELIEF ..................................................................................... 34

FIRST CAUSE OF ACTION ...................................................................... 34

Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq*........... 34

SECOND CAUSE OF ACTION .................................................................. 34

Violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. ............................... 34

THIRD CAUSE OF ACTION ..................................................................... 35

Violations of California State Negligence Law ................................................. 35

FOURTH CAUSE OF ACTION .................................................................. 36

Violations of California State Strict Liability Law ............................................. 36

PRAYER FOR RELIEF ................................................................................... 36

DEMAND FOR JURY TRIAL ........................................................................ 38

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1       Plaintiff Dan Clarke ("Clarke" or "Plaintiff") alleges on information and belief, except as

2 where based on personal knowledge, against Defendants Pacific Gas and Electric Company and

3 PG&E Corporation (collectively, "PG&E") as follows:

**INTRODUCTION**

1.     This action arises out of terrestrial and offshore contamination caused by one of

6 the four manufactured gas plants ("MGPs") owned and operated by PG&E along the northern

7 waterfront of San Francisco: the Cannery MGP.

2.     The other MGPs owned and operated by PG&E along San Francisco's northern

9 waterfront include the Fillmore MGP, North Beach MGP, and Beach Street MGP (the

10 "Additional MGPs," and, collectively with the Cannery MGP, the "SF Waterfront MGPs").

<u>Figure 1</u> – The Cannery MGP and Additional MGPs superimposed on a current map.



GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

3.      Claims arising from contamination caused by the Additional MGPs are or have been addressed in a separate action (N.D. Cal., Case No. 14-04393-WHO) ("Additional MGP Litigation").

4.      The Cannery MGP, like the other SF Waterfront MGPs, was a highly polluting, low-tech refinery that was used, in the nineteenth and early twentieth centuries, to create gas from coal, and later oil and a combination of coal and oil, that was then pumped in pipes to (mainly residential) consumers for lighting, cooking, and heating in their vicinity.

5.      The soil and groundwater in the historical footprint of the Cannery MGP, which as the above map shows encompassed an area roughly equivalent to a city block, as well as the soil and groundwater of the areas in its vicinity, are contaminated with a variety of solid and/or hazardous waste from the Cannery MGP that was stored, transported, and disposed of by PG&E on or in the vicinity of the Cannery MGP (collectively, "MGP Wastes").

6.      The area of the Cannery MGP ("Cannery MGP Site") is located at the northern terminus of Columbus street and is within the San Francisco Maritime National Historical Park. A hotel, restaurants, shops, and a National Park Visitor Center currently occupy the site. The Cannery MGP Site also abuts Aquatic Cove, one of the very few places in the San Francisco Bay used daily by recreational swimmers.

7.      The MGP Waste contamination from the Cannery MGP may present an imminent and substantial endangerment to human health and the environment.

8.      PG&E has known about this endangerment since at least the 1980s. However, PG&E has not performed any investigation of the Cannery MGP Site since a minimal investigation was done the 1980s. Rather, at the same time as it has acknowledged its liability for the Additional MGPs, PG&E has denied owning and operating the former Cannery MGP, despite multiple sources of evidence showing that PG&E owned and operated it—including PG&E's own records and a superficial investigation of the site conducted in 1986 by PG&E.

9.      With the exception of that superficial investigation, which confirmed the existence of high level of MGP Wastes on the site, PG&E has steadfastly refused to investigate contamination from the Cannery MGP, let alone take any remedial actions concerning it. A

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Consent Decree entered previously in the Additional MGP Litigation specifically excludes the area of the Cannery—both offshore and onshore—from its purview.

10.     Despite being aware of the Cannery MGP and the undeniable signs of contamination from it, neither the California Department of Toxic Substance Control ("DTSC") nor any other governmental agency has taken any interest in even questioning PG&E's obstinate refusal to take responsibility. Rather, those agencies have been content to leave it to PG&E—a convicted felon that recently plead guilty to multiple manslaughter charges—to determine for itself the nature and extent of its responsibilities.

11.     PG&E made its approach to the Cannery MGP clear: continue to do nothing, leaving the existing MGP Wastes and resulting contamination in place.

12.     Given PG&E's consistent and stubborn refusal to even acknowledge its responsibility for the Cannery MGP, it is necessary that the Court order the relief requested below in order to address the threats to human health and the environment that MGP Waste contamination may present on the Cannery MGP Site and its vicinity.

## PARTIES

### I.     Plaintiff

13.     Plaintiff **DAN CLARKE** ("Clarke") is an individual, residing in San Mateo, California.

14.     Clarke habitually visits the areas affected by the contamination alleged in this action for aesthetic and recreational enjoyment, visiting the affected area alone and with family, friends, and guests from out of town, and he intends to do so in the future.

15.     Despite having moved 25 miles away two years ago, Clarke still goes into the City often to recreate in and enjoy the areas affected by the contamination.

16.     It is Clarke's custom to drive to the Marina Green and leave his car there, while Clarke, or Clarke and his visitors, walk along the shoreline, including along Aquatic Park. There are few places on earth that are more peaceful or inspiring. When Clarke is with others, he likes to show off the area he used to call home. When alone, he just thinks about how lucky he is. The shoreline from the Golden Gate Bridge around to the Ferry Building are a source of continuing

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

pleasure for Clarke. Clarke still loves the northern waterfront of San Francisco, including the area in the vicinity of the Cannery MGP Site, and that is one of the reasons he keeps going back there.

17.     Clarke particularly enjoys the observing the abundant wildlife along the shoreline and in the vicinity of Hyde Street Pier, Aquatic Park, and Black Point. His typical wildlife observations in the Aquatic Park cove include the various shorebirds, harbor seals, and sea lions.

18.     When Clarke walks the shoreline, his thoughts go to the amazingly interconnected world we live in and how we share this beautiful environment with all God's creatures.

19.     Clarke's recreational and aesthetic enjoyment of the affected area is diminished by the contamination from the Cannery MGP and the harm it is causing to the environment of the affected area. Clarke believes humans have a responsibility to take care of the environment. The MGP contamination from the Cannery MGP diminishes his recreational and aesthetic enjoyment of the affected area, and it stresses him to think about the way MGP contamination from the Cannery MGP is impacting the environment where he recreates and plans to recreate in the future. The harm that contamination from the Cannery MGP is causing to shorebirds, harbor seals, and sea lions in the marine areas offshore of the Cannery MGP site and the reductions it causes in their numbers—including through the reduction of herring and other fish on which they feed—reduces Clarke's recreational and aesthetic enjoyment of the area.

20.     If the contamination from the Cannery MGP was investigated and remediated, Clarke's recreational and aesthetic enjoyment of the area in the vicinity of the Cannery MGP would be substantially increased by a reduction or elimination of these harms to the environment.

21.     Clarke is concerned for others. Clarke's enjoyment of the affected area is diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment. It pains Clarke to know that there are people exposed to MGP Wastes from the Cannery MGP through contaminated water, soil, and air. When Clarke sees swimmers and rowers taking their regular exercise in the churning waters of Aquatic Park—immediately offshore of the Cannery MGP Site—he is worried and frustrated that they are exposed to continuing contamination from PG&E's unremediated MGP Wastes. He is angered by PG&E's unconscionable neglect and failure to have fully informed them, and others, of this threat.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

22.     Clarke intends to visit the affected areas in the future, alone and with guests, for his own aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged in this action is addressed; and it is diminished by contamination and the harm it causes to human health and the environment.

23.     After Clarke sold his previous home to PG&E as a result of the contamination of the neighborhood and the inability to reach an agreed-upon plan with PG&E for remediating his home, Clarke refrained from searching for a new residence along San Francisco's northern waterfront because of the unknown extent of MGP Wastes from the SF Waterfront MGPs and the related health risks from possible exposure to unremediated MGP Wastes should he buy another home in the area.

24.     Because of Clarke's continued interest in seeing the contamination alleged in this action fully investigated and remediated, after selling his home to PG&E, Clarke continued to spend countless hours pursuing an adequate investigation of the contamination through the Additional MGP Litigation. Clarke now brings this action to ensure the that contamination resulting from Cannery MGP is investigated and remediated.

