1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7

DAN CLARKE,

Case No.  20-cv-04629-WHO

8

Plaintiff,

9

v.

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS THE COMPLAINT**

10

PACIFIC GAS & ELECTRIC COMPANY,
et al.,

11

Defendants.

Re: Dkt. No. 10

12

13        Roughly one hundred years ago, as alleged by plaintiff Dan Clarke, defendants Pacific Gas

14   and Electric Company and PG&E Corporation (collectively "PG&E") left behind hazardous waste

15   created by its manufactured gas plants ("MGPs") along the northern waterfront of San Francisco.

16   Those plants have long since been abandoned.  In 2014, Clarke and the San Francisco Herring

17   Association ("SFHA") sued PG&E for contamination arising out of the Fillmore, North Beach and

18   Beach Street MGPs, formerly located in the Marina neighborhood where Clarke lived (the

19   "Marina MGP case").  That case ultimately settled.  Now Clarke seeks to sue PG&E for similar

20   contamination caused by another MGP, the Cannery MGP, formerly located in the area east of the

21   Marina neighborhood.

22        PG&E moves to dismiss Clarke's causes of action for violations of the Resource

23   Conservation and Recovery Act ("RCRA"), the Clean Water Act ("CWA"), and state strict

24   liability and negligence law.  Clarke plausibly alleges standing based on his recreational and

25   aesthetic interests: he continues to walk in the area but his enjoyment is diminished by the damage

26   PG&E's conduct is causing wildlife and the environment.  PG&E asks that I dismiss his RCRA

27   claim for lack of redressability, because injunctive relief may require access to property owned by

28   non-parties.  Such an argument may have merit after discovery, but it is premature at this stage.

United States District Court
Northern District of California

Clarke's remaining claims are insufficiently pleaded.  While he alleges an ongoing and continuous CWA violation, it appears that his claim first accrued outside the five-year statute of limitations.  He also fails to plead cognizable damages for his state strict liability and negligence claims, and additionally fails to describe an ultrahazardous activity for his strict liability claim.  For these reasons, PG&E's motion to dismiss the RCRA claim is DENIED, but its motion to dismiss the CWA, strict liability and negligence claims is GRANTED with leave to amend.

## BACKGROUND

My previous orders in the related Marina MGP case provide a summary of the litigation between the parties over the last six years.  *See San Francisco Herring Ass'n v. PG&E*, No. 14-cv-04393-WHO, Dkt. Nos. 44, 208, 233.[1]  Here, I focus on the factual allegations Clarke makes with respect to the Cannery MGP, whose site is along San Francisco's northern waterfront at roughly the midway point between the Fillmore MGP and the Beach Street MGP.  Complaint ("Compl.") [Dkt. No. 1] ¶ 2, Figure 1.  It "is located at the northern terminus of Columbus street and is within the San Francisco Maritime National Historical Park."  *Id.* ¶ 5.  "A hotel, restaurants, shops, and a National Park Visitor Center currently occupy the site," and the Aquatic Cove abuts the site.  *Id.* The National Park Service ("NPS") currently owns the Cannery MGP site.  *Id.* ¶ 71.

Similar to his prior allegations concerning the Fillmore, North Beach, and Beach Street MGPs, Clarke alleges that PG&E and its predecessors produced and stored gas manufactured from coal and crude oil at the Cannery MGP.  Compl. ¶ 50.  While PG&E has acknowledged its ownership and operations of the North Beach and Fillmore MGPs, as well as the resulting contamination in the vicinity of those MGPs, it has allegedly "refused its responsibility to investigate and remediate the Cannery MGP and its vicinity."  *Id.* ¶¶ 75, 78.  Limited soil samples

---

[1] The parties request judicial notice of pleadings and orders in the related Marina MGP case. Defendants' Request for Judicial Notice in Support of Motion to Dismiss [Dkt. No. 10-2] (requesting judicial notice of orders on PG&E's motion for summary judgment and motion to dismiss the Second Amended Complaint, as well as the Second Amended Complaint); Plaintiff's Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss [Dkt. No. 15-1] (requesting judicial notice of the original Complaint and Revised Consent Decree).  Both requests are GRANTED.  *See Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n. 1 (9th Cir. 1996) (a court may take judicial notice of its own orders in a related case); *No Cost Conference, Inc. v. Windstream Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1296 (S.D. Cal. 2013) (a court may take judicial notice of a complaint in a related case).

taken in 1985 by the NPS and later in 1986 by PG&E "indicate significant MGP contamination of soil and groundwater [in] the site and its vicinity." *Id.* ¶¶ 71–73.  Although PG&E shared its results with the U.S. Environmental Protection Agency and the Regional Water Board at the time, neither agency nor PG&E has required or performed any additional testing for MGP contamination or remediation of the Cannery MGP Site or the vicinity thereof.  *Id.* ¶ 74.

In sum, Clarke alleges that the Cannery MGP site and lands in the vicinity thereof, including tidelands and submerged lands, remain contaminated.  On a continuous and repeated basis, pollutants from the site make their way via groundwater and discharge into the Bay, endangering human and marine life.  *Id*, ¶¶ 96–102, 109–15.

Clarke asserts a RCRA claim against PG&E because it allegedly "dumped, leaked, discharged, spilled, injected, and/or placed MGP Waste on the Cannery MGP Site and the vicinity thereof" (Compl. ¶¶ 181–85); a CWA claim for alleged discharges of "MGP wastes" into San Francisco Bay (*id.* ¶¶ 186–91); and state law claims for negligence (*id.* ¶¶ 192–96) and strict liability for ultrahazardous activities (*id.* ¶¶ 197–201).  He seeks injunctive relief requiring PG&E to fund an Environmental Remediation Trust ("ERT") that would remediate the entire "Cannery MGP Site," and civil penalties under the CWA.  *Id.*, Prayer for Relief ¶ 3–5.  In addition, he seeks compensatory and punitive damages "with respect to the Cannery MGP."  *Id.* ¶ 7.

