UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAN CLARKE,

    Plaintiff,

    v.

PACIFIC GAS & ELECTRIC COMPANY, et al.,

    Defendants.

Case No. 20-cv-04629-WHO

**ORDER DENYING MOTION TO DISMISS CLEAN WATER ACT CLAIM**

Re: Dkt. No. 38

    Defendants Pacific Gas and Electric Company and PG&E Corporation (collectively "PG&E") move to dismiss plaintiff Dan Clarke's Clean Water Act ("CWA") cause of action on the grounds that it is barred by the statute of limitations and is insufficiently pleaded to establish subject matter jurisdiction. But in Clarke's First Amended Complaint ("FAC") [Dkt. No. 28], he sufficiently alleges the mechanisms by which repeated and discrete discharges from the Cannery manufactured gas plant ("Cannery MGP") have occurred and will likely occur periodically in the future. Although PG&E argues that the series of discharges amount to one CWA violation that first accrued decades ago while the Cannery MGP was operational, given the allegations in the FAC it is plausible that each unpermitted discharge constitutes a separate CWA violation that begins a new statutory clock. Clarke also alleges that the discharges were by a "person" (PG&E) from a "point source" (Cannery MGP Site and its component parts), and that he provided adequate notice of the CWA claim in his Notice of Intent to Sue ("NOI"). Accordingly, this Order DENIES PG&E's motion to dismiss.

## BACKGROUND

    I detailed Clarke's allegations in my order on PG&E's first motion to dismiss. *See* Order Granting In Part And Denying In Part Motion To Dismiss The Complaint ("November 2020

Order") [Dkt. No. 26] 2–3. I incorporate that discussion by reference here. In sum, Clarke alleges that PG&E and its predecessors left behind hazardous waste created by the Cannery MGP along the northern waterfront of San Francisco. FAC ¶ 1. The Cannery MGP was in operation from on or around 1898 until at least 1906, when it was damaged in the Great Earthquake, and has long since been abandoned. *Id.* ¶ 48. The site is currently owned by the National Park Service ("NPS"). *Id.* ¶ 71. Soil samples taken in 1985 by the NPS and later in 1986 by PG&E "indicate significant MGP contamination of soil and groundwater [in] the site and its vicinity"; Clarke alleges that PG&E never performed any further testing or remediation. *Id.* ¶¶ 71–74.

On November 20, 2020, I granted in part and denied in part PG&E's motion to dismiss, finding that Clarke's claim under the Resource Conservation and Recovery Act ("RCRA") was sufficiently pleaded and dismissing the CWA claim as untimely under the five-year statute of limitations and the concurrent remedy doctrine. November 2020 Order at 1–2. I also dismissed the strict liability and negligence claims for failure to allege cognizable damages and an ultrahazardous activity. *Id.* at 2. I gave Clarke leave to amend.

On December 10, 2020, Clarke filed the FAC, retaining the RCRA claim, omitting the state law claims, and amending the CWA claim to allege a series of discrete discharges to the Bay, including discharges within the five years preceding the filing of this action that make his claim timely. *See* FAC ¶¶ 109–25, 211. PG&E then moved to dismiss the CWA claim. *See* Pacific Gas and Electric Company and PG&E Corporation's Notice of Motion and Partial Motion to Dismiss the First Amended Complaint ("MTD") [Dkt. No. 38].

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

2

While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the jurisdictional challenge is confined to the allegations pled in the complaint. See *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). The challenger asserts that the allegations in the complaint are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the allegations in the complaint are true and draws all reasonable inference in favor of the party opposing dismissal. *See Wolfe*, 392 F.3d at 362.