## II.    Defendants

25.     Defendant **PG&E CORPORATION** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California.

26.     Defendant **PACIFIC GAS AND ELECTRIC COMPANY** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California. Pacific Gas and Electric Company is the wholly owned operating company of PG&E Corporation.

27.     Defendants Pacific Gas and Electric Company and PG&E Corporation, with their respective predecessors, successors, subsidiaries, and parents, are referred to collectively herein as "PG&E" or "Defendants."

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

28.     PG&E owned and operated the North Beach MGP, Fillmore MGP, and Cannery MGP during the relevant period and is responsible for the contamination caused thereby alleged herein.

29.     At all relevant times, each of the Defendants was an agent, employee, servant, partner, alter ego, and/or joint venturer of its co-Defendant in the acts and omissions that have caused the injuries to Plaintiff and was at all times, acting within the course and scope of said agency, employment, service, partnership, conspiracy, alter ego status, and/or joint venture.

### JURISDICTION

30.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically, 42 U.S.C. §§ 6901 *et seq*.

31.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court may grant declaratory relief, and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 6972.

### VENUE

32.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to the claims at issue in this action occurred in this judicial district. The MGP waste contamination at issue is located in the City and County of San Francisco ("CCSF"), including without limitation the Marina and Fisherman's Wharf neighborhoods. Furthermore, PG&E is headquartered in the CCSF.

### INTRADISTRICT ASSIGNMENT

33.     This action substantially arises out of actions in the CCSF. Thus, under Civil L.R. 3-2(d) this action is to be assigned to the San Francisco or Oakland Division.

### FACTUAL BACKGROUND

I.     **PG&E's Former Operation of MGPs Along the Northern Waterfront of San Francisco**

   A.     **Background - MGPs and Toxic and Solid Waste Associated Therewith**

34.     As the name suggests, manufactured gas plants ("MGPs") were plants that manufactured gas used for lighting, heating, and cooking purposes throughout most of the

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

nineteenth century and the first half of the 20th century. The manufacturing process for "synthetic fuel gases" (also known as "manufactured fuel gas," "manufactured gas" or simply "gas") typically consisted of the gasification of combustible materials, almost always coal, but also wood and oil, and, especially in the later period of their operations, a combination of coal and oil. The coal and/or other fuel stock were gasified by heating it in enclosed ovens with an oxygen-poor atmosphere. The fuel gases generated were mixtures of many chemical substances, including hydrogen, methane, carbon monoxide and ethylene, and could be burnt for heating and lighting purposes. Coal gas, for example, also contains significant quantities of unwanted sulfur and ammonia compounds, as well as heavy hydrocarbons, and so the manufactured fuel gases needed to be purified before they could be used.

35.     Once manufactured, the gas would be pumped directly to residential and other users through pipes. Thus, as is the case with the Cannery MGP at issue here, the plants were often situated in close vicinity to residential areas.

36.     MGPs commonly (and here) consisted of several component operations/buildings, often colloquially referred to collectively as "gas-works," spread across an area of several city blocks. The heart of an MGP was the "retort bench," which would generally be housed in its own building known as the "retort house." The retort bench was the construction in which the retorts were located. Retorts were where the coal and/or other fuel stock would be heated and the gas evolved. Depending on the sophistication of the retort, a greater or lesser amount of the fuel stock would be carbonized. Within the retort house on top of the retort benches were "hydraulic mains," in which the gas evolved from the fuel stock, as well as MGP tar and ammoniac liquor, would collect through pipes that carried off the gas from the retorts. One of the principal purposes of the hydraulic mains was to draw off some of the large amounts of MGP tar, with which gas from the retorts was laden.

37.     Even with the drawing off of some MGP tar by the hydraulic mains, the gas coming directly from the bench was a noxious soup of chemicals. Components of that soup that needed to be reduced in quantity before the gas was distributed included: MGP tar, which could

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

be sold; ammonia vapors, which could also be sold; naphthalene; and hydrogen sulfide. The main components of an MGP used to accomplish this reduction were the "purifier" and the "scrubber."

38.    Chief among the contaminants that operators sought to remove was hydrogen sulfide, which caused the gas to smell like rotten eggs. Thus, the principal purpose of purifiers was the reduction of this chemical from the gas. This was originally done through either a dry or wet lime process, each involving lime through which the gas was passed. The resulting waste from the wet lime process was a material commonly known as "blue billy," which contains cyanides and is recognized as one of the first historical toxic wastes. Blue billy, along with other MGP Wastes like MGP tar, debris from MGP facilities, and waste maintenance materials, was often disposed of by depositing it into a nearby body of water, such a canal or bay. It was also frequently piled into heaps and buried onsite.

39.    Scrubbers were used principally to remove ammonia from the gas.

40.    Once through the purifier and the scrubber, the gas would then be stored in what was referred to as "gasholders" made of brick, stone, concrete, steel, or wrought iron, until pumped to customers.

41.    In addition, gas works often had various other facilities within their footprints, including: MGP tar refineries, tanks, and vats, which were collectively used to collect, store, process through fractional distillation the MGP tar byproduct created in the gas making process, recovering tar, benzole, creosote, phenol, and cresols for sale; a "lampblack separator" used to extract carbon black for sale from coke, the byproduct that would remain in the retort after evolution of the gas; boilers used to generate steam for the powering of MGP operations, often through the burning of coke; a generator house, in which electricity would be generated; and oil tanks.

42.    From their inception, MGPs had the reputation for being dirty and polluting, both as to the smoke and the waste their operations created. The wastes produced by MGPs are persistent in nature, and often still contaminate the site of former MGPs, as well as areas where MGP waste was intentionally deposited and/or to which it has migrated. These wastes come in

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

several forms including coal residue solids, MGP tar, blue billy, "ammoniac liquor," debris from MGP facilities, and waste maintenance materials.

43.    Ammoniac liquor, MGP tar that was not further refined and sold, and washes were often allowed to leach into the ground or dumped into waterways. These types of MGP Wastes and others were also often buried on site, including in what were referred to as "wells" or "tar wells."

44.    Coal residue solids and MGP tar contain mixed long-chain aromatic and aliphatic hydrocarbons, a byproduct of coal carbonization, types of chemicals that are commonly referred to, in the collective, as polycyclic aromatic hydrocarbons or PAHs. Many of the PAHs associated with MGP Waste are known carcinogens and are identified as "toxic pollutants" by the United States Environmental Protection Agency ("US/EPA") under 40 C.F.R. § 401.15. PAHs, in general, are recognized as extremely hazardous compounds to human health and the environment. Not only are many known carcinogens, they are also lipophilic, meaning they can dissolve into fats, a characteristic that allows them to easily cross biological membranes and accumulate inside organisms. PAHs are also genotoxic, meaning that once accumulated in an organism they damage the genetic information within the organism's cells, causing mutations.

45.    Blue billy contains cyanides and lime.

46.    MGP Wastes also contain significant amounts of lead. Lead was contained in feedstocks, and lead from this source is associated with purifier box wastes. Lead was also used in paint at MGPs, as caulking for gas holders, in pipework, for roofing, in batteries, and as lead arsenate insecticide in MGP facilities. It was also used in maintenance activities where the common pit-putty was an equal-parts (by weight) mixture of red lead, white lead, and litharge, litharge being another term for lead oxide. Additionally, mortars used in MGP facilities contained litharge because of its resistance to the acid environment and coal acid products from coal pyrolysis.

47.    The traditional pathways for contact between these wastes and humans and/or the environment include direct contact with contaminated soils, groundwater, and/or aboveground water and contact with toxic vapor off-gassing from contaminated soils and/or groundwater.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

**B.** **Overview of the Cannery MGP**

2      48.     PG&E and its predecessors, for the acts and omissions of whom PG&E has

3  successor liability, operated the Cannery MGP from on or around 1898 until at least 1906, when

4  it was damaged in the Great Earthquake.

5      49.     PG&E and its predecessors owned the Cannery MGP from on or around 1898 until

6  1907.

7      50.     PG&E and its predecessors produced and stored gas manufactured from coal and

8  crude oil at the Cannery MGP.