## LEGAL STANDARD

### I.    MOTION TO DISMISS UNDER RULE 12(B)(1)

"Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010).  The party invoking the jurisdiction of the federal court bears the burden of establishing that the court has the authority to grant the relief requested. *Id.*

A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to

invoke federal jurisdiction.  *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal.  *See Wolfe*, 392 F.3d at 362.

## II.    MOTION TO DISMISS UNDER RULE 12(B)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

## DISCUSSION

PG&E moves to dismiss the Complaint on the following grounds: (i) Clarke lacks standing to bring any of the alleged claims; (ii) he cannot establish redressability for purposes of injunctive relief standing for his RCRA claim because the relief he seeks would necessarily loop in non-parties; (iii) his CWA claim seeks retroactive application to discharges that took place before its enactment; (iv) his CWA claim is barred by the applicable statute of limitations and the concurrent remedy doctrine; (v) he lacks the damages required for his state law negligence and strict liability claims; and (vi) he cannot, as a matter of law, state a claim strict liability claim for ultrahazardous activity.  Pacific Gas and Electric Company and PG&E Corporation's Notice of Motion and Motion to Dismiss Complaint ("MTD") [Dkt. No. 10] 2.

## I.    STANDING

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

United States District Court
Northern District of California

1  redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

2  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally

3  protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or

4  hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

5      "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts

6  demonstrating' each element." *Spokeo*, 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490,

7  518, (1975)).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for

8  each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650

9  (2017) (citation omitted).

10      **A.    Injury in Fact**

11      Clarke initially raised three primary bases for his standing: (i) recreational and aesthetic

12  injuries; (ii) injuries to third parties; (iii) injury based on decision not to purchase home near the

13  Cannery MGP.  Compl. ¶¶ 14, 21, 23.  In his opposition, Clarke conceded that the latter two are

14  insufficient to establish standing, and focuses now on the first.  Plaintiff's Opposition to

15  Defendants' Motion to Dismiss Complaint ("Oppo.") [Dkt. No. 15] 7.[2]

16      The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact

17  when they aver that they use the affected area and are persons for whom the aesthetic and

18  recreational values of the area will be lessened by the challenged activity." *Cantrell v. City of*

19  *Long Beach*, 241 F.3d 674, 680 (9th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw*

20  *Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)).  In other words, "[t]he 'injury in fact'

21  requirement in environmental cases is satisfied if an individual adequately shows that she has an

22  aesthetic or recreational interest in a particular place, or animal, or plant species and that that

23  interest is impaired by a defendant's conduct." *Ecological Rights Found. v. Pac. Gas & Elec. Co.*,

24  874 F.3d 1083, 1093 (9th Cir. 2017) (hereinafter "*ERF*") (quoting *Ecological Rights Found. v.*

25  ─────────────────

26  [2] Although Clarke concedes that he cannot establish standing based on third party harms to
    "swimmers and rowers" who regularly exercise in the Cannery MGP area, he also cannot use them
27  to "further bolster his claim for standing."  Compl. ¶ 21; Oppo. 7; *see* Marina MGP case, Dkt. No.
    233 at 9 ("While Clarke sufficiently alleges standing based on his own recreational and aesthetic
28  interests, his attempt to further bolster standing based on potential injuries to third parties is
    improper.").

*Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (hereinafter "*Pac. Lumber*")).

Clarke alleges that he "habitually visits the areas affected by the contamination alleged in this action for aesthetic and recreational enjoyment, visiting the affected area alone and with family, friends, and guests from out of town, and he intends to do so in the future." Compl. ¶ 14. His "custom" is to "drive to the Marina Green and leave his car there, while [he] or [he] and his visitors, walk along the shoreline, including along Aquatic Park." *Id.* ¶ 16. While there, he "likes to show off the area he used to call home" and thinks about the "amazingly interconnected world we live in and how we share this beautiful environment with all God's creatures." *Id.* ¶¶ 16, 18.

He alleges that his "recreational and aesthetic enjoyment of the area" is diminished by "the contamination from the Cannery MGP and the harm it is causing to the environment of the affected area" and "by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment." *Id.* ¶¶ 19, 21. He highlights "[t]he harm that contamination from the Cannery MGP is causing to shorebirds, harbor seals, and sea lions in the marine areas offshore of the Cannery MGP site and the reductions it causes in their numbers—including through the reduction of herring and other fish on which they feed." *Id.* ¶ 19. He claims that "such enjoyment would be substantially increased if the contamination alleged in this action is addressed." *Id.* ¶ 22.

These allegations are quite similar to the ones he made in the Marina MGP case. Based on the allegations above, Clarke has sufficiently alleged a concrete and particularized recreational and aesthetic interest that is impaired due to PG&E's conduct. They are plausible: the Cannery MGP area is next to the Marina MGP area, so it is likely that his recreational activities and fondness for the area are similar. An environmental plaintiff "who uses an area for recreational purposes does not have to show that he or she lives particularly nearby to establish an injury-in-fact due to possible or feared environmental degradation"; "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *Pac. Lumber Co.*, 230 F.3d at 1149.