## DISCUSSION

To state a claim under the CWA, a plaintiff must allege "(1) the ongoing addition of (2) a pollutant (3) to the navigable waters of the United States (4) from a point source (5) without a permit (or in violation of a permit)." *Woodward v. Goodwin*, No. C 99-1103 MJJ, 2000 WL 694102, at *5 (N.D. Cal. May 12, 2000). In his original Complaint, Clarke alleged that PG&E "continues to violate" the CWA due to repeated unpermitted discharges of pollutants into the San Francisco Bay from the remains of the Cannery MGP Site, as well as through its illegal failure to do anything to stop those discharges. I found those allegations sufficient for the purposes of alleging an "ongoing" discharge under the CWA, satisfying the jurisdictional requirement prescribed in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987). *See* November 2020 Order at 11–12.

However, the allegations in the Complaint did not amount to a set of discrete unlawful acts within the last five years and were thus time-barred by the statute of limitations under 28 U.S.C. § 2462, a "separate question" from the *Gwaltney* jurisdictional requirement. *Id.* at 12–15. The allegations "amount[ed] to a single violation that first accrued decades ago, during the operation or demolition of the Cannery MGP, but continues and remains un-remedied till this day." *Id.* at 16. Clarke's alternative "failure to act" theory did not solve the timeliness issue either. *Id.* The CWA

1   claim was dismissed with leave to adequately allege a set of discrete unlawful acts within the last
2   five years that would not be time-barred by section 2462. *Id.*
3         PG&E argues that Clarke's amended CWA claim remains untimely. MTD 5–11. It
4   additionally moves to dismiss the claim for lack of subject matter jurisdiction on grounds that
5   Clarke (i) fails to allege an ongoing discharge by a "person"; (ii) fails to allege on ongoing
6   discharge from a "point source"; and (iii) did not provide adequate notice of the claim in his NOI.
7   *Id.* at 11–22.

## I. STATUTE OF LIMITATIONS

      Clarke adds allegations in the FAC that better describe how contaminants from the Cannery MGP Site are repeatedly and intermittently discharged by groundwater passing through the Cannery MGP Site. The waste disposed by PG&E at the Cannery MGP Site includes polyaromatic hydrocarbons ("PAHs"), which are known human carcinogens and are highly toxic to marine life. FAC ¶ 44. When groundwater passes through the demolished Cannery MGP Site, PAHs separate from the MGP waste. *Id.* ¶¶ 113, 120, 195. Those pollutants are then transported via groundwater that flows towards and into the Bay, whose elevation is approximately 240 feet lower than the Cannery MGP Site. *Id.* ¶¶ 109– 25, 210.

      The process by which MGP waste is periodically transported by groundwater from the Cannery MGP Site and discharged into the Bay "is highly complex" and "influenced by a variety of factors," including "seasonal, tidal, and other factors." *Id.* ¶¶ 109, 111, 113. "These conditions interact with one another and cause the intermittent (rather than constant) release of groundwater from upland areas, including the MGP Site, to tidal surface water of the Bay." *Id.* ¶ 113. For instance, "[d]uring periods with high precipitation, the flow rate of groundwater increases and contaminants are partitioned from MGP Wastes and transported into the Bay," amounting to a "functional equivalent of a direct discharge in violation of the CWA." *Id.* ¶ 121. On the other hand, "the lack of precipitation during the dry season slows or altogether stops contaminated groundwater from reaching the Bay for longer periods of time." *Id.* ¶ 122. During this time "the partitioning of contaminants into groundwater temporarily pauses or decreases, resulting in periods where no functional equivalents of a direct discharge of related contaminants to the Bay

4

occur or no discharges of related contaminants to the Bay occur at all," and thus no CWA violations. *Id.* Accordingly, Clarke alleges, "periods of CWA violations and non-violations continuously alternate, resulting in multiple, discrete CWA violations." *Id.* ¶ 124. That is, "the complex interactions of factors cause repeated and discrete discharges of contaminants from the Cannery MGP Site into the Bay, each of which is a separate violation of the CWA." *Id.* ¶ 125; Plaintiff's Opposition to Defendant's Partial Motion to Dismiss First Amended Complaint ("Oppo.") [Dkt. No. 40] 6.[1] Clarke contends that this process repeats itself to cause the ongoing and intermittent discharge of toxic pollutants into the Bay, including within the five years preceding the filing of this action. FAC ¶ 211.