9      51.     Like the Additional MGPs, the Cannery MGP was located on the margin of the

10  San Francisco Bay. The Cannery MGP extended into the Bay in an area that is now within the

11  square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., designated by

12  the CCSF Office of the Assessor-Recorder as Block 10 ("Cannery MGP Site").

13      52.     During the time of the Cannery MGP's operation, a coal wharf existed along its

14  northern edge, extending into the Bay roughly to the current location of Jefferson St. The former

15  locations of similar wharfs of the Additional MGPs owned and operated by PG&E along San

16  Francisco's waterfront are the locations of large quantities of MGP Wastes.

17      53.      In addition, a 47,000-gallon crude oil tank was located on the wharf, indicating

18  that the crude oil was delivered by boat to the facility.

19      54.     The former location of a crude oil tank within the North Beach MGP, located at

20  the margin of Gas House Cove (a.k.a. East Harbor), is highly contaminated with a very large

21  deposit of MGP tar, which, in turn, has contaminated the groundwater in the area.

22      55.     Along Hyde St., on the western edge of the Cannery MGP Site, two gas holders

23  existed immediately south of the oil tank. These two gas holding tanks were each 75 feet high and

24  each had a 180,000 cubic foot capacity.

25      56.     The locations of former gas holders of the North Beach and Fillmore MGPs are

26  highly contaminated. At the location of one of the North Beach MGP's gas holders, a very large

27  deposit of MGP tar was discovered in what appeared to the bottom portion of the tank,

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

underneath the ground. Groundwater tests in the vicinity showed high levels of contamination down gradient from the deposit.

57.    Down gradient to the west of the former locations of the gas holders was a large pipe extending into the Bay that served as a salt water intake for a public bathhouse located uphill.

58.    Purifiers, furnaces, retorts, and other facilities were located east of the gas holding tanks in the main building of the facility.

59.    At the bottom of the northwest corner of the main building of the Cannery MGP structure, a large drainage flume extended to the approximate shoreline. At the flume's terminus was a waste pit well.

60.    Solids and other wastes from MGP operations were stored onsite and were used to fill approximately half of the eastern portion of the facility, extending beyond the shoreline and into the San Francisco Bay.

61.    The below Sanborn map, dating from 1899, shows the general layout of the Cannery MGP and the location of the shoreline at the time (denoted by a darkened line running through the plotted, but as-of-then non-existent city blocks). The gas holders are the large circles on the left, the waste dump is in the middle of the right side and is labeled with the number "1583" and the words "Refuse fill."

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

62.     From approximately 1898, the Cannery MGP was owned operated by the Equitable Gas Light Company ("Equitable").

63.     In 1903, San Francisco Gas and Electric Company ("SFG&E") acquired Equitable and the Pacific Gas Improvement Company (the owner and operator of the Fillmore MGP since 1882) on the basis of exchange of stock and assumption of liabilities by the surviving entity, SFG&E.

64.     Prior to 1903, SFG&E owned the North Beach MGP and competed with the Cannery MGP, the Fillmore MGP, as well as other MGPs.

65.     PG&E has not disputed responsibility for the Fillmore MGP and the contamination caused by it.

66.     In contrast, PG&E has denied ever owning or operating the Cannery MGP.

67.     In fact, SFG&E owned and operated the Cannery MGP, including as a reserve facility, following SFG&E's acquisition of Equitable through SFG&E's merger, in 1905, with California Gas & Electric Company.

68.     That merger formed Pacific Gas & Electric Company, which continued to own and operate the Cannery MGP until it was destroyed in the Great Earth Quake of 1906.

69.     Following demolition of the Cannery MGP after the Great Earthquake, the Haslett Warehouse was constructed at the Cannery MGP Site and was used in conjunction with the Del Monte Canning Company, which occupied a nearby building.

70.     The present-day shoreline is located approximately 250 feet downgradient and to the north of the Cannery MGP Site.

71.     Today, the Cannery MGP Site is owned by the National Park Service ("NPS"). The property is included within the boundaries of the San Francisco Maritime National Historical Park, and is home to the 252-room Argonaut Hotel, multiple restaurants, a See's Candies shop, and a National Park Visitor Center.

72.     NPS performed at least one soil sample test at the Cannery MGP Site in 1985. The results of that test indicated extraordinarily high levels of "creosote"—a now-dated term typically used to describe MGP tar wastes. Contemporaneous communications regarding the 1985 test results observed that the contamination was *six times higher* than the level considered to be a suspected source of groundwater contamination.

73.     The next year, 1986, PG&E performed limited sampling of surface soils at the site. The results corroborated the NPS' testing taken the prior year and revealed a very high level of PAHs, lead, and other toxins, even at the surface of the site's soil.

74.     Despite these test results confirming contamination by MGP wastes, which PG&E shared with US/EPA and Regional Water Board, neither NPS, PG&E, nor any regulatory agency has performed any additional testing for MGP contamination or remediation of the Cannery MGP Site.

75.     Instead, while acknowledging its likely liability for contamination caused by the Cannery MGP in internal documents, PG&E has publically denied any responsibility for the Cannery MGP, and pointedly refused to investigate the confirmed threat in the court mediated investigation that occurred as part of the Additional MGP Litigation or address it in the Consent Decree entered in that case. PG&E has abandoned not just its legal responsibility to remedy its

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

contamination from the Cannery MGP, but also its obligation as a government-created monopoly to act in the public interest.

76.     When PG&E began to notify San Francisco residents of contamination from the MGPs along San Francisco's northern waterfront in the early 2010s, it did not disclose its former ownership and operation of the Cannery MGP.

77.     The Cannery MGP Site is contaminated and is the source of MGP Wastes that are being transported by groundwater that passes through the Cannery MGP Site down gradient into the Bay, including into the waters of Aquatic Park—which is effectively an enclosed bay that experiences substantially less mixing and dilution than unenclosed portions of San Francisco Bay.

78.     This contamination both on and off shore is PG&E's responsibility and may present and imminent and substantial endangerment to human health—including that of the many swimmers that use Aquatic Park—and the environment—including marine organisms in the areas immediately offshore and the birds, mammals, and fish that feed on them.

79.     However, the nature and extent of the MGP Waste contamination remains undefined, and PG&E has refused responsibility to investigate the Cannery MGP Site—let alone clean up what is found.

**C.**     **Investigations of the Additional MGPs Operated by PG&E at the Same Time and in the Same Area as the Cannery MGP Further Corroborate the Contamination of the Cannery MGP Site**

**1.**     **North Beach MGP**

80.     The North Beach MGP site is comprised of at least four city blocks bounded by Marina Boulevard, Buchanan Street, North Point Street, Laguna Street, Bay Street, and Webster Street, and is located approximately ten city blocks west of the Cannery MGP. PG&E produced gas at the North Beach MGP near the area north of Bay and Buchanan Streets until at least April 1906, when it was damaged in the Great Earthquake. Following the earthquake, PG&E used the gasholders at the site to store and distribute gas that was manufactured at the Beach Street MGP and piped to the gasholders at the North Beach MGP.

81.     The North Beach MGP's gasworks included a large retort house, a purifying house, scrubbers, tar wells, gas holders, deep wells, and crude petroleum tanks, including one

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

near the CCSF-owned marina in an inlet of San Francisco Bay ("Gashouse Cove"). The latter crude petroleum tank was built on an artificial earthen mole that extended into the Bay. The tar wells were used by PG&E as means of disposing of MGP tar wastes underground in the vicinity of the water table.

82.    The North Beach MGP also included facilities titled as "tar refinery," "tar tanks," "tar vats," and "tar well," as recorded in a contemporaneous map created following the 1906 earthquake.

83.    Following the Great Earthquake of 1906, PG&E demolished the structures that were not in continued use and disposed of the MGP Wastes created through their demolition on the North Beach MGP site or in its immediate vicinity.

84.    Investigations thus far conducted within the North Beach MGP Site and areas in its immediate vicinity, including offshore, show very significant levels of MGP Waste contamination. This includes: large deposits of MGP Waste contamination that has been characterized as MGP tar; large amounts of MGP Waste contamination in the soils, including solid MGP Waste containing high levels of PAHs; and high levels of groundwater MGP Waste contamination. The North Beach MGP site and areas in its immediate vicinity are now primarily residential with some small commercial buildings including at least one school.