I found that substantially similar allegations were sufficient to establish standing in the

related Marina MGP case.  *See* Marina MGP case, Dkt. No. 233 at 7 (citing *ERF*, 874 F.3d at

1093–94).  I rejected PG&E's attempt then to narrow the standard of recreational and aesthetic

injuries by requiring Clarke to plead a "direct sensory impact" or diminished ability to enjoy an

activity, as opposed to diminished enjoyment of an activity.  *Id.* at 6–7.  PG&E repeats the same

argument here, and I remain unconvinced that the case law regarding recreational and aesthetic

injuries is as restrictive as PG&E suggests.  Because Clarke has pleaded sufficient facts to satisfy

the standard articulated by the Ninth Circuit in *ERF* and *Pac. Lumber*, I DENY PG&E's motion to

dismiss for failure to allege standing.

## B.      Redressability of the RCRA Claim

No matter whether Clarke has sufficiently alleged injury-in-fact based on aesthetic and

recreational injuries, PG&E contends that he cannot establish redressability for the injunctive

relief he seeks.  Neither he nor PG&E owns the property within the Cannery MGP site that he

wants investigated and remediated—the NPS does. MTD 13; *see* Compl. ¶ 71.

PG&E asserts that Clarke is required to allege that the NPS or any other third parties with

legal interests in those properties (e.g., lessees from the NPS) would allow access for remedial

efforts or could be required to provide it.  MTD 14.  The Complaint is devoid of such allegations,

so PG&E concludes that there is no redressability for the injunctive relief Clarke seeks.  *Id.*

Clarke responds that he is not required to plead how he will gain access to the property.  But if he

is, he states that it is "perfectly conceivable, if not probable, that the NPS would grant the access

necessary to allow the contamination left behind by PG&E remediated, free of cost to U.S.

taxpayers."  Oppo. 9.[3]

In the Marina MGP case, Clarke sought to establish standing based on his own injuries as

---

[3] Clarke additionally argues that even if access to remediate the property owned by the NPS could not ultimately be gained, remedying his injuries does not depend on gaining such access because "[he] could still gain an order that required an ERT or PG&E to engage in remedial activities in other areas, including public rights-of-way, tidelands, and submerged lands, that redressed the environmental harms of which he complains, including harms that are originating from the Cannery MGP Site."  Oppo. 10.  PG&E contends that would not make a difference because those other properties are also owned by non-parties, and Clarke does not allege that those non-parties would grant the required access for investigation and remediation.  Pacific Gas and Electric Company and PG&E Corporation's Reply in Support of Motion to Dismiss Complaint ("Reply") [Dkt. No. 19] 6.

United States District Court
Northern District of California

well as injuries suffered by third parties.  I rejected Clarke's attempt to establish standing based on

contamination beneath properties owned by third parties, such as current homeowners in the

Marina, and likewise found that such allegations did not establish redressability for purposes of

standing because "Clarke has not alleged that he has control or authority to grant access to any

properties for which he seeks injunctive relief, or that each of the private property owners or City

would allow any such relief."  Marina MGP case, Dkt. No. 233 at 10.  "Therefore, while Clarke

sufficiently allege[d] standing based on his own recreational and aesthetic interests," I concluded

that "he cannot establish injury in fact based on subsurface soil or groundwater contamination at

third parties' properties; the redressability he seeks for these claims goes beyond his own

purported injuries." *Id.* at 10–11.  I allowed the RCRA claim based on his own recreational and

aesthetic injuries to proceed.

   PG&E challenged the redressability of Clarke's injuries by arguing that investigations and

actions to address MGP residues in the Marina were actively ongoing and/or completed.  *Id.* at 11.

Because "[b]oth parties spen[t] much time debating whether PG&E has done enough to moot

Clarke's RCRA claim," I found the "dispute is factual in nature, and improper to consider at the

pleadings stage."  *Id.*  PG&E's challenge here is different: it does not contend that it has done

enough to moot Clarke's claim.  Instead, it argues that Clarke's requested injunctive relief would

ultimately require access to subsurface soils, sediments, and groundwater on properties owned by

a federal agency, the NPS, which is not a party, and that necessarily dooms the redressability of

his RCRA claim.

   The Ninth Circuit has decided "that the statutory language permitting suits against 'any

person . . . who has contributed or who is contributing' to the handling, storage, treatment,

transportation or disposal of hazardous waste, [42] § 6972(a)(1)(B), requires that a defendant

be *actively involved* in or have *some degree of control over* the waste disposal process to be liable

under RCRA."  *Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011) (citing 42

U.S.C. § 6972(a)(1)(B)) (emphasis added).  In light of this contributor liability language, Clarke

argues that nothing in RCRA limits plaintiffs to the current owners of contaminated properties –

*i.e.*, there is no requirement that, at the time of suit (or at any other time), a defendant who had

such active involvement or control, own the property where the waste was disposed. He contends that such a requirement was rejected in *United States v. Price*, 523 F. Supp. 1055, 1072 (D.N.J. 1981), *aff'd*, 688 F.2d 204 (3d Cir. 1982), where the court held that defendants' "sale of the property [where contaminants were disposed] did not relieve them of their accountability under [RCRA]." *See also id.* (noting that "society's interests in deterring the improper disposal of hazardous wastes and in alleviating serious hazards as quickly as possible mandate that those responsible for the disposal of such wastes not be able to shirk their statutory responsibilities by simply selling the property on which the wastes are stored"); *Delaney v. Town of Carmel,* 55 F. Supp. 2d 237, 256 (S.D.N.Y.1999) ("The term ['contributed to'] has been universally held to infer something more than mere ownership of a site; some level of causation between the contamination and the party to be held liable must be established.").