These allegations sufficiently describe a series of discharges. The question, for statute of limitations purposes, is whether a series of separate discharges constitutes a single CWA violation that first accrued decades ago at the time of the first discharge or whether each discharge in the series constitutes a separate CWA violation. Clarke failed to adequately answer that question in the prior motion to dismiss round.

It is difficult to find persuasive precedent that is on point for this question. As I noted in the prior order, the parties relied on cases from the Tenth Circuit because the Ninth Circuit has not provided guidance on the difference between a "single, continuing violation" and "repeated, discrete violations" of the CWA that would reset the statutory clock. November 2020 Order at 16; *see Sierra Club v. Oklahoma Gas & Elec. Co.*, 816 F.3d 666 (10th Cir. 2016); *HEAL Utah v. PacificCorp.*, 375 F. Supp. 3d 1231 (D. Utah 2019). Then and now, Clarke distinguishes *Oklahoma Gas* and *HEAL* because those cases addressed singular events—the construction of a

---

[1] In his opposition, Clarke concedes that he "does not 'rely'" on his alternative "failure to act" theory to plead a timely CWA claim. Oppo. 10–11. He nevertheless argues that my previous order in the related Marina MGP case acknowledged that allegations regarding PG&E's affirmative refusals to investigate supported the timeliness of his CWA claims in that case. *See San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.*, 81 F. Supp. 3d 847, 861 (N.D. Cal. 2015) ("[T]he complaint also alleges that PG&E's current behavior," including its refusal to test for contaminants in groundwater, "contributes to ongoing violations relating to the MGP discharges"). My order did not address the timeliness of Clarke's CWA claims in the Marina MGP case because PG&E did not raise a statute of limitations challenge in that case. Rather, I found that Clarke sufficiently pleaded an "ongoing" violation as required by the *Gwaltney* jurisdictional requirement.

5

facility in *Oklahoma Gas* and the placement of fill in a waterway in *HEAL*—as opposed to the multiple discrete discharges into the Bay that have occurred within the limitations periods and continue to periodically occur. Oppo. 7–8. But that alone does not explain why "PG&E's and its predecessors' handling, storage, treatment, disposal and/or transportation of solid and/or hazardous MGP wastes at the Cannery MGP Sites and/or the vicinity thereof," which allegedly "resulted in the contamination of the soil and groundwater of the terrestrial portions of those locations," is not a similarly singular event that led to a single CWA violation first accrued decades ago. *See* FAC ¶ 103.

PG&E analogizes to the securities and employment cases discussed in *Oklahoma Gas* to draw the distinction between discrete violations and a single, ongoing violation. MTD 8; *see Oklahoma Gas*, 816 F.3d at 672 ("[O]ne violation continues when 'the conduct as a whole can be considered as a single course of conduct.'" (quoting *Birkelbach v. SEC*, 751 F.3d 472, 479 n.7 (7th Cir. 2014) (securities violations)); *see id.* at 673 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (hostile work environment)). It argues that Clarke's CWA claim ignores the central holding of those case—single, ongoing violations are not discrete acts just because "[t]heir very nature involves repeated conduct." *Joseph v. J.J. Mac Intyre Companies, L.L.C.*, 281 F. Supp. 2d 1156, 1161 (N.D. Cal. 2003) (quoting *Morgan*, 536 U.S. at 115). As PG&E interprets Clarke's allegations, the recurring pattern of groundwater allegedly interacting with tides, by its very nature, involves repeated conduct, not discrete acts by PG&E itself.