## 2.    Fillmore MGP

85.    The Fillmore MGP site is comprised of at least four city blocks bounded by Fillmore Street, Cervantes Street, Mallorca Way, Pierce Street, and Toledo Way, and is located approximately twelve city blocks west of the Cannery MGP. PG&E owned and operated the Fillmore MGP near the area west of Fillmore and Bay Streets until at least April 1906, when it was damaged in the Great Earthquake. The Marina Middle School is located on part of this site.

86.    Following the Great Earthquake of 1906, PG&E demolished the structures that were not in continued use and disposed of the MGP Wastes created thereby on the Fillmore MGP Site or in its immediate vicinity.

87.    Like the Cannery MGP, the Fillmore MGP included a wharf used to supply coal and other supplies. In the mid-1800s, a seawall, named Fair's Seawall, was constructed on the

1  north edge of what is now Marina Green. Until approximately 1912, behind this seawall there was

2  a "lagoon" in the area now diagonally bisected by Cervantes St., into which the Fillmore MGP's

3  wharf jutted.

4      88.    Investigations thus far conducted indicate significant soil contamination in the

5  historical footprint of the Fillmore MGP and its vicinity, including highly elevated levels of

6  PAHs and other toxins, as well as large MGP tar deposits within what was the artificial bay and is

7  now fill on which residents of the Marina live.

8             **3.**    **Beach Street MGP**

9      89.    The Beach Street MGP site is comprised of an area in the vicinity of Beach and

10  Powell Streets in the Fisherman's Wharf neighborhood of San Francisco, and is located

11  approximately four city blocks east of the Cannery MGP Site. PG&E owned and operated the

12  MGP until at least the mid-1950s when the property was sold and redeveloped for commercial

13  use. A hotel currently occupies portions of the site.

14      90.    The Beach Street MGP included, *inter alia*, a gasworks with numerous purifying

15  tanks, scrubbers, exhaust rooms, three oil tanks, two gas holders, a generator, gas turbines, and a

16  lamp black separator.

17      91.    The Beach Street MGP operated as a coke and gas producing facility. The

18  earthquake and fires of 1906 did not result in significant damage to the Beach Street MGP. A

19  1913 map shows the layout of the PG&E Beach Street MGP, with a 2,000,000 cubic foot ("cf")

20  gas holder and a 200,000 cf gas holder in the eastern portion of the site, several purifying tanks in

21  the center of the site, three oil tanks in the northwestern corner of the site, and lampblack

22  separators in the southwest. The Beach Street MGP operated until approximately 1931.

23      92.    The Beach Street MGP was built on fill, and for a substantial portion of its

24  operations, abutted the shoreline of the Bay.

25      93.    Testing in 1997 at a hotel across the street from Pier 39, in the historic location of

26  the Beach Street MGP, found exceptionally high PAHs in soil and severe contamination of

27  groundwater, attributable to PG&E's Beach Street MGP.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

94.     Investigations conducted more recently have indicated a very significant MGP contamination on or in the vicinity of the Beach Street MGP. This includes extensive contamination offshore of the site, including large MGP tar deposits that appear to emanate from a disposal pipe that carried waste from the Beach Street MGP to the Bay.

95.     The Cannery MGP similarly had, at the bottom of the northwest corner of the main building of the Cannery MGP structure, a large drainage flume extended to the approximate shoreline. At the flume's terminus was a waste pit well.

## II.   PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous MGP Wastes at the Cannery MGP Sites and/or in the Vicinity Thereof

96.     During the course of PG&E's ownership and operation of the Cannery MGP and upon its closure of the Cannery MGP, PG&E handled, stored, treated, transported and/or disposed of solid and/or hazardous MGP wastes at the Cannery MGP Sites and/or the vicinity thereof.

97.     In addition, during the course of PG&E's predecessors' ownership and operation of the Cannery MGP, PG&E's predecessors handled, stored, treated, transported and/or disposed of solid and/or hazardous MGP wastes at the Cannery MGP Site and/or the vicinity thereof.

98.     PG&E is liable for the contamination caused by these actions of its predecessors.

99.     The operation of the Cannery MGP centered on the separation of gas from coal and/or crude oil and then the purification of the gas. During these processes, PG&E and its predecessors created, handled, stored, transported and/or disposed of at various locations within the grounds of the Cannery MGP Site and/or in the vicinity thereof significant amounts of solid and hazardous toxic wastes.

100.     During the course of PG&E's and its predecessors' operation of the Cannery MGP, debris from damaged facilities as well as unused maintenance materials, which included high levels of PAHs and other toxic substances, were stored, transported, and disposed of by PG&E and its predecessors on the Cannery MGP Site and in the immediate vicinity thereof.

101.     When portions of the facilities of the Cannery MGP were decommissioned and demolished by PG&E, the demolition debris, which included high levels of PAHs, and other toxic

substances, were stored, transported, and disposed of by PG&E on the Cannery MGP Site and in the immediate vicinity thereof.

102.    Accordingly, the limited sampling on the Cannery MGP Site and in the immediate vicinity thereof has revealed high concentrations of MGP Wastes. The results of the far more extensive investigations of the Additional MGPs strongly corroborates the existence of MGP Wastes on the Cannery MGP Site and its vicinity, including areas offshore thereof.

**III.   The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or Disposed of by PG&E at the Cannery MGP Site and/or in the Vicinity thereof Present, and/or May Present, an Imminent and Substantial Endangerment to Health and/or the Environment**

103.    PG&E's and its predecessors' handling, storage, treatment, disposal and/or transportation of solid and/or hazardous MGP wastes at the Cannery MGP Sites and/or the vicinity thereof has resulted in the contamination of the soil and groundwater of the terrestrial portions of those locations. This contamination presents an imminent and substantial endangerment to health and/or the environment and/or may present an imminent and substantial endangerment to health and/or the environment in the future.

104.    In the very limited locations where sampling has been conducted, contaminants associated with former MGP operations have been detected in soils within the footprint of the Cannery MGP Site. The results of the far more extensive investigations of the Additional MGPs strongly corroborates the existence of MGP Wastes on the Cannery MGP Site and its vicinity, including areas offshore thereof.

105.    The concentrations of the MGP Waste contaminants detected to date are significant and pose an imminent and substantial endangerment to both human health and the environment, and/or may present an imminent and substantial endangerment to health and/or the environment in the future.

106.    The full extent of the contamination associated with the Cannery MGP has not yet been defined. It is highly probable that additional significant levels of contamination exist in areas the within Cannery MGP Site and its vicinity that would also pose an imminent and substantial

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    endangerment to human health and the environment, and/or may present an imminent and

2    substantial endangerment to health and/or environment in the future.

3          107.    Notably, and as detailed further herein, PG&E vigorously refused to include the

4    Cannery MGP Site and its vicinity in the areas to be investigated through the earlier court

5    mediated investigation that occurred as part of the Additional MGP Litigation. PG&E has not

6    otherwise investigated the site or its vicinity—voluntarily or otherwise.

7          108.    The Consent Decree entered in the Additional MGP Litigation specifically

8    excludes from its scope contamination caused by the Cannery MGP. Moreover, its provisions

9    requiring PG&E to investigate and remediate shoreline contamination also exclude the terrestrial

10   shoreline in front of and adjacent to the Cannery MGP, and its provisions requiring PG&E to

11   investigate and remediate offshore areas specifically exclude the area between Van Ness Avenue

12   and Pier 45—the area of the San Francisco Bay offshore of the Cannery MGP Site.