PG&E's cited authority is not particularly helpful to the question before me. Its sole RCRA case, *Sierra Club v. Chesapeake Operating, LLC*, 248 F. Supp. 3d 1194 (W.D. Okla. 2017), was not decided in the context of dismissing an unredressable RCRA claim. Rather, the court was deciding whether to "decline to exercise jurisdiction over the action under the *Burford* abstention and primary jurisdiction doctrines because the Oklahoma Corporation Commission [("OCC")] ha[d] taken action in response to the increased seismicity caused by wastewater disposal activities." *Id.* at 1199. The court found that dismissal of the action was appropriate under the *Burford* abstention doctrine because "the primary relief that plaintiff [sought] for its RCRA claim [was] available from the OCC." *Id.* at 1204. In drawing this conclusion, it responded to one of plaintiff's arguments that "it also seeks relief under RCRA in the form of an order requiring defendants to," among other things "reinforce vulnerable structures that current forecasts indicate could be affected by major earthquakes," a form of relief purportedly not available from the OCC. *Id.* The court rejected the argument because "[a]lthough RCRA provides that the court has jurisdiction [] 'to order such person to take such other action as may be necessary,' *see*, [section] 6972(a), the court has found no authority to support a requirement, mandated by this court, that the defendants reinforce vulnerable structures, including vulnerable structures owned by third parties who are not before the court seeking that relief." *Id.*

9

United States District Court
Northern District of California

1    Even if the holding in *Chesapeake Operating* can be imported to the redressability

2    question, the alleged facts here are different. Clarke is not seeking to redress third-party harms by

3    accessing properties owned by third parties, as was the issue in the Marina MGP case. *See* Marina

4    MGP case, Dkt. No. 233 at 10 (citing *Chesapeake Operating* and holding that Clarke "has not

5    alleged how redressing third-party harms necessarily related to his own injuries"). Instead, he is

6    seeking relief that would benefit him, *i.e.*, cleaning up the waste that diminishes his aesthetic and

7    recreational enjoyment of the area. Whether NPS would grant access to PG&E to perform the

8    requested relief is an open question, but PG&E has not provided me with adequate case law that

9    supports dismissal at the pleadings stage.

10    In short, I cannot conclude that Clarke's RCRA claim based on recreational and aesthetic

11    injuries is unredressable at this stage. If discovery establishes that the NPS will not grant access to

12    PG&E to investigate and/or remediate its contributions to that contamination, PG&E may raise

13    this issue on summary judgment. Most RCRA redressability issues, which seem to arise in the

14    context of whether a defendant has done enough to moot a plaintiffs' claim, are fact-intensive and

15    resolved after the pleadings stage. *See* Marina MGP case, Dkt. No. 233 at 11 (dispute over

16    whether PG&E has done enough to moot Clarke's RCRA claim is "factual in nature and improper

17    to consider at the pleadings stage"); *id.* at 12 ("flawed requested remedy is not sufficient basis for

18    dismissal"); *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1104 (D.C. Cir. 1985) ("[I]t need not

19    appear that the plaintiff can obtain the specific relief demanded as long as the court can ascertain

20    from the face of the complaint that some relief can be granted."); *accord generally Lujan*, 504

21    U.S. at 568–70 (addressing the question of redressability with reference to the actions of third

22    parties at the summary judgment stage). [4]

23

24    _____

[4] One wonders if the issue here isn't whether NPS is an indispensable party under Rule 19, but that

25    issue too should await discovery. *See Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-CV-4117
      JAP, 2013 WL 103880, at *19 (D.N.J. Jan. 8, 2013) (in denying Middlesex County's motion to

26    dismiss the RCRA claim against it as moot, the court noted that plaintiffs, in their opposition,
      "withdrew their claim against the County but did not release the County from the lawsuit since the

27    County is a necessary party because it owns property on the Site, which will likely need to be
      accessed during remediation"); *see Steel Valley Authority v. Union Switch and Signal

28    Division*, 809 F.2d 1006, 1013–14 (3d Cir. 1987) (a property owner is a party to be joined to an
      action if injunctive relief would interfere with its rights).

1    PG&E's motion to dismiss the RCRA claim for lack of redressability is DENIED.

2    **III.    CWA CLAIM**

3            To state a claim under the CWA, a plaintiff must allege "(1) the ongoing addition of (2) a

4    pollutant (3) to the navigable waters of the United States (4) from a point source (5) without a

5    permit (or in violation of a permit)."  *Woodward v. Goodwin*, No. C 99-1103 MJJ, 2000 WL

6    694102, at *5 (N.D. Cal. May 12, 2000).  PG&E argues that Clarke has failed to state a claim for

7    relief under the CWA for two reasons: (i) Clarke fails to allege an "ongoing" violation and rather

8    seeks improper retroactive application of the CWA; and (ii) his CWA claim for penalties is barred

9    by the five-year statute of limitations of 28 U.S.C. § 2462 and his claim for injunctive relief is

10   likewise barred under the concurrent remedy doctrine.  MTD 14–19.

11           **A.    Ongoing Violations**

12           "Taking its cues from the present-tense syntax and the legislative history, the Supreme

13   Court has confirmed that standing under the CWA requires that 'the harm sought to be addressed

14   by the citizen suit lies in the present and the future, not in the past.'"  *Woodward*, 2000 WL

15   694102, at *6 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49,

16   59 (1987)).  Subject-matter jurisdiction therefore exists only where "the citizen plaintiffs make a

17   good-faith allegation of continuous or intermittent violation."  *Gwaltney*, 484 U.S. at 64.  The

18   Court rejected the suggestion that a heightened pleading standard be imposed, concluding that

19   Federal Rule of Civil Procedure 11 protects defendants from factually baseless assertions of

20   ongoing or intermittent violations of the Act.  *Id.* at 65.