PG&E also cites cases construing other statutes of limitations that are triggered when a claim "first accrues." MTD 8. In *Kosmo v. United States*, 72 Fed. Cl. 46, 53 (2006), the Court of Federal Claims found that under 28 U.S.C. § 2501's six-year statute of limitations for claims against the government, a claim first accrues "when all the events have occurred which fix the liability of the Government and entitle the [plaintiff] to institute an action." (citation omitted). In the context of claims for military back pay and benefits, the single event that fixes the government's liability is the reassignment or discharge of the plaintiff, which does "not involve a series of independent, distinct wrongs," because it is the initial improper reassignment or discharge that causes the loss of pay. *Id.* at 54–55 (citing *Brown Park Estates-Fairfield Dev. Co.*

6

*v. United States*, 127 F.3d 1449, 1457 (Fed. Cir. 1997)).  Similarly, *Brown Park* distinguished claims that "could be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages," and "one alleged wrong by the government, which accrued all at once at one point in time, even though it may have had later adverse effects."  *Brown Park*, 127 F.3d at 1457.

The securities, employment, and military benefit cases that PG&E relies on are not particularly useful in the CWA context.  The single CWA case it cites, *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943 (9th Cir. 2002), is not helpful either.  *Bosma Dairy* addressed whether the plaintiff's pre-suit notice was sufficient to satisfy the statutory notice requirement, not whether plaintiff's claims were time-barred under the five-year statute of limitations.  *See id.* at 952 (plaintiff's NOI, which did not list all of the CWA violations alleged in the subsequent complaint, satisfied the CWA's notice requirement because the "violations originated from the same source…[and] deposited the same waste material" into the same waters, and "[t]hus in essence all of the alleged violations are a single violation that repeated over a span of time").

Clarke argues that the text of section 301 of the CWA makes clear that it is each "discharge" of pollutants that is unlawful and not, as PG&E suggests, the beginning of the chain of events that contributed to the recurring discrete discharges.  Oppo. 10.  Although his case citations do not straightforwardly address the point, there is case law that supports this reading of section 301.[2]

For example, in *Cox v. Bd. of Cty. Commissioners of Franklin Cty.*, 436 F. Supp. 3d 1070, 1085 (S.D. Ohio 2020), the defendants moved to dismiss some of the dry weather screenings listed

---

[2] Clarke's cites the Supreme Court's recent opinion in *Cty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462 (2020).  *Maui* addressed the parameters of what is considered "from a point source" and when that constitutes a CWA violation.  After considering "the statute's language, structure, and purposes," the Court held that the CWA "requires a permit when there is a direct discharge from a point source into navigable waters or when there is the *functional equivalent of a direct discharge*" from the point source into navigable waters.  *Id.* at 1476 (emphasis in original).  *Maui* does not squarely address the issue raised here, *i.e.*, whether each "direct discharge" or "functional equivalent of a direct discharge" in a series of repeated discharges would constitute a separate actionable violation of the CWA.

in the complaint on grounds that they took place outside of the five-year statute of limitations. The court denied dismissal, finding that the CWA makes clear that "each day upon which an unpermitted discharge occurs results in a separate and distinct violation of [section] 301(a)." *Id.* (quoting *Wisconsin Res. Prot. Council, Ctr. for Biological Diversity v. Flambeau Min. Co.*, 903 F. Supp. 2d 690, 721 (W.D. Wis. 2012), *rev'd on other grounds,* 727 F.3d 700 (7th Cir. 2013)). The plaintiff "sufficiently allege[d] that the illicit discharges detected by the dry weather screenings are the types of violations which occur every day and continue to the present," and although "[t]he upshot of the [defendant's] argument [was] that the dry weather screenings were one-time events which reflect wholly past violations," the court found that the plaintiff sufficiently "allege[d] continuous violations." *Id.* "Though the dry weather screenings may have occurred over five years before the Notice Letter, the illicit discharges have allegedly occurred every day within the limitations period." *Id.*