13         **D.**      **MGP Waste Disposed by PG&E on and/or in the Vicinity of the Cannery**
                     **MGP Site Has Contaminated the Sediment of Tidal and Submerged Lands in**
14                   **the Bay and Groundwater that Is Hydrologically Connected to the Bay**

15         109.    The Cannery MGP, like all of the SF Waterfront MGPs, was located in whole or in

16   substantial part beyond the historical shoreline of the Bay on fill that has a very shallow

17   groundwater table of less than 10 or 15 feet below the surface. During its operation, facilities at

18   the Cannery MGP were either abutting the shoreline or within a couple hundred feet of it. Some

19   of the Cannery MGP's facilities, including the 47,000-gallon crude oil tank on a wharf, were

20   located offshore of the then-contemporary shoreline. Although the historic shoreline has since

21   been filled in, the Cannery MGP Site remains less than one city block south of the current

22   shoreline (approximately 250 feet away) and up gradient of ground water flows to the shoreline.

23         110.    The Cannery MGP site has similar contamination from MGP Wastes as the

24   analogously-situated Additional MGPs. Where testing of tidal and submerged lands has been

25   undertaken in the vicinity of the Fillmore MGP, North Beach MGP, and Beach Street MGP, the

26   results have confirmed the existence of MGP Wastes with high levels of total extractable

27   petroleum hydrocarbons (TEPH) and PAHs in the sediments of the tested areas. For instance, in

28   those locations, high levels of TEPHs and PAHs in groundwater are concentrated around and

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

downgradient from particular locations, indicating that contamination originates and flows from discrete MGP tar deposits.

111.    Where PG&E has conducted soil tests at depths of approximately 10 feet at the other MGP sites along San Francisco's northern waterfront, it has found MGP Wastes containing high concentrations of PAHs, even though much of it was disposed over a hundred years ago. Given the prevalence of MGP Wastes in the areas within and around the MGP sites that PG&E has investigated, it is highly probable that MPG Waste with similarly high levels of PAHs and TEPHs exist throughout the soils of areas in and around the Cannery MGP Site, which has not yet been tested in any significant way.

112.    The origin of this contamination is both through the direct disposal of MGP Waste into the water by PG&E during the operations of the Cannery MGP, including into the waters of Aquatic Park, and through the ongoing migration of MGP Waste from terrestrial locations where the waste was disposed via groundwater flowing through the disposed wastes and/or other mechanisms. Testing results from tidal and submerged lands in the vicinity of the Fillmore MGP and North Beach MGP indicate that contaminants levels fluctuate seasonally, confirming that groundwater flows transport MGP Waste contamination.

113.    The same process occurs at the Cannery MGP Site. As groundwater flows through the soil of the Cannery MGP Site, the functional equivalent of a direct discharge occurs: PAHs partition from the MGP Wastes and then are transported in the groundwater as it flows towards and ultimately into the Bay, which is approximately 250 feet downgradient of the Cannery MGP Site. This groundwater is hydrologically connected to the San Francisco Bay, flowing into the Bay, and conveying MGP Waste disposed by PG&E on the MGP Sites into the Bay.

114.    The Cannery MGP Site is located in San Francisco's Northshore Groundwater Basin. The Northshore Groundwater Basin is open to the San Francisco Bay. Groundwater in the Northshore Groundwater Basin flows roughly to the Northwest into the Bay and is known to be subject to seawater intrusion. Thus, contamination in such groundwater contaminates the Bay. Once it reaches the Bay, a certain amount of the PAH contamination will remain in the water

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

column, while the remainder will partition into the sediment, until it partitions back into the water column or something else, like a fish egg or larva.

115.    PG&E has affirmatively omitted and vigorously resisted testing of the groundwater at the Cannery MGP Site. However, where PG&E and/or others have tested groundwater within and near the footprint of the Additional MGP sites, the groundwater has been shown to contain high levels of PAH contamination as a result of MGP Waste. Such tests suggest a very high certainty that PAHs are migrating from the Cannery MGP Site to other locations via contaminated groundwater.

**E.      MGP Wastes Cause Direct Harm to Herring in the Vicinity of the Cannery MGP Site, Causing Cascading Negative Impacts to the Many Other Marine Species that Rely on Herring as a Food Source**

116.    Pacific herring (*Clupea pallasii*) are a keystone species in the pelagic food web. This is due to their traditionally very high levels of productivity and interactions with a high number of predators and prey. Thus, herring are an important source of food for many other species and serve as a bridge between plankton and other small food sources and larger animals, including larger fish, mammals, and a wide variety of bird species.

117.    Sub-adult and adult herring in schools are one of the major fodder animals of the sea, providing food for salmon, sharks, lingcod, and other fish species, as well as for sea birds, sea lions, and whales. Herring eggs are a major source of food in the areas where they are laid for various types of fish, including sturgeons, smelts, surfperches, and crabs, as well as for birds, including California gulls, mew gulls, glaucous-winged gulls, western gulls, American coots, and surf scoters.

118.     The San Francisco Bay is the main spawning and rearing habitat for the largest coastal population of Pacific herring along the continental United States. The San Francisco Bay herring fishery has been carefully managed for decades to ensure that a sufficient number of fish are allowed to escape to both ensure the long-term viability of the stock and to ensure there are sufficient herring and herring eggs available for predators.

119.    Herring traditionally spawn—laying their eggs to be fertilized, develop, and hatch into larval herring—in the substrate along the San Francisco waterfront, including areas in the immediate vicinity of the Cannery MGP Site and areas South and East along the waterfront as far as Hunter's Point.

120.    PAHs are very hazardous compounds and, owing to their lipophilicity—the ability to dissolve into fats—they can easily cross biological membranes and accumulate inside organisms, causing damage to the genetic material. PAHs are referred to as "genotoxic"— meaning they damage the genetic information within a cell, causing mutations.

121.    PAHs are known to have devastating effects to herring productivity and abundance, killing the fertilized eggs and larva that come in contact with them, including through a process known as photo-enhanced toxicity, and leading to the long-term weakening of swimming capacity of those fish that survive.

122.    Every year, herring return to the San Francisco Bay to spawn. Like many anadromous fish, the herring that return to the Bay were born in the Bay. Furthermore, a herring born in the Bay will return to spawn in the Bay in as many as eight yearly seasons. Thus, a loss of fertilized herring eggs or larval herring can have significant negative population consequences almost indefinitely into the future.

123.    Herring spawning East and South along the waterfront are also known to be washed, along with their fertilized eggs, out and around the waterfront to areas adjacent to the Cannery MGP Site where they often come to rest on the sediments of tidal and submerged lands there.

124.    As to herring in particular, significant scientific research—much of it catalyzed by oil spills—has shown that when fertilized herring eggs and larval herring are exposed to PAHs, very significant levels of mortality occur both acutely and over-time. In other words, PAH exposure both kills off a large portion of exposed fertilized eggs and larva and weakens those fish that survive the initial insult, decreasing the long-term survival of the fish, which, in turn, decreases the period of ecological services that the fish can provide. A healthy herring can return

to spawn in the San Francisco Bay every year for eight years or more. A fish killed at birth will return zero times to spawn; a fish that survives exposure but is weakened will return fewer times.

125.    Thus, the loss of herring eggs and larva has a multiyear ripple effect throughout the San Francisco Bay herring stock, which, in turn causes rippling effects throughout the marine ecosystem.

126.    One of the mechanisms by PAHs negatively affect herring is through a process known as "phototoxicity" or "photo enhanced toxicity." PAHs, due to their lipophilicity are uptaken into the cells of fertilized herring eggs and larval herring. Fertilized herring eggs and larval herring are translucent; thus, sunlight enters the cells of fertilized herring eggs and larval herring. When the cells of fertilized herring eggs and herring larvae into which PAHs have been uptaken are exposed to sunlight, a chemical reaction occurs, causing the oxygen molecules contained within such cells to reverse their orientation. Once reversed these oxygen molecules essentially burn the cells from the inside out, causing dramatic and generally mortal impacts to fertilized eggs and embryos. This effective "energization" of uptaken PAHs by sunlight means that even an uptake of a small quantity of conventionally measured PAHs, below that which would be expected to have lethal effects, causes lethal mortality in herring eggs and larva.

127.    This and other mechanisms cause exposure to PAHs to be a virtual death sentence for most exposed fertilized herring eggs and larval herring, with stock-based effects felt for years after.