21           Contrary to PG&E's contention, Clarke's CWA claim does not require retroactive

22   application of the statute.  His allegations are based on PG&E's alleged ongoing and continuous

23   violations, namely that PG&E "continues to violate" the CWA due to repeated unpermitted

24   discharges of pollutants into the San Francisco Bay from the remains of the Cannery MGP Site

25   (Compl. ¶¶ 113, 175(i) 187, 189–90), as well as through its illegal failure to do anything to stop

26   those discharges (*id.* at ¶¶ 75–79, 107, 115).

27           Clarke makes substantially similar allegations of continuous, ongoing violations of the

28   CWA as those that I found were adequate in the Marina MGP case:

United States District Court
Northern District of California

> In the instant case, the plaintiffs have provided enough facts to support an ongoing regulatory violation. The complaint explicitly states that 'PG&E has violated, and continues to violate, effluent standards and limitations as defined under section 505(f) of the CWA . . . by discharging pollutants into the waters of the United States without a permit . . . .' Compl. ¶ 215. It supports this allegation with facts that 'toxic chemicals from the MGP Wastes located in the soil of the MGP Sites' are continually discharged into the Bay. *Id.* ¶¶ 216–18.
>
> Significantly, the complaint also alleges that PG&E's current behavior contributes to ongoing violations relating to the MGP discharges. It provides that PG&E's refusal to test for contaminants in groundwater that serves as a conduit means that MGP sites will '*continue* to present an imminent and substantial endangerment to human health and the environment . . . .' *Id.* ¶ 169 (emphasis added).

*San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 861 (N.D. Cal. 2015); *see, e.g.*, Compl. ¶ 115, 187–91.

Accordingly, I find that Clarke has adequately alleged an ongoing discharge that does not seek retroactive application of the CWA. PG&E's motion to dismiss the CWA claim on this ground is DENIED.

### B.   Statute of Limitations and the Concurrent Remedy Doctrine

That said, whether Clarke's "continuous or intermittent violation" allegation is within the five-year statute of limitations under 28 U.S.C. § 2462 is a separate question. *See HEAL Utah v. PacifiCorp*, 375 F. Supp. 3d 1231, 1249–50 (D. Utah 2019) (differentiating "'continuous violations' in the context of [section] 2462" and "the separate jurisdictional requirement prescribed in *Gwaltney*"; finding "good reason to view the *Gwaltney* jurisdictional requirement and [section] 2462 differently" because "[a]lthough both standards deal with a similar issue—the import of a violation's ongoing effects—they serve distinct purposes").[5]

Section 2462 provides a five-year limitations period for Clarke's CWA claim from the date when the cause of action "first accrued". *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517,

---

[5] *See Friends of Warm Mineral Springs, Inc. v. McCarthy*, No. 8:13-cv-3236-R-23TGW, 2015 WL 2169241, at *3 n.6 (M.D. Fla. May 8, 2015) ("The parties in this action and the opinions in many other actions conflate the limitation in 28 U.S.C. § 2462 with the jurisdictional requirement in 33 U.S.C. § 1365(a). 28 U.S.C. § 2462 forbids liability under 33 U.S.C. § 1311(a) if more than five years has passed between the accrual of the claim and the filing of the complaint. Separately, 33 U.S.C. § 1365(a) 'require[s for jurisdiction] that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'") (quoting *Gwaltney,* 484 U.S. at 57).

12

1521–23 (9th Cir. 1987) (federal five-year limitation period applies to citizen action seeking enforcement of civil penalties under CWA).  The date when the claim first accrues under section 2462 is the date of the underlying violation, not the date of discovery.  *Gabelli v. S.E.C.,* 568 U.S. 442, 447–48 (2013) ("[A] claim accrues when the plaintiff has a complete and present cause of action[.]") (quoting *Wallace v. Kato,* 549 U.S. 384, 388 (2007)).

Because Clarke alleges that discharges began while the Cannery MGP was still operating, PG&E argues that to the extent any CWA claim could be asserted, it would have first accrued, at the latest, when the CWA permitting requirements became effective in 1973 (*i.e.*, the date its conduct constituted a violation).  Given then that Clarke's CWA claim for penalties would be barred by the five-year statute of limitations under section 2462, it argues that equitable remedies based on the same set of facts are likewise barred by the concurrent remedy doctrine.  *See Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240 (9th Cir. 1996) ("[E]quity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy.") (quoting *Cope v. Anderson*, 331 U.S. 461, 463–64 (1947)).

The timeliness of Clarke's claim depends on whether his allegations involve a "single, continuing violation" of the CWA or "repeated, discrete violations" of the CWA.  If it is the former, his CWA claim is time-barred because the alleged contamination "first accrued" decades ago while the Cannery MGP was operating, when it was demolished, or when PG&E's conduct became a violation upon the CWA's enactment, all of which are well before the five-year statute of limitations.  If it is the latter, his claim is not time-barred because each alleged action, including ones within the last five years, is a discrete CWA violation.  Without much guidance from the Ninth Circuit on the difference between a "single, continuing violation" and "repeated, discrete violations", I turn to the cases cited by the parties.

PG&E contends that Clarke has alleged a "single, continuing violation" such as those at issue in *Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d 666, 674 (10th Cir. 2016) and *HEAL Utah v. PacifiCorp.*, 375 F. Supp. 3d 1231, 1249 (D. Utah 2019).  In *Oklahoma Gas*, the Tenth Circuit held that an action for civil penalties based on a "single, continuing violation" of the Clean Air Act ("CAA")—the unpermitted construction of a facility—accrued on the first day of

United States District Court
Northern District of California

United States District Court
Northern District of California

1   unpermitted construction.  816 F.3d at 672.  "[A]ny penalties stemming from the alleged violation

2   [were] therefore time-barred," as that construction had occurred more than five years before the

3   complaint was filed.  *Id.* at 673.  It rejected plaintiff's argument that the statute of limitations

4   should be equitably tolled based on the continuing violation doctrine, holding that application of

5   the doctrine was barred because 28 U.S.C. § 2462 explicitly provided for its limitation period to

6   begin running on the date the claim "*first* accrue[s]."  *Id.* at 673 (quoting 28 U.S.C. § 2462)

7   (emphasis in original).