In *Flambeau*, 903 F. Supp. 2d at 721, defendants moved for summary judgment on the statute of limitations issue, arguing that one of the events giving rise to the suit (a 1998 permit modification approved by the Wisconsin Department of Natural Resources) occurred more than five years before the suit was filed. The court rejected that argument, finding that the plaintiffs "[did] not seek relief for the 1998 permit modification, construction of the biofilter or even the first discharges from the biofilter in 1999"; "[r]ather, plaintiffs' claims [were] for those discharges from the biofilter that occurred within the statute of limitations period, and "[a]s the Clean Water Act makes clear, each day upon which an unpermitted discharge occurs results in a separate and distinct violation of [section] 301(a)." *Id.* (citing cases). Thus, the plaintiffs could "seek civil penalties for each violation that accrued within the five years preceding the notice letter." *Id.*

One of the cases on which *Flambeau* relied was a Ninth Circuit case, *Borden Ranch P'ship v. U.S. Army Corps of Engineers*, 261 F.3d 810 (9th Cir. 2001), *aff'd,* 537 U.S. 99, (2002). Defendants there appealed the district court's ruling that each individual pass of a ripper (metal prongs dragged through the soil behind a tractor or a bulldozer) through a protected wetland was a separate CWA violation for which penalty could be assessed. *Id.* at 816–17. The Ninth Circuit affirmed, finding that "the better rule is to treat each rip as a separate violation," an approach that

8

1    is "more consistent with the statutory language, with prior judicial interpretations of the statute,

2    and with the general policy goal of discouraging pollution." *Id.* at 818.

3          At this stage, I conclude that Clarke's CWA claim, as pleaded, is sufficient for statute of

4    limitations purposes.  As other courts have noted, "[t]he application of the statute of limitations to

5    the circumstances of the case often must be done at the summary judgment stage and may require

6    expert testimony as to the cause or source of the violation(s)."  *Cox*, 436 F. Supp. 3d at 1086 n.4.

7    Whether the alleged violations are in fact within the statute of limitations is better determined on a

8    full factual record.  PG&E's motion to dismiss the CWA claim as time-barred is DENIED.

## II.    DISCHARGE BY A "PERSON"

To the extent that Clarke alleges the groundwater pathway is only intermittent, causing discrete "discharges," PG&E argues that those discharges are not discharges by a "person," as required in order to constitute a violation of 33 U.S.C. § 1311(a), but are discharges by the confluence of a number of natural atmospheric and geological processes.  MTD 12; *see* 33 U.S.C. § 1311(a) ("[T]he discharge of any pollutant by any person shall be unlawful."); *see also* 33 U.S.C. § 1365(a)(1) ("[A]ny citizen may commence a civil action on his own behalf . . . against any person . . .").  It interprets the FAC as alleging that several natural factors cause the discharges, not any activity by PG&E itself.  It argues that such "passive migration" of pollutants on a defendant's property is not subject to CWA permitting requirements.  *See Cal. Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1077 (E.D. Cal. 2002) (citing *Froebel v. Meyer*, 217 F.3d 928, 938–39 (7th Cir. 2000)); *see also N. Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 680 (E.D.N.C. 2003) (citing *Cal. Sportfishing* and *Froebel*).

Clarke responds that the natural processes contributing to PG&E's repeated discharge of pollutants into the Bay do not change the substance of his allegations that, but for PG&E's actions, no pollutant discharges would occur from the Cannery MGP.  Oppo. 12.  He notes that I rejected PG&E's argument that dismissal is warranted because the alleged violations are "wholly past" and the mere "migration of residual contamination" in the Marina MGP case.  *See San Francisco Herring Ass'n v. Pac. Gas & Elec. Co.* ("*SFHA*"), 81 F. Supp. 3d 847, 860 (N.D. Cal. 2015).  As

in the Marina MGP case, Clarke contends that the allegations are sufficient to establish that PG&E caused, and thus is liable for, the ongoing intermittent discharges from the Cannery MGP.

PG&E clarifies that it is not seeking dismissal based on "wholly past" violations. Instead, it states that to the extent any discharges occurred within the last five years, those discharges were caused by an interplay of natural processes and not by its own action. Pacific Gas and Electric Company and PG&E Corporation's Reply in Support of Partial Motion to Dismiss First Amended Complaint ("Reply") [Dkt. No. 43] 6.