128.    In addition, recent studies have indicated that other petroleum product components, in addition to PAHs, that are contained in, especially, low grade refined petroleum products like bunker fuel have lethal phototoxic effects on herring eggs and larva. Coal tar is recognized as one of the most toxic substances used to make bunker fuel, leading some regulatory authorities to ban the sale of bunker fuel containing it.

129.    Thus, the MGP Waste contamination of the waters of the Bay and the sediment of the tidal and submerged lands thereof presents, and/or may present, an imminent and substantial endangerment to the environment of the Bay, including its herring population. Exposure of fertilized herring eggs and herring larva to the PAHs and other toxic chemicals in the MGP

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Wastes has caused, and is reasonably certain in the future to cause reductions in the productivity and abundance and survival of the San Francisco Bay herring stock, with related long-term consequences for the health and survival of other marine species that rely on herring.

130.    The endangerment that the MGP Wastes presents, and/or may present in the future, to the San Francisco Bay herring stock, in turn, endangers, and/or may endanger in the future, the various other species that depend on the herring and the proper functioning of the pelagic food web as a whole.

131.    Among the animals that depend on herring for food are the birds and marine mammals that Clarke enjoys observing when he visits the area of the Cannery MGP and which he wishes to enjoy observing in the future.

**IV.    PG&E's Conduct with Regards to the SF Waterfront MGPs Requires the Establishment of an Environmental Remediation Trust to Manage the Investigation and Remediation of the Cannery MGP Site**

132.    PG&E has continually avoided its responsibility to comprehensively investigate and remediate MGP Wastes at the SF Waterfront MGP sites and the vicinity thereof.

133.    PG&E has acknowledged its responsibility for investigating and cleaning up the Cannery MGP in internal documents.

134.    However, publicly PG&E has denied even owning or operating the Cannery MGP.

135.    This opportunistic characterization of the facts depending on the audience demonstrates that PG&E cannot be trusted to adequately investigate and remediate the Cannery MGP even if ordered to do so, but rather must be ordered to fund an environmental remediation trust ("ERT") that will engage in such actions.

136.    The need for establishment of an ERT to investigate and remediate the Cannery MGP is further demonstrated by PG&E's conduct with regards to the Additional MGPs.

137.    PG&E has demonstrated that when left to its own devices—whether or not any regulatory agency is purportedly supervising it—it will do everything possible to avoid adequately investigating or remediating the contamination it is responsible for. This conduct further demonstrates that the creation of an independent ERT is needed to ensure that contamination from the Cannery MGP is adequately and efficiently investigated and remediated.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

2

     **A.**     **In 1991, PG&E Took Advantage of Divided and Weak State Regulatory Agencies to Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Marina Substation**

3

4

     138.     In 1984, the US/EPA identified a number of former MGP sites across the country that could pose a threat to health or the environment.

5

6

7

     139.     In 1986, PG&E and the US/EPA met and discussed a plan for investigating and remediating MGP sites in PG&E's service area. PG&E's plan included coordination with the California Environmental Protection Agency ("Cal/EPA").

8

9

10

11

     140.     US/EPA has a policy to transfer the administration of national programs to state and local governments to the fullest extent possible. Consistent with that policy, US/EPA deferred to Cal/EPA the responsibility for oversight of testing and remediation of the Additional MGP Sites. The US/EPA has not been involved since.

12

13

     141.     Subsequently, two branches of Cal/EPA became involved in these investigations: the DTSC and the RWQCB.

14

15

     142.     PG&E took advantage of ineffective regulation by Cal/EPA when the Marina Substation, a very small part of the North Beach MGP, was tested in 1991.

16

17

     143.     DTSC was the lead agency for oversight and classified the project as a State Response or National Priority List ("NPL").

18

19

     144.     Testing of the Marina Substation revealed significant PAHs in soil and groundwater.

20

21

22

23

     145.     A 1991 RWQCB memo clearly and unambiguously indicated that PG&E needed to test the wider area for MGP contamination, and stated: "should watch this case. I'm concerned that DTSC will sign off or not push [groundwater and environmental] risk issues. Also 'side' boundry [sic] definition could become an issue (RWQCB vs. DTSC)."

24

25

26

27

28

     146.     DTSC did attempt to "push" the risk issues initially—but ultimately failed. The Site Evaluation Tracking Sheet written by DTSC in December 1991 was unambiguous. It stated *inter alia*: "chemicals of concern are present in soil and groundwater . . . Additional investigations needed regarding sources and/or transport of chemicals in soil and groundwater . . . [Preliminary Endangerment Assessment] high priority . . . Further investigation

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

must include entire 9.5 acres [North Beach MGP site] . . .  Confirmed groundwater contamination at the site."

147.    Then in June 1992, DTSC wrote a strongly worded letter to PG&E stating that further action across the larger site was necessary. The letter cited the significant levels of PAHs found in both soil and groundwater. It said these were hazardous substances known to cause cancer. The letter emphasized the threat to health and the environment. DTSC wanted PG&E to test both soil and groundwater across the entire 9.5 acre site. The letter was a call to action.

148.    Notwithstanding its strongly worded letter, DTSC did not pursue the matter further, and PG&E ignored the request. The result was that no remediation of the substation—let alone even an investigation of the entire North Beach MGP Site—was done by PG&E for twenty years.

149.    DTSC effectively closed its file on the Marina Substation in 1992, and took no action to refer the investigation to RWQCB.

150.    These actions (and failures to act) by state regulatory agencies, in 1991-92, allowed PG&E to affirmatively avoid testing and remediating toxic MGP Wastes in the North Beach MGP Site that have been endangering the health and the environment for over twenty years. As DTSC suspected then, but did nothing about, it is now known that the larger area does, in fact, contain significant contamination from MGP Waste in soil and groundwater. Furthermore, extensive remediation has been necessary at almost every site investigated in the North Beach MGP Site to date.

**B.     In 1997, PG&E Used Questionable Means to Skirt State Regulatory Agencies and Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Gaslight Building**

151.    Adjacent to the Marina Substation portion of the North Beach MGP and sharing a large border is a property known as the Gaslight Building. The Gaslight Building is private property and ownership was changing hands in 1997. An investigation was initiated because one of the lenders was concerned about potential liability from contamination on the property.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

152.    As noted elsewhere herein, the 1997 testing of the Gaslight Building revealed significant PAHs from MGP Wastes at the site. The report for that investigation is called a Phase II Environmental Site Assessment ("P2ESA").

153.    Between the 1991 testing at the Marina Substation and the 1997 testing at the Gaslight Building, there was a little-known testing for MGP contamination at the Gaslight Building. This occurred in 1994. The testing is little known because it was not reported to any regulator at the time and only indirectly reported later by way of inclusion as a reference within a subsequent report. The contractor in 1994, soon after communications with PG&E, warned the owner of "close scrutiny" due to the history of the site and the fact that the North Beach MGP was listed in the CERCLA database. PG&E engaged in misconduct by its failure to report the contamination in 1994 and by conducting the 1997 investigation in a manner designed to avoid the regulators' demand for a wider investigation as had occurred after finding contamination during the 1991 investigation. PG&E's misconduct was an attempt to avoid both its responsibility for MGP contamination in the area and the likelihood that close scrutiny would reveal its nefarious activities.

154.    Not surprisingly, the 1997 P2ESA for the Gaslight Building contained findings similar to the 1991 PEA for the Marina Substation: significant PAHs; soil and groundwater contamination; and the suggestion that contamination was migrating through groundwater. In addition, the P2ESA identified high levels of naphthalene in shallow groundwater. The 1997 results reinforced what was known in 1991 – there was contamination throughout the larger North Beach MGP site.

155.    Despite these findings, PG&E, in an operation later called "scoop and run" by one regulator, performed a minimal remediation at the Gaslight Building. A narrow landscaping strip along one side of the property was excavated a few feet deep and the area replenished with clean soil and new plants. PG&E's justification for doing so little was: it is a commercial site rather than residential; most of the site is covered by buildings, patios, etc.; gardeners might be the only people coming into contact with contaminated soil. Groundwater and its ability to transport known highly toxic PAHs from the site to other locations, including residences, were ignored.