8          The Tenth Circuit distinguished "between a single, continuing violation and repeated,

9   discrete violations," finding that when the latter exists "an entirely new violation would first

10  accrue apart from the other violations in the series and would begin a new statutory clock."  *Id.* at

11  672 n.5.  "In contrast, a single, continuing violation would not extend the limitations periods of

12  [section] 2462 because the statute would begin to run as soon as that violation *first* accrued and

13  would not reset thereafter."  *Id.* (emphasis in original).

14         The Tenth Circuit also rejected plaintiff's argument that where a continuing violation

15  exists, the limitation period under section 2462 does not begin to run until the final day of the

16  violation.  *Id.* at 672.  It found that a claim "accrues as soon as the plaintiff can file suit and obtain

17  relief" and "a continuing violation is actionable even before the last act of the violation where the

18  conduct that has already occurred is sufficient to support a claim."  *Id.* at 673.   Accordingly, it

19  concluded that plaintiff's cause of action "first accrued" on April 1, 2008, the day of unpermitted

20  construction or modification in violation of the CAA, "even if the violation continued until some

21  later date."  *Id.*   Given that "[a]ny penalties stemming from the alleged violation [were] time-

22  barred", it found that plaintiff's request for declaratory and injunctive relief was also time-barred

23  under the concurrent remedy doctrine "because the equitable claims [were] based on the same

24  facts supported the time-barred legal claim."  *Id.* at 673, 675.

25         The District Court of Utah in *HEAL* followed *Oklahoma Gas* and found that the CWA

26  claims were time-barred based on similar facts.  375 F. Supp. 3d at 1249.  There, environmental

27  organizations brought an action against a power plant operator, alleging that the power plant

28  violated the CWA when it installed a "collection system" between 2007 and 2008, which was

connected to the unpermitted discharge of fill material into the waters of the United States at its power plant. *Id.* at 1238–39. The environmental organizations argued that their CWA claim, brought in 2016, was not time-barred under section 2462 because the power plant "[was] in 'continuing violation' of the CWA each day the fill material remains in place." *Id.* at 1248.

The court rejected that argument, finding that "[a]s in *Oklahoma Gas*, [the power plant's] addition of fill materials to jurisdictional waters during the installation of the collection system gave rise to a claim that first accrued outside the statutory period, even if its effects continued." *Id.* at 1249. The environmental organizations "could have filed suit and obtained relief beginning in 2007 or 2008 at the latest, meaning the statute of limitations was exhausted no later than sometime in 2013—several years before the 2016 filing of [the] lawsuit." *Id.* The enduring presence of the fill material "[was] at best a 'continuing violation' which, under *Oklahoma Gas*, [did] not reset [section] 2462's statutory clock." *Id.*

Clarke advances two theories that he contends are different than the time-barred claims in *Oklahoma Gas* and *HEAL*—ongoing migration via groundwater and failure to test or remediate. For his first theory, he asserts that *Oklahoma Gas* and *HEAL* involved a "single" violation that started long ago and continued to this day—*i.e.*, a discrete statutory violation that occurred one time and was not remedied. By contrast, he alleges that PG&E's violations of the CWA are multiple and continuous, a new violation occurring and a new claim accruing each time pollutants from the Cannery MGP are discharged into the Bay. Oppo. 18–19 (citing Compl. ¶¶ 113-14, 187–90). He contends that his claim does not involve a "single" violation, as in *Oklahoma Gas* and *HEAL*, but rather falls into the "repeated, discrete violations" recognized in *Oklahoma Gas*, where "[each violation] begin[s] a new statutory clock." *Oklahoma Gas*, 816 F.3d at 672 n.5.

I am not convinced that Clarke's allegations amount to a set of discrete unlawful acts within the last five years that would not be time-barred by section 2462. The cited paragraphs of his Complaint do not clearly allege "discrete," "repeated," or "multiple" CWA violations. To the contrary, the Complaint alleges that an "ongoing migration" of contaminants through groundwater is "the functional equivalent of *a direct discharge*[.]" Compl. ¶¶ 112-113 (emphasis added). This appears to involve only one discharge (not multiple discharges or discrete discharges), which

15

1    would amount to a single violation that first accrued decades ago, during the operation or

2    demolition of the Cannery MGP, but continues and remains un-remedied till this day.

3           Even if the "ongoing migration" constitutes a series of separate "discharges," as Clarke

4    contends, the Complaint does not explain why that would still not constitute a "single violation,"

5    as the term is used *Oklahoma Gas* and *HEAL*.  *See Oklahoma Gas* 816 F.3d at 672 (explaining

6    that a "single violation continues over an extended period of time 'when the plaintiff's claim seeks

7    redress for injuries resulting from a series of separate acts that collectively constitute one unlawful

8    act' as opposed to 'conduct that is a discrete unlawful act.'") (*quoting Shomo v. City of New York*,

9    579 F.3d 176, 181 (2d Cir. 2009)).  Counsel for Clarke spent much time at the hearing explaining

10   how Clarke's claims involve multiple discrete violations of the CWA, but the fact of the matter is

11   that the Complaint, on its face, does not make those allegations.