None of the "passive migration" cases cited by PG&E support dismissal at the pleadings stage. Most of the cases PG&E cites were decided on the summary judgment with the benefit of a full evidentiary record. *See Cal. Sportfishing*, 209 F. Supp. 2d at 1077; *N. Carolina Shellfish Growers*, 278 F. Supp. 2d at 680. The one that was not is easily distinguished. In *Froebel*, a Wisconsin citizen sued a set of state defendants, arguing that their removal of a dam led to a discharge of fill materials for which they should have sought a permit pursuant to section 404 of the CWA. *Froebel*, 217 F.3d at 932. He also sued Waukesha County, which was not involved in the removal of the dam but owned the property on which the dam was located at the time he brought his suit. *Id.* The Seventh Circuit affirmed the court's dismissal of Frobel's CWA claim against Waukesha County because the claim "would essentially require Waukesha County to seek a permit to do nothing but continue to own the land," suggesting that CWA violations cannot result for "purely passive activity." *Id.* at 938–39. PG&E is alleged to have been responsible for the operation of the Cannery MGP, and even though the alleged pollution first occurred more than a century ago, it cannot be said to have been "purely passive."

Factual disputes about what or who caused the discharges and whether the discharges amount to merely "passive migration" of pollutants not subject to CWA permitting requirements cannot be resolved on the pleadings. PG&E's motion to dismiss Clarke's CWA claim for failure to allege discharges by a "person" is DENIED.

### III. DISCHARGE FROM A "POINT SOURCE"

PG&E argues that Clarke has not sufficiently alleged discharge of pollutants from a "point source". The FAC alleges that pollutants are drawn by groundwater from portions of the Cannery

10

1    MGP Site and its vicinity, and PG&E contends that the alleged site-wide releases amount to
2    discharges from a "nonpoint source." MTD 14–18.
3           The CWA defines a "point source" as "any discernible, confined and discrete conveyance,
4    including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or]
5    container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The
6    statutory definition of a point source is meant to be "extremely broad." *Borden Ranch*, 261 F.3d
7    at 815. A "source" may be "[a]ny building, structure, facility, or installation from which there is
8    or may be the discharge of pollutants." 33 U.S.C. § 1316(a)(3). All other sources of pollution are
9    characterized as "nonpoint sources." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d
10   778, 780 (9th Cir. 2008); *see Oregon Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 n.9
11   (9th Cir. 1987) ("Nonpoint source pollution is not specifically defined in the Act, but is pollution
12   that does not result from the 'discharge' or 'addition' of pollutants from a point source."). The
13   CWA requires a permit "when there is a discharge from a point source directly into navigable
14   waters or when there is the *functional equivalent of a direct discharge*." *Maui*, 140 S. Ct. at 1465
15   (emphasis in original).
16          In the Marina MGP case, I found Clarke's point source allegations sufficient and
17   "decline[d] to hold as a matter of law that an entire factory or plant cannot be considered a 'point
18   source' under the CWA." *SFHA*, 81 F. Supp. 3d at 862. At the hearing, PG&E argued that
19   Clarke does not allege here, as he did in the Marina MGP case, that the *plant* itself is the point
20   source; rather, he alleges that the Cannery MGP *Site* is the point source. *See* FAC ¶ 209 ("The
21   Cannery MGP Site on which PG&E disposed MGP Wastes qualifies as a point source of these
22   pollutants."). He defines the Cannery MGP Site as an entire city block, but, PG&E asserts, fails to
23   cite any authority to support such a broad interpretation of "point source."
24          The point source allegations in the Marina MGP case and this case are not as different as
25   PG&E claims. In the Marina MGP case, I rejected PG&E's arguments that "the plaintiffs
26   inappropriately identified the three subject MGP *sites* as 'point sources' under the CWA," and
27   "that the designation of an entire MGP *site* is overly broad and does not specify a 'conveyance' by
28   which pollutants are discharged." *SFHA*, 81 F. Supp. 3d at 862 (emphasis added). The complaint