156.   Oversight of the 1997 Gaslight Building investigation and remediation was dubious. DTSC does not have the P2ESA or any other information about the 1997 Gaslight Building project in its files. A responsible individual at DTSC denies any knowledge of the 1997 Gaslight Building investigation and remediation.

157.   It is clearly evident that in connection with the 1997 Gaslight Building activity, PG&E once again actively ignored signs of contamination in the larger North Beach MGP area and thereby allowed the endangerment to health and the environment to persist for many years. There could be no question that, by 1997, PG&E knew that soil contamination, groundwater contamination, and the spreading of contamination via groundwater existed on a site that contained residences, schools, parks, etc. and bordered on the San Francisco Bay. PG&E also, again, exhibited a careless attitude—at the very least—toward state regulators in order to further its agenda.

158.   It is an unmistakable example of PG&E's irresponsible behavior that it remediated the Gaslight Building in 1997 to protect gardeners, while at the same time deliberately ignoring that conditions similar to those at the Gaslight building were likely to exist at other locations and thereby pose a threat to other members of the public. Indeed, the "black rocks" found in Clarke's home were later, in 2010, confirmed by PG&E to be the same material as found at the Gaslight Building. Thus, PG&E's twin actions – protecting one group of people from a known threat (for which PG&E is responsible) while simultaneously using devious means to avoid knowing if that same threat exists nearby (as is likely in the circumstances) – demonstrate a reckless disregard for the safety of the public.

**C.**   **Since 1977, PG&E Has Purposefully Ignored Indications of a Large Plume of MGP Waste from the Fillmore MGP and Failed to Report It to Regulatory Agencies or Initiate an Investigation of It**

159.   In 1977, test borings for a box sewer along Marina Boulevard found the area between Scott and Webster extensively contaminated with what was characterized as a "creosote" residue, but which would now be described as "MGP tar." The report said the contamination probably resulted from previous MGP activities in the area. PG&E, as the owner-operator of those MGPs, would have been informed at that time.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

160.    CCSF discovered the deposits in 1977 but did little more than record the findings in their report. The box sewer along Marina Boulevard got built, and no department in CCSF apparently saw the health and environmental endangerment caused by this contamination as part of their mission to address.

161.    The MGP Waste deposits along Marina Boulevard are located in what was historically a lagoon confined by Fair's Seawall when the North Beach and Fillmore MGPs were in operation. The Fillmore MGP fronted onto this lagoon in the same way the North Beach MGP fronted onto Gashouse Cove. The sediments in Gashouse Cove today are heavily contaminated with MGP Wastes. The area inland from Fair's Seawall was filled after the MGP ceased operations, in approximately 1912. That filling created a sizable part of the Marina district. Today, the lagoon and whatever contamination it contains is covered over by the Marina Green and perhaps 50 acres of San Francisco residential property.

162.    In 2010, PG&E was asked about their plans for investigation of the likely contamination behind Fair's Seawall. PG&E's initial response was that the soil and soil-gas investigation they initiated in 2010 would eventually include groundwater and that that testing would define any impacts in the subject area. Later, PG&E settled into the position that no investigation is needed because all the contamination is below the water table, i.e. in the groundwater. PG&E maintains that contamination in the groundwater cannot harm humans because no one comes in contact with it and no one drinks it. PG&E maintains that MGP contamination that is capped and left in place cannot harm the environment because PAHs are insoluble and immobile.

163.    As a result of the court mediated investigation that occurred during the Additional MGP Litigation, testing for MGP contamination in the lagoon was begun. However, as a result of the ending of that investigation before it fulfilled its purpose, that work is far from complete. There remains, at this writing, more that is unknown than what is known about contamination in this area.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1      164.    Indeed, despite the US/EPA's initiative in the 1980s to investigate MGP sites that

2  might pose a threat to health or the environment, neither DTSC nor RWQCB have any

3  information in their files about the 1977 creosote discovery or any projects to investigate the area.

4      **D.    PG&E Has Grossly Misled Plaintiff and the Public About Oversight on Past
        Investigations of MGP Waste**

5

6      165.    PG&E has repeatedly used fact sheets to shape the public perception of the MGP

7  Waste contamination at the North Beach and Fillmore MGP Sites and in the surrounding areas.

8  PG&E employs very carefully worded but nonetheless false and misleading statements about

9  earlier investigations. For example:

10      a.    Concerning the Gaslight Building remediation in the 1990s, PG&E says:

11  "We worked with one of these owners to remove soil from a portion of their property – no further

12  work was requested by the owner. This work was completed under the oversight of the Regional

13  Water Quality Control Board." This is referring to the "scoop and run" at the Gaslight Building in

14  1997 discussed above.

15      b.    Concerning Marina Substation testing in the 1990s, PG&E says: "The

16  other owner was satisfied with the test results and made no request for further work." This is

17  referring to the Marina Substation testing in 1991 discussed above.

18      166.    In the first quote, PG&E uses the word "oversight" to imply something

19  significantly more than what actually took place. As discussed, RWQCB had no knowledge of

20  this work and PG&E skirted the oversight through dubious means.

21      167.    In the second quote, PG&E speaks of an "other owner" who was apparently

22  satisfied with the test results and makes no request for further work. But the property is the

23  Marina Substation, so PG&E is committing a deception of omission by failing to mention that

24  ***PG&E itself*** is the "other owner." The fact that the entity liable for any remediation costs made

25  the decision that no remediation was necessary is a much different reality that is intentionally and

26  falsely suggested by the quote: to whit, that an independent third party gave the property a

27  passing grade. This is made further misleading by the fact that, while PG&E was satisfied and

28  made no request for further work, DTSC, RWQCB, and its own consultant were not at all

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   satisfied; and all three requested further work. Indeed, that the lead agency overseeing this

2   investigation, DTSC demanded (but was ignored) further work across the whole 9.5 acre North

3   Beach MGP Site and that both soil and groundwater be tested.

**E.    PG&E Has Ignored and Denied Responsibility for Contamination from the Cannery MGP, Which Remains Only Minimally Investigated and Completely Unremediated Due to PG&E's Willful Neglect**

6   168.   As discussed herein, PG&E has demonstrated its willingness to obscure the extent

7   of MGP-related contamination and the related health and environmental risks and to avoid

8   effective regulation of such contamination.

9   169.   PG&E's pattern of misinformation and regulatory avoidance extends to

10  contamination from the Cannery MGP.

11  170.   Although PG&E conducted a superficial investigation of the Cannery MGP Site in

12  1986 as part of the aforementioned investigation in cooperation with US/EPA, PG&E has since

13  repudiated any responsibility whatsoever related to the Cannery MGP.

14  171.   This followed an investigation in December 1985, by NPS consultants, which

15  include the results of a soil sample that contained 6000 parts per million ("ppm") of "creosote" (a

16  now-dated term generally used to refer to MGP tar wastes) in the single soil sample taken.

17  172.   Contemporaneous notes and communications regarding the test results stated

18  "[t]his is a relatively high level of creosote. Above 1000 ppm is considered as a suspected source

19  of ground water contamination;" "[t]his explains why some of the laborors [sic] were

20  complaining about ill effects during the test pit excavation. I recommend having PG&E do

21  additional tests;" and "We need to make every reasonable effort to find out whether or not this

22  stuff is under the warehouse. If it is we need to find out how deep it is."

23  173.   As a result of US/EPA's nationwide effort to locate and test former MGP sites, in

24  1986, PG&E offered to NPS to test surface soils at the Cannery MGP Site. The results showed the

25  highest PAH level of all the 25 former MGP sites tested by PG&E at the time.

26  174.   Despite these alarming results, which were reported to the US/EPA and the

27  RWQCB, no further investigation or remediation occurred at the Cannery MGP Site by PG&E or

28  NPS. Nor has any federal, state, or local regulatory agency ordered an investigation or cleanup of

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the site or its vicinity, mirroring their abdication of duty regarding addressing the contamination of public ROWs surrounding the Additional MGPs. PG&E, for its part, was more than willing skirt its investigation and remediation responsibilities by allowing memories of the contamination fade.