12          Clarke's second "failure to act" theory fares no better.  He argues that the application of

13   *Oklahoma Gas* to find his CWA claim untimely is inappropriate because his claim is also based on

14   PG&E's current and ongoing illegal refusals to do any investigation or remediation that could stop

15   the discharges.  Oppo. 19; Compl. ¶¶ 8-12, 75–79, 107, 115.  In support of this theory, he cites to

16   *Colorado Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United*

17   *States*, 381 F. Supp. 3d 1300, 1311 (D. Colo. 2019), where the court found *Oklahoma Gas*

18   inapplicable because "[p]laintiff's claim alleges a failure to act," and because defendants "failed to

19   take required action, there is no way to identify a discrete act at a specified point in time" from

20   which the statute of limitations can be calculated.

21          Clarke's reliance on *Colorado Dep't of Pub. Health* is inapposite.  That case involved a

22   Colorado statute of limitations that "uses critically different language" than 28 U.S.C. § 2462, the

23   statute analyzed in *Oklahoma Gas* and applicable here.  *Colorado Dep't of Pub. Health*, 381 F.

24   Supp. 3d at 1310.  Section 2462 "requires any action for failure to obtain a mandatory pre-

25   construction permit to be brought 'within five years from the date when the claim *first accrued*.'"

26   *Id.* (quoting *Oklahoma* Gas, 816 F.3d at 671) (emphasis added).  "By contrast, [Colorado's statute

27   of limitations] begins to run when the department *discovers a violation*."  *Id.* (emphasis added).

28   Clarke does not adequately explain why his "failure to act" theory satisfies, or can circumvent, the

1  "first accrued" language of section 2462.

2  Because the Complaint fails to allege a timely CWA claim for penalties under section

3  2462, the related CWA claim for injunctive relief is likewise barred by the concurrent remedy

4  doctrine. PG&E's motion to dismiss the CWA claim on these grounds is GRANTED with leave

5  to amend.[6]

6  ## IV.    STATE LAW CLAIMS

7  ### A.    Viable Claim for Damages

8  PG&E moves to dismiss Clarke's negligence and strict liability claims on grounds that he

9  has not stated a viable claim for damages. MTD 19–20. Clarke contends that refraining from

10  buying a new home was a detriment that was proximately caused by PG&E's acts and omissions,

11  and therefore is sufficient to satisfy his burden to allege harm resulting from PG&E's negligence

12  and conduct for which it is strictly liable. Oppo. 22 (citing Compl. ¶ 23).

13  PG&E asserts that this argument fails for three reasons. First, the decision not to search

14  for a new house in a particular location is not a cognizable injury because it would not constitute

15  personal injury, property damage, or economic loss; Clarke cites no authority for the proposition

16  that his choice not to look for another house in the area constitutes any other type of compensable

17  injury. Reply 12.[7] Second, even if Clarke had standing to seek damages, he could not do so here

18  because such damages would be entirely speculative. *Id.* Third, even if he overcame those

19

20  ───────────

21  [6] PG&E also contends that the Complaint does not clearly allege that failure to investigate or
remediate violated the CWA, and even if it did, such claims are not within the permissible scope

22  of a CWA in the absence of a prior agency order directing investigation or remediation. Reply 11;
*see* Compl. ¶ 174 (recognizing that no "regulatory agency" has "ordered an investigation or

23  cleanup of the site or its vicinity[.]"). Because this argument was raised in PG&E's reply brief,
and Clarke did not squarely address it at the hearing, the issue is not ripe for my decision. But if

24  Clarke chooses to amend his Complaint to bring CWA claims based on a "failure to act" theory,
he should include allegations that support his theory and address the concerns raised in PG&E's
reply brief.

25  [7] Although anxiety can be a form of emotional distress, PG&E argues that its availability as a

26  basis for damages in California is limited to three categories, all inapplicable here: "negligent
mishandling of a corpse; negligent misdiagnosis of a disease; or negligent breach of a duty arising

27  out of a pre-existing relationship, as required for emotional distress damages as a 'direct' victim."
CACI Instruction No. 1620 (*citing Burgess v. Superior Court*, 2 Cal. 4th 1064, 1076 (1992)).

28  Clarke does not respond to this argument in his opposition brief, and instead only focuses on the
alleged harm of not purchasing a home.

United States District Court
Northern District of California

hurdles, Clarke cannot bootstrap claims relating to the Marina MGPs into this case given his dismissal of such claims; he fails to allege that his injury arose from the Cannery MGP itself. *Id.* at 13.

I agree that Clarke's "refrain from buying a home" theory of injury is merely speculative. The theory is premised on allegations regarding purported "health risks" from the "unknown extent" of MGP Waste—he decided not to look for a house in the area because of health risks he might encounter from "possible exposure to unremediated MGP Wastes should he buy another home in the area." Compl. ¶ 23.

As I previously held in the Marina MGP case, Clarke's alleged health concerns—based on his alleged routine handling over 18 years of "black rocks" that he claimed were cancer causing— were too speculative to constitute a "concrete injury" for purposes of standing. Marina MGP case, Dkt. No. 233 at 8–9. This Complaint's unspecified "health risks" from "possible exposure" in the hypothetical scenario of Clarke buying another home in the area is even more speculative.

Nor are those allegations plausibly tied to the Cannery MGP itself. Clarke only points to paragraph 23 in his Complaint, which reads:

> After Clarke sold his previous home to PG&E as a result of the contamination of the neighborhood and the inability to reach an agreed-upon plan with PG&E for remediating his home, Clarke refrained from searching for a new residence along San Francisco's northern waterfront because of the unknown extent of MGP Wastes from the SF Waterfront MGPs and the related health risks from possible exposure to unremediated MGP Wastes should he buy another home in the area.

Compl. ¶ 23. Paragraph 23 generally refers to "SF Waterfront MGPs", which includes the Fillmore, North Beach, Beach Street, and the Cannery MGPs. *Id.* ¶¶ 2, 23. Clarke does not allege that he could have or would have purchased a home in the area of the Cannery MGP site, nor does he try to claim that the Cannery MGP caused contamination in other residential areas where he used to live or would like to live.