United States District Court
Northern District of California

11

in the Marina MGP case sufficiently described "in detail the activities of the MGPs, how they emitted various pollutants into the soil and directly into the Bay, and several conduits by which the pollutants travel from the MGPs into the Bay," including "via direct disposal into the San Francisco Bay waters, through groundwater, and through the T/S system," a network of combined transportation and storage boxes. *Id.*

The FAC describes the alleged point source with similar specificity. Clarke alleges that PG&E's discharges occur from groundwater passing through a "discernable, confined and discrete conveyance"—the demolished MGP facility on the Cannery MGP Site. He contends that the demolished facility consists of multiple different components that are themselves identified conveyances and sources of contaminants that enter the groundwater, and that the groundwater is then conveyed into the Bay, which constitutes a "discharge." FAC ¶ 195. He provides detailed descriptions of the component parts that PG&E left in place, including pipes, storage vats, and drainage flumes, and claims that each of these parts, and the demolished facility as a whole, are the alleged point sources of pollution. *Id.* ¶¶ 36, 41–43, 59, 114, 209.

For example, he describes that "a coal wharf existed along [the] northern edge" of the Cannery MGP, and "similar wharfs of the [Marina MGPs] . . . are locations of large quantities of MGP Wastes." *Id.* ¶ 52. "In addition, a 47,000-gallon crude oil tank was located on the wharf," and a similar crude oil take in one of the Marina MGPs was found to be "highly contaminated with a very large deposit of MGP tar, which, in turn, has contaminated the groundwater in the area." *Id.* ¶¶ 53–54. On the "western edge of the Cannery MGP Site, two gas holders existed immediately south of the oil tank," and similar former gas holders of the Marina MGPs were found to be "highly contaminated," and at the location of one of those gas holders, "a very large deposit of MGP tar was discovered." *Id.* ¶¶ 55–56. "Based on the known operations of the Cannery MGP, the limited investigation performed in the 1980s, and the contamination patterns that exist at the other MGPs," Clarke alleges that the "contamination existing at the Cannery MGP Site and areas offshore thereof most certainly include, without limitation" identifiable points of contamination such as : (i) "MGP tar deposits" and "[g]roundwater contamination" from "two former gas holders," "former locations of the coal wharf and crude oil tank," and "downgradient

1    of tar wells"; (ii) solid MGP wastes, "including high levels of PAH," as a result of "on-site waste
2    disposal . . . in the eastern portion of the Cannery MGP Site where MGP Waste was used as fill";
3    and (iii) solid MGP wastes and MGP tar deposits "in the sediment of Fisherman's Wharf, Aquatic
4    Park, and other offshore areas, as a result of direct disposal therein and redistribution from such
5    direct disposal sites and onshore locations." *Id.* ¶¶ 195(a)–(i).

6    This level of specificity is sufficient at the pleadings stage, particularly in light of the
7    "extremely broad" statutory definition of a "point source." *Borden Ranch*, 261 F.3d at 815.
8    Whether a particular part of the demolished facility or the demolished facility as a whole is in fact
9    a point source will be determined on a full factual record.

10   PG&E's motion to dismiss Clarke's CWA claim for failure to allege discharges from a
11   "point source" is DENIED.

## IV. NOTICE REQUIREMENTS

13   PG&E separately argues that Clarke's NOI failed to provide adequate notice of his theory
14   of discrete discharges. In particular, it contends that the NOI failed to identify the activities
15   alleged to violate the CWA, the location of the violations, and the dates of the violations. MTD
16   18.