175.   Based on the known operations of the Cannery MGP, the limited investigation performed in the 1980s, and the contamination patterns that exist at the other MGPs along San Francisco's northern waterfront owned and operated by PG&E and its predecessors contemporaneously with PG&E's and its predecessor's ownership and operation of the Cannery MGP, the contamination existing at the Cannery MGP Site and areas offshore thereof most certainly include, without limitation:

a.   MGP tar deposits in the vicinity of and down gradient from two former gas holders;

b.   Groundwater contamination, including naphthalene and benzene, down gradient from the two former gas holders;

c.   MGP tar deposits in the vicinity of the former location of the coal wharf and crude oil tank;

d.   Groundwater contamination, including naphthalene and benzene, down gradient from the coal wharf and crude oil tank;

e.   Solid MGP Wastes—including high levels of PAHs—near the soil surface and at depth, as a result of on-site waste disposal, including in the eastern portion of the Cannery MGP Site where MGP Waste was used as fill and was discarded immediately onshore or directly into the San Francisco Bay, which was further created and distributed throughout the site and vicinity during demolition of the MGP;

f.   MPG tar deposits downgradient of tar wells and ground water contamination down gradient thereof; and

g.   Solid MGP Wastes and MGP tar deposits in the sediment of Fisherman's Wharf, Aquatic Park, and other offshore areas, as a result of direct disposal therein and redistribution from such direct disposal sites and onshore locations;

1     h. Contaminated pore water of such sediments and the water column above

2 caused by the partition of PAHs from MGP Wastes in the sediment; and

3     i. Contaminated water in Fisherman's Wharf, Aquatic Park, and nearby

4 offshore areas caused by PAHs partitioning from MGP Wastes on the Cannery MGP Site into

5 groundwater passing through the site and transporting the contamination until it is discharged into

6 the Bay.

7    176. The Cannery MGP Site is the current location of a large hotel, multiple restaurants,

8 shops, and a National Park Visitor Center. Extensive contamination exists under each of these

9 properties.

10    177. The area offshore of the Cannery MGP Site includes Aquatic Park, which is

11 extensively used by humans for recreation—including swimming—and is the home to many

12 types of wildlife.

13    178. PG&E's denial of responsibility for the contamination places at risk the health of

14 visitors, guests, and employees of these areas, and threatens the health of the natural environment

15 and its residents.

16    179. Unless the Court grants the relief requested herein—including the creation of an

17 independent Environmental Remediation Trust to manage investigation and remediation efforts—

18 the extent of contamination at the Cannery MGP Site will remain unknown and unaddressed.

19 **V.** **Plaintiff Has Complied with Applicable Notice Requirements under RCRA and the**
   **Clean Water Act**

20

21    180. On October 23, 2018, Plaintiff sent, via certified mail return receipt requested,

22 PG&E, DTSC, US/EPA, CAL/EPA, the State Water Resources Control Board, and the San

23 Francisco RWQCB, with written notice of PG&E's violations of RCRA and the CWA arising out

24 of PG&E's ownership and operation of the Cannery MGP.

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

## CLAIM FOR RELIEF

## FIRST CAUSE OF ACTION

**Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.***

181.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

182.    PG&E has contributed to the handling, storage, treatment, transportation, and disposal of MGP Waste on the Cannery MGP Site and the vicinity thereof.

183.    PG&E dumped, leaked, discharged, spilled, injected, and/or placed MGP Waste on the Cannery MGP Site and the vicinity thereof.

184.    PG&E dumped, leaked, discharged, spilled, injected, and/or placed MGP Waste originating from the Cannery MGP on and/or into the waters of the San Francisco Bay and tidal and submerged lands below the Bay, and/or MGP Waste from the Cannery MGP dumped, discharged, spilled, injected, and/or placed by PG&E elsewhere on and/or into land and/or groundwater in the vicinity of the San Francisco Bay leaked, and continues to leak, into the waters of the San Francisco Bay and the tidal and submerged lands below it.

185.    Such MGP Waste may present an imminent and substantial threat to health and/or the environment.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

**Violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.***

186.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

187.    PG&E has violated, and continues to violate, effluent standards and limitations as defined under section 505(f) of the CWA, 33 U.S.C. § 1365(f), by discharging pollutants into the waters of the United States without a permit required by CWA section 301(a), 33 U.S.C. § 1311(a).

188.    The toxic chemicals from the MGP Wastes located in the soil of the Cannery MGP Site qualify as pollutants, including without limitation based on their inclusion of carcinogenic

PAHs that are known to be harmful to marine life, including without limitation fertilized herring eggs and larval herring. Indeed, several of the PAHs at the Cannery MGP Site, are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15. The CWA defines "toxic pollutants" as "those pollutants, or combinations of pollutants . . . which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will . . . cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring." 22 U.S.C. § 1362(13). This definition is on all fours in relation to PAHs and their effects on fertilized herring eggs and larval herring.

189.    The Cannery MGP Site on which PG&E disposed MGP Wastes qualifies as a point source of these pollutants.

190.    These pollutants are discharged on the San Francisco Bay via groundwater that flows through the Cannery MGP Site into the Bay directly via MGP Wastes in soils on the Bay's shoreline, tidelands, and submerged lands; and/or via direct disposal by PG&E of the MGP Wastes into the Bay.

191.    The San Francisco Bay qualifies as navigable waters of the United States.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

### Violations of California State Negligence Law

192.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

193.    PG&E was grossly negligent in its acts and omissions concerning MGP Wastes at and/or in the vicinity of the Cannery MGP Site, including without limitation its storage, disposal, cleanup, and remediation of such MGP Wastes.

194.    Plaintiff has not released any claim for damages arising out of the Cannery MGP.

195.    The acts and omissions of PG&E alleged herein were done with malice, fraud, and/or oppression as herein set forth.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

196.     As a proximate result of these negligent actions, Plaintiff has been harmed including without limitation in the ways set forth herein.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Violations of California State Strict Liability Law

197.     Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

198.     PG&E was engaged in the operation and demolition of the Cannery MGP, which includes without limitation the creation and refinement of gas from coal and oil and disposal of wastes created thereby; the operation and demolition of an MGP constitutes an ultrahazardous activity.

199.     The harms suffered by Plaintiff, as set forth herein, are the kinds of harms that would be anticipated as a result of the risk created by operation of MGPs.

200.     Plaintiff has not released any claim for damages arising out of the Cannery MGP.

201.     The acts and omissions of PG&E alleged herein were done with malice, fraud, and/or oppression as herein set forth.

202.     As a proximate result of PG&E's operation of MGPs, Plaintiff has been harmed in the manners set forth herein.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and further relief as follows:

1.     This Court declare PG&E in violation of RCRA concerning the Cannery MGP.

2.     This Court declare PG&E in violation of the CWA concerning the Cannery MGP.

3.     This Court order the establishment of an independent environmental remediation trust (the "ERT") that will be responsible for remediating the MGP Waste contamination of the Cannery MGP Site and its vicinity, including offshore MGP Waste originating from the Cannery MGP, as alleged herein.

4.     This Court declare PG&E responsible for funding the ERT.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

5.      This Court order and restrain PG&E to pay into the ERT, over time, funds sufficient to affect the remediation of the MGP Waste contamination of the Cannery MGP Site and its vicinity as alleged herein.

6.      This Court order Defendants to pay civil penalties concerning the Cannery MGP, including without limitation pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 *et seq*.

7.      This Court award Plaintiff compensatory and punitive damages with respect to the Cannery MGP in an amount to be proved at trial;

8.      This Court award Plaintiff the costs of suit herein, including attorneys' fees and expert witness fees, including without limitation pursuant to 42 U.S.C. § 6972(e); and

9.      This Court grant such other and further injunctive, equitable, or legal relief as the Court deems just and proper.

Dated:  July 10, 2020              **GROSS & KLEIN LLP**

By: ___*/s/ Stuart G. Gross*_____
STUART G. GROSS

*Counsel for Plaintiff*

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

## DEMAND FOR JURY TRIAL

2          Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims

3   asserted in this Complaint so triable.

4

5

6   Dated:  July 10, 2020                    **GROSS & KLEIN LLP**

7

8                                           By:  ___*/s/ Stuart G. Gross*_____
                                                 STUART G. GROSS

9                                                *Counsel for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111