PG&E's motion to dismiss the negligence and strict liability claims on this basis is GRANTED with leave to amend.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**B.      Ultrahazardous Activity**

PG&E moves to dismiss Clarke's strict liability claim for the additional reason that, as a

matter of law, operation of an MGP was not "uncommon," and could be made safe through the

exercise of due care.  MTD 21–22.

"The doctrine of ultrahazardous activity provides that one who undertakes an

ultrahazardous activity is liable to every person who is injured as a proximate result of that

activity, regardless of the amount of care he uses."  *Pierce v. Pacific Gas & Electric Co.,* 166 Cal.

App. 3d 68, 85 (1985).  The doctrine "focuses not on a product and its defects but upon an activity

intentionally undertaken by the defendant, which by its nature is very dangerous."  *Id.*  "[T]he

doctrine scrutinizes not the accident itself but the activity which led up to the accident."  *Id.*

Six factors apply to determine whether an activity should be classified as ultrahazardous:

[1] "existence of a high degree of risk of some harm to the person, land or chattels of others; [2]

likelihood that the harm that results from it will be great; [3] inability to eliminate the risk by the

exercise of reasonable care; [4] extent to which the activity is not a matter of common usage; [5]

inappropriateness of the activity to the place where it is carried on; and [6] extent to which its

value to the community is outweighed by its dangerous attributes."  *Edwards v. Post*

*Transportation Co.,* 228 Cal. App. 3d 980, 985 (1991).  While "the several factors are to be

considered together and "establishment of one factor alone is usually not sufficient to categorize

an activity", the California Supreme Court "has limited the doctrine of ultrahazardous activity to

encompass only activities which are neither commonplace nor customary." *Id.*; *Pierce,* 166 Cal.

App. 3d at 85 (citation omitted).

PG&E cites multiple cases that have disposed of strict liability claims involving the

delivery of power or the operations of power plants.  *See, e.g.*, *Pierce,* 166 Cal. App. 3d at 85

(finding public utility's maintenance of high-voltage power systems is not an ultrahazardous

activity because it "has become pervasive and is now entirely commonplace"); *United States v. S.*

*California Edison Co.*, 300 F. Supp. 2d 964, 991 (E.D. Cal. 2004) (granting motion to dismiss

because "[u]nder California law, the activities of power plants are not classified as ultrahazardous

for the purposes of the strict liability doctrine").  It also points out that at the time of the MGP

1    operations in the late 1800s and early 1900s, production and delivery of manufactured gas was at

2    least as common as the delivery of electricity, if not more so.  *See, e.g., Davoust v. City of*

3    *Alameda*, 149 Cal. 69, 72 (1906) ("There is obviously no distinction, so far as the law on the

4    subject is concerned, between an electric plant for furnishing light, which is comparatively a new

5    thing, and a gas plant maintained for the same purpose").  Because operation of an MGP was not

6    an unusual or abnormal activity, PG&E contends that it cannot be considered an ultrahazardous

7    activity.

8        Clarke responds that his allegations are not just based on operation of a power plant and

9    power lines but rather "the operation and demolition of the Cannery MGP . . . [and] the creation

10   and refinement of gas from coal and oil and disposal of wastes created thereby . . . constitutes an

11   ultrahazardous activity."  Compl. ¶ 198.  Given the inherently factual nature of the determination

12   whether an activity is ultrahazardous, he argues that it would be inappropriate to resolve this

13   determination on a motion to dismiss.  Oppo. 23.

14       While the inquiry of whether an activity should be classified as ultrahazardous requires

15   fact-specific analysis regarding the activity in question, strict liability claims are still subject to

16   dismissal at the pleadings stage if they are not plausibly pleaded.  Courts have dismissed strict

17   liability claims for failure to allege an ultrahazardous activity.  *See supra*, *California Edison Co.*,

18   300 F. Supp. 2d at 99; *see also Greenfield MHP Assocs., L.P. v. Ametek, Inc.*, 145 F. Supp. 3d

19   1000, 1010 (S.D. Cal. 2015) (dismissing strict liability claims because "[p]laintiffs cite no cases

20   supporting the proposition that the use, storage and/or disposal of such solvents is considered an

21   ultrahazardous activity"); *In re Burbank Envtl. Litig.*, 42 F. Supp. 2d 976, 983 (C.D. Cal. 1998)

22   (dismissing strict liability claims because "plaintiffs have not stated sufficient facts to establish the

23   use of [certain chemicals] is an ultrahazardous activity").  At present, Clarke fails to state

24   sufficient facts to establish that the activity in question here was an ultrahazardous activity.  He

25   cites no cases supporting that proposition.  The case law cited by PG&E, which Clarke does not

26   convincingly refute, suggests that the activity was entirely commonplace and cannot constitute an

27   ultrahazardous activity.

28       PG&E's motion to dismiss Clarke's claims for strict liability under the doctrine of

ultrahazardous activity is GRANTED with leave to amend.

## CONCLUSION

For the foregoing reasons, PG&E's motion to dismiss for lack of standing and redressability of the RCRA claim is DENIED.  Dismissal of the CWA claim for failure to plead an "ongoing" violation is DENIED, but dismissal based on the statute of limitations and the concurrent remedy doctrine is GRANTED.  Dismissal of the strict liability and negligence claims are also GRANTED for failure to allege cognizable damages and an ultrahazardous activity.  If Clarke can in good faith allege facts that fix these deficiencies, he has leave to amend within twenty (20) days of this Order.

**IT IS SO ORDERED.**

Dated: November 20, 2020



William H. Orrick
United States District Judge