17   CWA notice requirements are mandatory and must be strictly construed. *Hallstrom v.*
18   *Tillamook Cnty.*, 493 U.S. 20, 31 (1989). The Ninth Circuit requires notice to inform the targeted
19   party "precisely what it allegedly did wrong, and when." *Ctr. for Biological Diversity v. Marina*
20   *Point Dev. Co.*, 566 F.3d 794, 801 (9th Cir. 2008). But as long as the information in the notice
21   letter is "reasonably specific" as to the nature and time of the alleged violation, the CWA notice
22   requirement is fulfilled. *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th
23   Cir. 2002). The NOI "does not need to describe every detail of every violation"; "it need only
24   provide enough information that the defendant can identify and correct the problem." *Id.*

25   The Ninth Circuit recognizes that precise dates of violations may not always be available
26   to a plaintiff, and, thus, a notice that describes the conditions giving rise to a violation are adequate
27   when "specific enough to give [the violator] an 'opportunity to correct the problem.'" *Tosco*
28   *Corp.*, 309 F.3d at 1159 (quoting *Bosma Dairy*, 305 F.3d at 952). For instance, the plaintiff in

13

*Tosco Corp.* "did not provide any specific dates other than the general date range covered by its notice letter," but the "notice did, however, clearly identify the alleged violation—namely, that during the time when the [petroleum] coke piles remained uncovered, wind blew coke into the slough"—and that was sufficient. *Id.* Similarly, while Clarke's NOI broadly stated that the "[t]he violations that are the subject of this notice began sometime during or prior to the year 1903 and are ongoing," it nonetheless explained that violations occur when groundwater "flows through the terrestrial portions of the [Cannery] MGP Site . . ." MTD, Ex. A (October 23, 2018 NOI) at 2, 6. Like the notice in *Tosco Corp.*, Clarke's NOI provided a description of the conditions under which discharges occur that are sufficient to allow PG&E the "opportunity to correct the problem." *See Tosco Corp.*, 309 F.3d at 1159.

The NOI sufficiently informed PG&E of its activities alleged to violate the CWA—PG&E's intermittent and repeated discharges via groundwater flows through the polluted Cannery MGP and into the Bay. *See* October 23, 2018 NOI at 6 (PG&E "discharged [pollutants] via the groundwater that flows through the terrestrial portions of the [Cannery] MGP Site and via seawater that flows as a result of tidal action in and out of the terrestrial portions of the [Cannery] MGP Site"). In the FAC, Clarke likewise alleges that "the multiple factors affecting groundwater flows from and through the Cannery MGP Site determine whether and when the functional equivalent of a direct discharge occurs from the Cannery MGP Site . . . includ[ing] groundwater density gradients due to the salinity difference between seawater and fresh groundwater; tidal oscillations, wave action, and storm surges; seasonal variations in precipitation; and other factors." FAC ¶ 119. Clarke's description of discharge mechanisms is adequately reflected in the NOI and is "reasonably specific" as to the nature of the alleged violations. *See Tosco Corp.*, 309 F.3d at 1155. Both identify tidally influenced groundwater flowing through the Cannery MGP Site as the central discharge mechanism causing PG&E's CWA violations. Clarke's NOI need not "describe every detail of every violation," it needs "only provide enough information that the [PG&E] can identify and correct the problem." *Tosco Corp.*, 309 F.3d at 1155.

Finally, Clarke's NOI sufficiently identified the location of PG&E's discharges. The NOI notified PG&E that its "violations have occurred and continue to occur at the former location of

14

the [Cannery] MGP, which is located on the western portion of the square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., within the Fisherman's Wharf Neighborhood in San Francisco, CA, as well as in areas in the terrestrial vicinity and immediately offshore of the former location of the [Cannery] MGP." October 23, 2018 NOI at 2; *see* FAC ¶ 51.

In sum, PG&E's motion to dismiss for failure to provide adequate notice is DENIED.

## CONCLUSION

For the foregoing reasons, PG&E's motion to dismiss Clarke's CWA cause of action is DENIED.

**IT IS SO ORDERED.**

Dated: April 22, 2021



William H. Orrick
United States District Judge