SCOTT D. MROZ (Bar No. 111848)
SMroz@wfbm.com
JAMES L. MINK (Bar No. 219267)
JMink@wfbm.com
WFBM, LLP
One Sansome Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 781-7072
Facsimile: ( 415) 391-6258

SANDI L. NICHOLS (Bar No. 100403)
snichols@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
Three Embarcadero Center, 12th Floor
San Francisco, CA  94111-4074
Telephone: (415) 837-1515
Facsimile: (415) 837-1516

Attorneys for Defendants
PACIFIC GAS AND ELECTRIC COMPANY
and PG&E CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| DAN CLARKE,<br><br>   Plaintiff,<br><br> vs.<br><br>PACIFIC GAS AND ELECTRIC COMPANY;<br>and PG&E CORPORATION<br><br>   Defendants. | Case No. 3:20-cv-04629-WHO<br><br>**PACIFIC GAS AND ELECTRIC COMPANY AND PG&E CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF**<br><br>Date:  November 3, 2021<br>Time:  2:00 p.m.<br>Location: Courtroom 2, 17th Floor<br><br>The Honorable William H. Orrick |

**Error! Unknown document property name.Error! Unknown**
5624051.6
4784-84.001

1

1

# TABLE OF CONTENTS

2    TABLE OF AUTHORITIES ...................................................................................................iii

3    NOTICE OF MOTION AND MOTION ..................................................................................2

4    STATEMENT OF ISSUES TO BE DECIDED........................................................................2

5    I.     INTRODUCTION.........................................................................................................2

6    II.    RELEVANT PROCEDURAL BACKGROUND .........................................................3

7    III.   RELEVANT FACTUAL BACKGROUND ..................................................................4

8           A.     SFG&E and Equitable Were Separate Companies, Incorporated in the
                   1890s.          4
9
            B.     SFG&E Purchased Equitable's Assets on August 31, 1903 For Cash....................4
10
            C.     SFG&E Shut Down the CAN MGP, and There is No Evidence That
11                 SFG&E Ever Operated It. ...................................................................................5

12          D.     Equitable's Directors, Shareholders, and Managers Did Not Become
                   SFG&E Directors and Shareholders and Managers. .................................................5
13
            E.     Following SFG&E's Asset Purchase, Equitable Continued to Exist and to
14                 Take Actions Until It Was Judicially Dissolved in October 1904. ........................7

15          F.     SFG&E Sold its Interest in the Site in September 1906. ........................................7

16          G.     The New Owners of the Site Demolished the CAN MGP in October 1906. ..........7

17   IV.    APPLICABLE PROCEDURAL STANDARDS ............................................................7

18   V.     DIRECT LIABILITY FOR CWA OR RCRA FAILS BECAUSE NEITHER
            PG&E NOR SFG&E CAUSED ANY CONTAMINATION AT OR FROM
19          THE SITE.....................................................................................................................8

20          A.     There Is No Evidence That SFG&E Contaminated the Site. ...............................10

21                 1.     There is No Evidence that SFG&E ever operated the CAN
                          MGP, or used any of its components at the Site. .....................................10
22
                   2.     The Evidence Shows that SFG&E did not demolish the CAN
23                        MGP.  11

24          B.     PG&E Did Not Contaminate the Site....................................................................11

25   VI.    SFG&E DID NOT SUCCEED TO ANY LIABILITY OF EQUITABLE. ...................11

26          A.     Equitable Did Not Merge or Consolidate With SFG&E. .....................................12

27          B.     The August 1903 Transaction Was an Asset Purchase, Which Does Not
                   Result in Successor Liability Without an Exception............................................13

28

**Error! Unknown
document
property
name..Error!
Unknown...
5624051.6
4784-84.001**

i

Case No.  3:20-cv-04629

1           1.      There Was No Assumption of Liability. ....................................................15

2           2.      SFG&E Was Not a "Mere Continuation" of Equitable............................16

3           3.      There Was No De Facto Merger. ............................................................20

4           4.      The fraudulent purpose exception does not apply.....................................24

5    VII.    CONCLUSION ................................................................................................24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Cases**

*Acheson v. Falstaff Brewing Corp.*,
  523 F.2d 1327 (9th Cir. 1975) ............................................................................. 23

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) ............................................................................................... 8

*Anderson v. Valspar Corp.*,
  2013 WL 552001 (E.D. Cal. Feb. 12, 2013) ............................................... 13, 16

*Arnold Graphics Industries, Inc. v. Independent Agents Center, Inc.*,
  775 F.2d 38 (2d Cir. 1985) .................................................................................. 20

*Atchison, Topeka and Santa Fe R.R. Co. v. Brown & Bryant, Inc.*,
  159 F.3d 358 (9th Cir. 1997) ........................................................................ 14, 19

*Bank Melli Iran v. Pahlavi*,
  58 F.3d 1406 (9th Cir. 1995) .............................................................................. 10

*Beatrice Company v. State Board of Equalization*,
  6 Cal. 4th 767 (1993) .................................................................................... 14, 17

*Bushie v. Stenocord Corp.*,
  460 F.2d 116 (9th Cir. 1972) ................................................................................ 8

*Cal. Ass'n of Highway Patrolmen v. Cal. Dept. of Personnel and Admin.*
  185 Cal. App. 3d 352 (1986) .............................................................................. 21

*Carter v. CMTA-Molders & Allied Workers Health & Welfare Tr.*,
  563 F. Supp. 244 (N.D. Cal. 1983) ............................................................... 15, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 8

*CenterPoint Energy, Inc. v. Superior Court*,
  157 Cal.App.4th 1101 (2007) ............................................................................. 16

*Cermetek, Inc. v. Butler Avpak, Inc.*,
  573 F.2d 1370 (9th Cir. 1978) ............................................................................ 10

*Chaknova v. Wilbur Ellis Co.*,
  69 Cal. App. 4th 962 (1999) ............................................................................... 14

*City of Imperial Beach v. Int'l Boundary & Water Comm'n, United States Section*,
  356 F. Supp. 3d 1006 (S.D. Cal. 2018) ................................................................. 9

*Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*,
  944 F.2d 1525 (9th Cir. 1991) ........................................................................ 8, 10

*Coplin v. Conejo Valley Unified Sch. Dist.*,
  903 F. Supp. 1377 (C.D. Cal. 1995) ............................................................... 8, 10

*Delaney v. Town of Carmel,*
    55 F. Supp. 2d 237 (S.D.N.Y. 1999) ................................................................ 9

*Ferguson v. Arcata Redwood Co., LLC,*
    2004 WL 2600471 (N.D. Cal. Nov. 12, 2004) ......................................... 14, 18

*First San Diego Properties v. Exxon Co.,*
    859 F. Supp. 1313 (S.D. Cal. 1994) .................................................................. 9

*Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust,*
    95 Cal. App. 4th 1182 (2002) ......................................................................... 14

*Franklin v. USX Corp.,*
    87 Cal. App. 4th 615 (2001) ..................................................................... passim

*Froebel v. Meyer,*
    217 F.3d 928 (7th Cir. 2000) .......................................................................... 10

*Gallegos v. City of Los Angeles,*
    308 F.3d 987 (9th Cir. 2002) .................................................................... 13, 16

*Gerritsen v. Warner Bros. Ent. Inc.,*
    112 F. Supp. 3d 1011 (C.D. Cal. 2015) ........................................................... 16

*Globe Oil Mills v. Van Camp Seafood Co.,*
    52 Cal. App. 781 (1921) .................................................................................. 21

*Gofron v. Picsel Techs., Inc.,*
    804 F. Supp. 2d 1030 (N.D. Cal. 2011) ........................................................... 16

*Hamilton v. Bates,* 35 P. 304 (Cal. 1893) ........................................................... 12

*Helvering v. Pennsylvania Water & Power Co.,*
    306 U.S. 522 (1939) ........................................................................................ 21

*Hinds Investments, L.P. v. Angioli,*
    654 F.3d 846 (9th Cir. 2011) ............................................................................ 9

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,*
    263 F. Supp. 2d 796 (D.N.J. 2003 ................................................................... 9

*Katzir's Floor & Home Design, Inc. v. M–MLS.com,*
    394 F.3d 1143 (9th Cir. 2004) ................................................................... 16, 17

*Leffridge v. Nationstar Mortg., LLC,*  2015 WL 12681307 (C.D. Cal. Nov. 19,
    2015) ............................................................................................................ 8, 13

*Louisiana-Pacific Corp. v. Asarco, Inc.,*
    909 F.2d 1260 (9th Cir. 1990) ........................................................... 19, 22, 23

*Maloney v. American Pharm. Co.,*
    207 Cal. App. 3d 282 (1988) ........................................................... 17, 18, 19

*Mardan Corp. v. C.G.C. Music, Ltd.,*
    804 F.2d 1454 (9th Cir. 1986) ........................................................................ 15

*Marks v. Minnesota Mining and Manufacturing Company*,
  187 Cal. App. 3d 1429 (1986)............................................................................... 18, 20, 21

*Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*,
  632 F.3d 1056 (9th Cir. 2011)........................................................................................ 14

*Miller v. Glenn Miller Prod., Inc.*,
  454 F.3d 975 (9th Cir. 2006)............................................................................................ 8

*Mkt. St. Ry. Co. v. Hellman*,
  109 Cal. 571 (1895)......................................................................................................... 12

*No Cost Conf., Inc. v. Windstream Commc'ns, Inc.*,
  940 F. Supp. 2d 1285 (S.D. Cal. 2013) ........................................................................ 15

*O'Melveny & Myers v. F.D.I.C.*,
  512 U.S. 79 (1994)) ........................................................................................................ 14

*Orthotec, LLC v. Reo Spineline, LLC*,
  438 F. Supp. 2d 1122 (C.D. Cal. 2006).................................................................... 22, 23

*Phillips v. Cooper Laboratories*,
  215 Cal. App. 3d 1648 (1989) ....................................................................................... 14

*Ray v. Alad Corp.*,
  19 Cal. 3d 22 (1977)................................................................................... 16, 18, 21, 22

*Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*,
  468 F. Supp. 3d 1236 (C.D. Cal. 2020)................................................................... 17, 19

*Roger D. Dahl, Inc. v. Sun Microstamping Techs.*,
  242 F. App'x 433 (9th Cir. 2007) ................................................................................. 17

*Schwartz v. Pillsbury Inc.*,
  969 F.2d 840 (9th Cir. 1992)......................................................................................... 16

*Stanford Hotel Co. v. M. Schwind Co.*,
  180 Cal. 348 (1919)................................................................................................... 18, 19

*Sullivan v. Dollar Tree Stores, Inc.*,
  623 F.3d 770 (9th Cir. 2010)...................................................................................... 8, 13

*Sunnyside Dev. Co., LLC v. Opsys Ltd.*,
  2007 WL 2462142 (N.D. Cal. Aug. 29, 2007)..................................................... 18, 20, 22

*Swenson v. File*,
  3 Cal. 3d 389 (1970)....................................................................................................... 21

*Sycamore Indus. Park Assocs. v. Ericsson, Inc.*,
  546 F.3d 847 (7th Cir. 2008)............................................................................................ 9

*Tidewater Oil Co. v. Workers' Comp. Appeals Bd.*,
  67 Cal.App.3d 950 (1977) .............................................................................................. 20

*United States v. Bestfoods*,

524 U.S. 51 (1998) ................................................................................................. 2

*Weber v. John Crane, Inc.*,
143 Cal. App. 4th 1433 (2006) ........................................................................... 14

**Statutes**

Former Cal. Civil Code § 361 ................................................................................. 13

Former Cal. Civil Code § 361a ............................................................................... 13

Former Cal. Civil Code § 473 ................................................................................. 13

**Treatises**

15 Fletcher, Cyclopedia of the Law of Private Corporations
(rev. vol. 1990) § 7153 ...................................................................................... 20

15 Fletcher, Cyclopedia of the Law of Private Corporations (rev.vol.1990) § 7153 ................... 12

19 C.J. S. Corporations § 796 ................................................................................ 13

Hills, George S., *Consolidation of Corporations by Sale of Assets and Distribution of Shares*,
19 Calif. L. Rev. 349 (Vol. 4 1931) ................................................................. 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on November 3, 2021, at 2:00 p.m., in Courtroom 2, 17th Floor of the San Francisco Courthouse before the Honorable William H. Orrick, Defendants Pacific Gas and Electric Company and PG&E Corporation (collectively, "PG&E") will and hereby do move the Court for summary judgment in their favor against Plaintiff Dan Clarke ("Clarke") on his First Amended Complaint ("FAC"), pursuant to Fed. R. Civ. Pro. 56.  The Motion will be based on this Notice, the Memorandum of Points and Authorities, the Declaration of James Mink ("Mink Dec.") and exhibits thereto, the Declaration of Gregory Mark ("Mark Dec.") and exhibits thereto, the record of this action, and any oral argument presented at the hearing of this Motion.[1]

**STATEMENT OF ISSUES TO BE DECIDED**

A.  Do PG&E or San Francisco Gas & Electric Company ("SFG&E") have any potential "direct" liability under the Resource Conservation & Recovery Act ("RCRA") or the Clean Water Act ("CWA") from alleged "operation" or "demolition" of the Cannery MGP ("CAN MGP")?

B.  Was the transaction between SFG&E and the Equitable Gas Light Company ("Equitable") an asset purchase?

C.  Can Clarke show application of any exceptions to non-liability of asset purchasers?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

The two causes of action in the FAC allege contamination of the site of the CAN MGP (the "Site") during operation and demolition of the CAN MGP.  Although SFG&E bought the CAN MGP and began leasing the Site in 1903, and used components of the dismantled MGP at other locations, Clarke cannot prevail on a theory that PG&E is liable for SFG&E's mere ownership of an MGP on land it leased, without showing that SFG&E ever did anything with the MGP, or at the Site, to cause contamination.  There is no evidence that either PG&E or SFG&E ever operated the CAN MGP, and the evidence shows that the California Fruit Canners' Association demolished the

---

[1] PG&E Corporation joins in this motion as a protective measure.  It has requested that Clarke dismiss the company because Clarke has not alleged any basis for imposing any liability under RCRA or the CWA on PG&E Corporation, which Clarke alleges is the mere parent of the defendant utility (Pacific Gas and Electric Company).  *See, e.g., United States v. Bestfoods*, 524 U.S. 51 (1998).  Absent dismissal, the company will seek judgment in its favor at the appropriate time.

1  MGP.  Thus, Clarke cannot establish "direct" liability of PG&E or SFG&E.

2         Instead, Clarke must rely upon a successor liability theory for Equitable's operation of the

3  CAN MGP.  PG&E was not even incorporated until a year after Equitable dissolved, so Clarke

4  must show that SFG&E succeeded to Equitable's liabilities for operation of the CAN MGP.  But

5  the Equitable-SFG&E transaction was an asset purchase for cash, and Clarke cannot meet his

6  burden to show that any of the four exceptions to the non-liability of asset purchasers applies:

7  (1) SFG&E did not assume Equitable's liabilities; (2) SFG&E was not a "mere continuation" of

8  Equitable; (3) the transaction was not—and could not have been—a de facto merger; and

9  (4) Clarke does not claim that SFG&E and Equitable entered into the transaction in order to

10 defraud Equitable's creditors.  As a result, Clarke cannot establish successor liability for SFG&E

11 or PG&E and PG&E is entitled to summary judgment.

12 **II.      RELEVANT PROCEDURAL BACKGROUND**

13        Clarke alleges that Equitable owned and operated the CAN MGP starting in 1898.  FAC

14 ¶ 62.  He alleges that, in 1903, SFG&E acquired Equitable and the Pacific Gas Improvement

15 Company ("PGIC") "on the basis of exchange of stock and assumption of liabilities by the

16 surviving entity, SFG&E."  *Id.* ¶ 63.  Clarke claims that SFG&E owned and operated the CAN

17 MGP from 1903 through 1905., (*id.* ¶ 67) and  that Pacific Gas & Electric Company owned and

18 operated the CAN MGP from 1905 "until it was destroyed by the Great Earth Quake of 1906,"

19 after which the utility allegedly demolished the CAN MGP.  FAC ¶¶ 68, 101.  Clarke makes no

20 separate allegations as to any involvement of PG&E Corporation—which was not formed until

21 1996 (*see* Mink Dec. Exs. WW, XX)—with the CAN MGP or the Site.

22        Following rulings on PG&E's motions to dismiss, Clarke's FAC is limited to causes of

23 action under RCRA and the CWA.  His RCRA cause of action is based on allegations that PG&E,

24 SFG&E, and/or Equitable "handled, stored, treated, transported and/or disposed of solid and/or

25 hazardous MGP wastes at the Site and/or the vicinity thereof" through operation and demolition of

26 the CAN MGP.  FAC ¶¶ 96-97, 101.  His CWA cause of action is similarly premised on alleged

27 contamination of the soil at the CAN MGP site by PG&E, SFG&E, and/or Equitable during such

28 historical operations and demolition, which he alleges is carried to the Bay after being picked up

by groundwater intermittently passing through the Site.  FAC ¶¶109, 208, 210.

## III.   RELEVANT FACTUAL BACKGROUND

### A.   SFG&E and Equitable Were Separate Companies, Incorporated in the 1890s.

SFG&E's 1896 Articles of Incorporation provided that it would manufacture and sell gas, and did not provide any authority for merging or consolidating with other corporations.  Mink Dec. Ex. A.  Nor did SFG&E's Bylaws permit merger or consolidation.  *Id.* Ex. B.  Equitable's 1898 Articles of Incorporation provided that it would manufacture and sell gas, and did not provide for the ability to merge or consolidate with other corporations.  *Id.* Ex. C.  Equitable held a leasehold on the land on which the CAN MGP was located (the "Site"), which was owned by W.B. Cluff and W.F. Harris.[2]  On August 17, 1903, Frank Drum purchased 128,510 shares of Equitable stock, out of a total of 141,770 issued shares, at a reported price of $600,000.[3]

### B.   SFG&E Purchased Equitable's Assets on August 31, 1903 For Cash.

In an Indenture executed on August 31, 1903, SFG&E purchased all of Equitable's assets, including the CAN MGP and Equitable's leasehold interest in the Site.  Mink Dec. Ex. D. SFG&E agreed to pay Equitable $708,850 *in cash*, for property valued at $445,392.75 at the time of purchase.[4]  The purchase was approved by SFG&E's Board of Directors, and by the holders of two-thirds of Equitable's stock.[5]  It was not submitted to SFG&E's stockholders for approval.[6] SFG&E paid Equitable the agreed-upon amount of $708,850 at some point before October 19, 1903, when SFG&E recorded the Indenture.[7]  As was the custom at the time, the parties did not list the entire payment amount in documents that would be recorded, instead using the term of art "ten (10) dollars, United States Gold coin…and other good and valuable considerations," to establish legal consideration for the transaction.  *See* Mark Dec., ¶¶ 6-7.  Notably, the Indenture did not include assumption of any of Equitable's liabilities.  Mink Dec. Ex. D.

In 1903, SFG&E also acquired the assets of PGIC.  Mink Dec. Ex. I, at 6.  In contrast to

---

[2] *See* Mink Dec. Exs. D, at 2-3; E.
[3] *See* Mink Dec. Exs. D, at 5 (number of shares held); F, col. 7 ("Gas Company Changes Hands") (price paid); G, at 453 (price paid).
[4] Mink Dec. Exs. H, at 166-167; I, at 6.
[5] Mink Dec. Exs. D, at 5; H, at 166-167.
[6] *See* Mink Dec. Exs. J; K; L.
[7] *See* Mink Dec. Exs. M; N.

the $708,850 all cash Equitable transaction, Independent's assets were purchased for a combination of cash, an interest payment, and assumption of floating debt.  *Id*.  PGIC's assets were purchased for an exchange of stock, and assumption of PGIC's bonded indebtedness.[8]

**C.    SFG&E Shut Down the CAN MGP, and There is No Evidence That SFG&E Ever Operated It.**

The evidence shows that, when SFG&E got access to the CAN MGP after the asset purchase on August 31, 1903, it disconnected Equitable's mains from the CAN MGP, "in such manner that we were enabled to shut down the plant at the foot of Hyde Street."  Mink Dec. Ex. I, at 12.  By the end of 1903, SFG&E had removed the gas generators from the CAN MGP for use at the Independent MGP (*id.* at 12-13), such that gas could no longer be manufactured at the CAN MGP.  Of the three MGPs SFG&E acquired in 1903, SFG&E only operated the Independent MGP.  *Id.* at 12.  In 1905, SFG&E transferred the two gas-holders from the CAN MGP to the Independent MGP.[9]  There is no evidence that SFG&E used the gas-holders at the CAN MGP site before their removal.  A 1909 article confirms that neither the PGIC MGP nor the CAN MGP had been in use at the time of the April 1906 earthquake.  Mink Dec. Ex. S, at 78.

**D.    Equitable's Directors, Shareholders, and Managers Did Not Become SFG&E Directors and Shareholders and Managers.**

The individuals who served on Equitable's Board of Directors at any point from May 21, 1903 through October 18, 1904 (when Equitable was dissolved) were Charles Ackerman, Lloyd Baldwin, Leon Blum, W.S. Burnett, Albert Cerf, Joseph Donohoe, F.G. Drum, Frank L. Fenton, D. Freidenrich, P.J. Muller, Joseph Naphtaly, Frank Pauson, L.E.W. Pioda, Leon E. Prescott, F.C. Seibe, S.H. Tacy, Thomas Turner, J. Walter Ward, Charles W. Willard, A.H. Winn, and L.F. Young.[10]  The individuals who served on SFG&E's Board of Directors at any point from April 1903 through April 1904 were Antoine Borel, H.C. Bothin, W.B. Bourn, W.J. Dutton, J. Downey Harvey, Isaias W. Helmann, C. Osgood Hooker, Homer King, Edward J. McCutcheon, C.O.G.

---

[8] Mink Dec. Exs. H, at 168-172; I, at 6; O, at 145; P, at 5.
[9] Mink Dec. Exs. Q, at 324; R, col. 1 ("Gas Holder Towed Up the Bay").
[10] *See* Mink Dec. Exs. T, at 797; U; F, col. 7 ("Gas Company Changes Hands"); W, at 1; X, at 5.

1   Miller, L.F. Monteagle, Daniel Murphy, A.H. Payson, Rudolph Spreckels, and Robert Watt.[11]

2           The only evidence showing the identities of Equitable's shareholders consists of two sets

3   of stock certificates, a newspaper article, and lists of shareholders in several documents.[12]  The

4   complete listings of SFG&E shareholders are contained in the Minutes of the SFG&E

5   Shareholders' Meetings for October 1903, April 1904, and April 1905, and in a listing dated

6   March 30, 1904.[13]  At the time of the asset purchase in August 1903, Frank Drum held 128,510 of

7   Equitable's 141,770 shares.  Mink Dec. Ex. D, at 7.  By November 1, 1903, SFG&E had

8   purchased all of Drum's Equitable shares, along with 9,942 shares from other sources.[14]  Of the 24

9   known Equitable shareholders,[15] only two held any shares in SFG&E in their own names in 1903

10  or 1904, but they continued to hold the same number of Equitable shares after they acquired the

11  SFG&E stock as they had before they acquired it.  Worthington Ames purchased 100 shares of

12  Equitable stock in 1901.[16]  Although he obtained 145 shares of SFG&E stock between October 22,

13  1903 and April 26, 1904, he retained his 100 shares in Equitable until it dissolved in 1904.[17]  J.

14  Walter Ward acquired 5 shares of Equitable stock in September 1903—after the SFG&E-

15  Equitable transaction.[18]  Although he had obtained 592 shares of SFG&E stock by October 22,

16  1903, he retained his 5 shares of Equitable stock until Equitable dissolved in 1904.[19]

17          Before and after the SFG&E-Equitable transaction, SFG&E's General Manager was Allan

18  Pollok.[20]  When Pollok left the job later in 1903 to manage the St. Francis Hotel, J.F. Lawless,

19  formerly of the Pacific Steamship Company, was hired as SFG&E's new General Manager.[21]

20

21  [11] *See* Mink Dec. Exs. I (PDF p. 3); J, at 37; U; Y.
    [12] *See* Mink Dec. Exs. Z; AA; BB; CC, at 93; D, at 5; DD, at 1.
22  [13] *See* Mink Dec. Exs. K, at 40-52; L, at 60-86; EE; FF, at 93-114.
    [14] Mink Dec. Ex. GG (deposit of SFG&E's 138,452 Equitable shares); VV (SFG&E purchased the
23  Equitable shares it held); V (three of the Equitable certificates SFG&E deposited totaled 128,510 shares).
    [15] Charles Ackerman, Worthington Ames, Lloyd Baldwin, Leon Blum, W.S. Burnett, Albert Cerf,
24  Joseph Donahoe, Frank Drum, Frank Fenton, W.B. Hepworth, P.J. Muller, Joseph Naphtaly, Frank
    Pauson, R.B. Phillips, L.E.W. Pioda, Leon Prescott, A.E. Brooke Ridley, F.C. Siebe, S.H. Tacy, Thomas
25  Turner, J. Walter Ward, Charles Willard, A.H. Winn, L.F. Young.  *See* Mink Dec. Exs. D, at 7; Z; AA;
    BB; CC, at 93; DD, at 1.
26  [16] Mink Dec. Ex. Z, at 3-5.
    [17] Mink Dec. Exs. K (not listed); L, at 60 (145 shares); DD, at 1.
27  [18] Mink Dec. Ex. AA, at 4.
    [19] Mink Dec. Exs. K, at 52; DD, at 1.
28  [20] *See* Mink Dec. Ex. HH, col. 5 ("One Dollar Gas May Continue").
    [21] *See* Mink Dec. Exs. II, col. 3 ("Personal Mention"); JJ, col. 1 ("Receives Presents From His Former
    Associates"); KK, col. 2 ("Personal Mention").

**E.      Following SFG&E's Asset Purchase, Equitable Continued to Exist and to Take Actions Until It Was Judicially Dissolved in October 1904.**

After the asset purchase in August 1903, Equitable continued to exist as a corporation for more than a year.  On October 18, 1904, the San Francisco Superior Court entered a decree of dissolution, formally dissolving Equitable, finding that "all claims and demands against said corporation, Equitable Gas Light Company, have been fully paid, satisfied, and discharged[.]" Mink Dec. Ex. X, at 5.  Between the SFG&E asset purchase and the dissolution, Equitable appeared in court and defended a lawsuit based on events that occurred before the asset purchase. *See Gallagher v. Equitable Gaslight Co.*, 141 Cal. 699, 709, fn. * (1904) (Equitable sought reconsideration at some point between opinion date of January 20, 1904 and February 19, 1904).

**F.      SFG&E Sold its Interest in the Site in September 1906.**

On September 19, 1906, SFG&E's Board of Directors noted that it had received an offer from Charles Ackerman to purchase all of SFG&E's interest in the Site for $24,000—including an option in the lease allowing the lessee to purchase the property from the lessors for $80,000.  Mink Dec. Ex. LL, at 444-447.  Because the CAN MGP had been dormant for years, the Board of Directors approved a resolution to sell SFG&E's leasehold interest to Ackerman, listing consideration of $10 for purposes of recording the indenture.  *Id.*  On September 22, 1906, SFG&E executed an indenture to Ackerman containing those terms.  *Id.* Ex. MM.  Two days later, on September 24, 1906, Ackerman recorded his purchase of the Site from Cluff and Harris, as well as his re-sale of the property to William Thomas, listing $10 as the recorded consideration for each transaction.  *Id.* Ex. NN.  On September 26, 1906, Thomas sold the Site to the California Fruit Canners' Association, listing $10 as the recorded consideration.  *Id.*

**G.      The New Owners of the Site Demolished the CAN MGP in October 1906.**

In October 1906, the buildings comprising the CAN MGP were demolished by the new owners of the property, the California Fruit Canners' Association, not by PG&E as alleged in the FAC.  *Compare* Mink Dec. Ex. OO *with* FAC ¶¶ 68, 101.

**IV.      APPLICABLE PROCEDURAL STANDARDS**

Under Rule 56, summary judgment "should be rendered forthwith" when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Id*. at 323.  When the nonmoving party would bear the burden of proof at trial, the moving party may satisfy its burden on summary judgment by simply pointing out to the Court an absence of evidence from the nonmoving party. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  "The moving party need not disprove the other party's case." *Id.*  Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate specific facts showing a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

Facts submitted in opposition to summary judgment "must be admissible at trial and made on personal knowledge." *Coplin v. Conejo Valley Unif. Sch. Dist.*, 903 F. Supp. 1377, 1381 (C.D. Cal. 1995), *aff'd,* 116 F.3d 483 (9th Cir. 1997).  Neither legal conclusions nor statements not based on personal knowledge can create genuine issues of material fact.  *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 777 (9th Cir. 2010); *Leffridge v. Nationstar Mortg., LLC*, 2015 WL 12681307, *5 (C.D. Cal. Nov. 19, 2015); *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Inv'rs, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991), *aff'd,* 508 U.S. 49 (1993).  A dispute of fact is only genuine and material if it relates to "a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law." *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986) (for a dispute to be genuine, evidence must be "such that a reasonable jury could return a verdict for the nonmoving party").

## V.   DIRECT LIABILITY FOR CWA OR RCRA FAILS BECAUSE NEITHER PG&E NOR SFG&E CAUSED ANY CONTAMINATION AT OR FROM THE SITE.

Direct liability on Clarke's RCRA claim requires active conduct by PG&E or SFG&E, not SFG&E's mere ownership of the CAN MGP or leasing of the Site.  As the Court previously noted,

> The Ninth Circuit has decided "that the statutory language permitting suits against 'any person ... who has contributed or who is contributing' to the handling, storage, treatment, transportation or disposal of hazardous waste, [42] § 6972(a)(1)(B), requires that a defendant be actively involved in or have some degree of control over the waste disposal process to be liable under RCRA."

1   Dkt. 26 at 8:21-26 (*citing Hinds Investments, L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011)).

2   "The term ['contributed to'] has been universally held to infer something more than mere

3   ownership of a site; some level of causation between the contamination and the party to be held

4   liable must be established." *Id.* at 9:8-11 (*quoting Delaney v. Carmel*, 55 F. Supp. 2d 237, 256

5   (S.D.N.Y. 1999)). *Hinds* noted that its ruling was consistent with *Sycamore Indus. Park Assocs. v.

6   Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008) (RCRA requires "affirmative action rather than

7   merely passive conduct") and *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796,

8   844 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ("only active human involvement with the

9   waste is subject to liability under RCRA.") *Hinds*, 654 F.3d at 851.

10        In *City of Imperial Beach v. Int'l Boundary & Water Comm'n, United States Section*, 356

11   F. Supp. 3d 1006 (S.D. Cal. 2018), the court rejected an argument that, under *Hinds*, any handling,

12   storage, treatment, transportation, or disposal of waste is *per se* "active involvement with the

13   waste." *Id.* at 1023, n. 9 (*citing Sycamore Indus. Park*, 546 F.3d at 854). It also noted that "the

14   mere ownership of contaminated land…[is] insufficient for contribution under RCRA." *Id.* at

15   1023 (*citing First San Diego Properties v. Exxon Co.*, 859 F. Supp. 1313 (S.D. Cal. 1994). In

16   *First San Diego*, the court dismissed a RCRA counterclaim against the plaintiff who, "since

17   purchasing the property has never used the new storage tanks, and has added no contaminants to

18   the property during plaintiff's ownership period." *Id.* at 1316.

19        Here, there is no evidence that SFG&E, much less PG&E, ever had any active involvement

20   in the handling, storage, treatment, transportation or disposal of waste at the CAN MGP, and thus

21   they cannot be held directly liable under RCRA as a matter of law.

22        Similarly, direct liability on Clarke's CWA cause of action requires something more from

23   SFG&E than mere ownership of the CAN MGP. Clarke's only theory that the alleged discharges

24   are made "by a person" (as required for CWA liability) is that they are by the person who

25   originally deposited the contamination now allegedly being discharged from the site. In his

26   Opposition to PG&E's Motion to Dismiss the CWA claim in the FAC, Clarke argued that "but for

27   PG&E's actions, no pollutant discharges would occur from the Cannery MGP." Dkt. 46 at 9:23-

28   25 (*citing* Clarke Opp. at 12). In ruling on that motion, the Court distinguished *Froebel v. Meyer*,

217 F.3d 928, 938-39 (7th Cir. 2000) on the ground that the *Froebel* court affirmed the dismissal of a CWA defendant whose only "activity" was owning the land on which the violation occurred, whereas "PG&E is alleged to have been responsible for operation of the Cannery MGP," which the Court held "cannot be said to have been 'purely passive.'"  Dkt. 46 at 10:11-21.

As discussed below, Clarke cannot show that PG&E or SFG&E operated the CAN MGP— or did anything else to cause contamination at the Site—and thus Clarke cannot establish direct liability against PG&E on either of his causes of action.

**A.    There Is No Evidence That SFG&E Contaminated the Site.**

      **1.    There is No Evidence that SFG&E ever operated the CAN MGP, or used any of its components at the Site.**

When SFG&E got access to the CAN MGP after its asset purchase on August 31, 1903, it disconnected Equitable's mains from the CAN MGP "in such manner that we were enabled to shut down the plant at the foot of Hyde Street."  Mink Dec. Ex. I, at 12.  Thus, once SFG&E obtained the CAN MGP, the plant stopped manufacturing gas or supplying gas to customers.  Of the three MGPs that SFG&E acquired in 1903, SFG&E only operated the Independent MGP.  *Id*.  Next, before the end of 1903, SFG&E removed the gas generators from the CAN MGP, so that they could be used at the Independent MGP.  *Id.* at 12-13.  Thus, the MGP was no longer even capable of being operated to manufacture gas.  In 1905, SFG&E had the two gas-holders at the Site removed and relocated for use at the Independent MGP.  *Id*. Exs. Q, at 324; R, col. 1 ("Gas Holder Towed Up the Bay").  There is no evidence SFG&E used the gas-holders before their removal, or that it ever operated the CAN MGP. [22]

---

[22] PG&E expects Clarke to offer tables, prepared in the mid-1980s summarizing the periods of operation for various MGPs in San Francisco, to suggest that the CAN MGP may have operated until 1906. PG&E will address those documents in more detail should Clarke seek to admit them as evidence in opposing this motion, but PG&E notes that those documents were prepared some 80+ years after the SFG&E sold its leasehold interest in the Site, and written by persons without any personal knowledge or foundational documentation to support the referenced end-date.  Those documents therefore could not create any triable issue of material fact.  *Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370, 1377 (9th Cir. 1978) (statements that a witness "could only have gained knowledge of through unrevealed records or hearsay" were insufficient to create genuine issues of fact); *see Coplin*, 903 F. Supp. at 1381, *aff'd*, 116 F.3d 483; *Columbia Pictures*, 944 F.2d at 1529, *aff'd*, 508 U.S. 49 (statement not based on personal knowledge cannot create a triable issue of fact); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (statements without personal knowledge are "entitled to no weight" on summary judgment).

2.     **The Evidence Shows that SFG&E did not demolish the CAN MGP.**

Clarke also alleges that PG&E or SFG&E demolished the CAN MGP, and on that basis seeks to establish liability under RCRA and the CWA. The undisputed evidence shows that Clarke is wrong. The buildings that comprised the CAN MGP were demolished in October 1906, not by SFG&E but by the then-new owners of the property, the California Fruit Canners' Association. Mink Dec. Ex. OO. SFG&E had already transferred all of its rights to the Site to Charles Ackerman in September 1906, a month before any demolition activities. Mink Dec. Ex. MM. Thus, Clarke cannot establish that SFG&E or PG&E "demolished" the CAN MGP—let alone that either entity caused any contamination as a result of the demolition.

**B.     PG&E Did Not Contaminate the Site.**

Clarke alleges that, after its incorporation in October 1905 and before the April 1906 earthquake, PG&E owned and operated the CAN MGP. But neither is true. By the time PG&E was incorporated, SFG&E had already:  purchased the CAN MGP from Equitable, along with a leasehold to the Site; shut down the CAN MGP; removed its gas generators; and removed the former CAN MGP's gas holders.[23] Moreover, SFG&E—not PG&E—continued to hold the leasehold rights to the Site after the 1906 earthquake, until September 1906, when SFG&E sold all of its rights to the Site (along with the buildings that comprised the former CAN MGP—given that the buildings were still on the site when the California Fruit Canners' Association demolished the site a month later). Mink Dec. Exs. MM, OO. There is no evidence PG&E ever held any rights to the Site, or the remaining components of the former CAN MGP.

**VI.     SFG&E DID NOT SUCCEED TO ANY LIABILITY OF EQUITABLE.**

Because neither SFG&E nor PG&E undertook activities that would subject either of them to RCRA or CWA liability related to the Site, Clarke can only prevail on his claims if he can show that SFG&E succeeded to Equitable's liabilities.[24] As discussed below, however, the Equitable-

---

[23] Mink Dec. Exs. D; I, at 12; Q, at 324; R, col. 1 ("Gas Holder Towed Up the Bay"); QQ, at 7.
[24] Equitable dissolved a year before PG&E was incorporated. *See* Mink Dec. Exs. X, at 5; QQ, at 7. Thus, Clarke cannot show that PG&E holds successor liability for Equitable directly. However, for purposes of this action, PG&E does not dispute that it succeeds to any adjudicated liability of SFG&E with respect to contamination of the Site.

1   SFG&E transaction was an asset purchase, and did not result in a transfer of Equitable's liability.[25]

2          **A.      Equitable Did Not Merge or Consolidate With SFG&E.**

3          At the time of the 1903 transaction, California did not have a statute allowing merger of

4   gas corporations such as Equitable and SFG&E.  As the California Supreme Court had held only

5   eight years earlier, "[c]orporations cannot, without the consent of all their stockholders,

6   consolidate with others, except where the power so to do is given by their charters, or by a general

7   statute, existing at the date of incorporation, or in those cases where the right is reserved by

8   constitutional or statutory provision to the legislature to alter or amend the charter."  *Mkt. St. Ry.*

9   *Co. v. Hellman*, 109 Cal. 571, 585 (1895); *see also* 15 Fletcher, Cyclopedia of the Law of Private

10  Corporations (rev.vol.1990) § 7153 ("Corporations must have legal authority to consolidate or

11  merge").  None of these methods were used in the Equitable-SFG&E transaction.

12         The transaction was not accomplished with the consent of all of the two companies'

13  stockholders.  The transaction was approved by the holders of two-thirds of Equitable's stock, not

14  by all of its stockholders.  Mink Dec. Ex. D, at 5.  Approval of the transaction was not even

15  submitted to SFG&E's shareholders at all, but rather was authorized by its Board of Directors.[26]

16  As a result, the transaction could not have been a consolidation by consent.  Nor did the

17  companies' "charters"—their articles of incorporation—authorize consolidations.  . *Id.* Exs. A, C;

18  *Hamilton v. Bates*, 35 P. 304, 306 (Cal. 1893) (using "articles of incorporation" and "charter"

19  synonymously).  Accordingly, consolidation based on charters is inapplicable here.

20         Finally, there was no general statute, existing at the time of the transaction, allowing for

21  merger or consolidation of gas companies.  Rather, the Civil Code authorized consolidations only

---

[25] Clarke will have to establish, because PG&E does not concede, that Equitable could have liability under statutes that did not exist when the company existed, and the same is true for SFG&E.

[26] The transaction also failed to meet additional requirements for consolidations.  According to a law review article published shortly before California's general merger statute went into effect, earlier courts had recognized the ability of corporations to consolidate, but only if certain requirements were met. These requirements included:  (1) transfer of assets by operation of law, rather than by instruments of conveyance; and (2) that upon consolidation, a new corporation was created and the constituent corporations lost their corporate existence.  Hills, George S., *Consolidation of Corporations by Sale of Assets and Distribution of Shares*, 19 Calif. L. Rev. 349, 351-352 (Vol. 4 1931).  Given these requirements, the SFG&E-Equitable transaction was not a consolidation:  SFG&E purchased Equitable's assets by means of a written conveyance, rather than by operation of law; and both Equitable and SFG&E maintained their corporate existences after the transaction.

1   of railway and mining companies.  *See* Mink Dec. Ex. RR, at 4-6, former § 473 ("Two or more

2   Railroad Corporations may consolidate their capital stock, debts, property, assets, and franchises

3   in such manner as may be agreed upon by their respective Boards of Directors"); *id* at 2-3, former

4   § 361 (authorizing consolidation of mining companies).  Former title XV of the Civil Code

5   (sections 628-632), which applied to gas corporations, contained no such authorization to merge or

6   consolidate.  *Id.* at 7-8.  Authorizing a particular class of companies, such as railroad companies,

7   to consolidate does not constitute authority for other companies to do so.  *See* 19 C.J. S.

8   Corporations § 796 (where a statute authorizes certain categories of corporations to consolidate,

9   "the power to consolidate is limited to the corporations falling within the designated class").

10          Because a consolidation was not authorized by unanimous consent, nor charter, nor general

11   statute, the Equitable-SFG&E transaction did not amount to a consolidation or merger.[27]

12          **B.      The August 1903 Transaction Was an Asset Purchase, Which Does Not Result
                    in Successor Liability Without an Exception.**

13

14          Although there was no general merger statute in California in 1903, the law at the time did

15   provide for sale by a corporation of all of its assets.  Under former Civil Code section 361a, such a

16   sale required the consent of the holders of two-thirds of issued capital stock of the selling

17   corporation.  Mink Dec. Ex. RR, at 3.  The consent of the shareholders of the purchasing

18   corporation was not required.  *Id.*  The August 31, 1903 Indenture is just such an asset purchase.

19   *First*, on its face, the Indenture purports to transfer to SFG&E all of Equitable's assets.  *Second*,

20   the Indenture specifically notes that the transaction is being approved by the holders of more than

21

---

22   [27] PG&E anticipates that Clarke may argue that Equitable and SFG&E "merged" based on colloquial use
     of the term "merge" in certain documents authored after the transaction.  Such documents cannot create
23   genuine disputes of fact.  The documents constitute hearsay, and are not based on personal knowledge, as
     required for documents to be admissible in opposition to summary judgment; cannot create a triable issue
24   of fact; and are "entitled to no weight" on summary judgment.  *See* fn. **Error! Bookmark not defined.**, *s
     upra*. Even if the statements were admissible, they are either irrelevant or constitute legal conclusions:  If
25   the term "merge" was being used in a colloquial sense—i.e. not in the legal sense that could result in
     successor liability—then the statements are irrelevant to the issue of successor liability.  If, on the other
26   hand, the term "merge" was being used in its legal sense, it would constitute a legal conclusion, which
     cannot create a genuine issue of fact.  *Sullivan*, 623 F.3d at 777; *Leffridge* 2015 WL 12681307, at *5.
27   Whether the SFG&E-Equitable transaction was a merger is a question of law, which is determined by
     what the parties *did*, not by what they or others later *said*.  *See Gallegos v. City of Los Angeles*, 308 F.3d
28   987, 992 (9th Cir. 2002); *Anderson v. Valspar Corp.*, 2013 WL 552001, at *18 (E.D. Cal. Feb. 12,
     2013).

two-thirds (but less than all) of the stock of Equitable.  Mink Dec. Ex. D, at 5 (135,910 shares out of a total of 141,770 issued shares).  *Third*, the transaction was not based on the consent of SFG&E's shareholders:  the Indenture does not mention SFG&E's shareholders, and the purchase was not submitted to the shareholders at their next meeting on October 22, 1903, or at the April 26, 1904 meeting (the only other shareholders meeting held before Equitable dissolved in October 1904).  Thus, the Equitable-SFG&E transaction was an asset purchase.

"The general rule of successor nonliability provides that where a corporation purchases or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities." *Fisher v. Allis-Chalmers Corp. Prod. Liab. Trust*, 95 Cal. App. 4th 1182, 1188 (2002).[28]   A purchaser of corporate assets does not assume the seller's liabilities unless one of four exceptions applies:

1.   An express or implied agreement to assume the selling corporation's liabilities;

2.   The purchasing corporation is the mere continuation of the selling corporation;

3.   The transaction amounts to a de facto merger or consolidation; or

4.   The transfer was for the purpose of defrauding the seller's creditors.

*Beatrice Co. v. State Bd of Equalization*, 6 Cal. 4th 767, 778 (1993); *Phillips v. Cooper Labs*, 215 Cal. App. 3d 1648, 1654 (1989); *see also Atchison, Topeka and Santa Fe R.R. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997) (federal common law is the same); *Ferguson v. Arcata Redwood Co., LLC*, No. C03-05632 SI, 2004 WL 2600471, at *6 (N.D. Cal. Nov. 12, 2004) (applying same four exceptions to non-liability of asset purchasers in granting motion to dismiss RCRA claim without leave to amend for failure to aver facts establishing any exception). In order to impose successor liability on SFG&E for the pre-August 1903 operations of Equitable, Clarke has the burden of alleging and proving that one of these four exceptions should apply to transfer that liability.  *See Ferguson*, at *8-17; *Chaknova v. Wilbur Ellis Co.*, 69 Cal. App. 4th 962 (1999) (abrogated on other grounds as recognized in *Weber v. John Crane, Inc*., 143 Cal. App. 4th

---

[28] Because neither RCRA nor the CWA addresses successor liability, that issue is governed by California law.  "[T]he Supreme Court has instructed that "matters left unaddressed in [a comprehensive and detailed statutory scheme] are presumably left to the disposition provided by state law."  *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1061 (9th Cir. 2011) (*citing O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 85 (1994)).

1  1433, 1441 (2006)).  Clarke has not averred facts as to any of the four exceptions.  Moreover, as

2  discussed below, none of the four exceptions to non-liability applies here in any case.

3  **1.  There Was No Assumption of Liability.**

4  There is no evidence SFG&E assumed any of Equitable's liabilities.  In approving its

5  dissolution in October 1904, the San Francisco Superior Court made findings about Equitable's

6  liabilities without any reference to any assumption of liabilities by SFG&E.  *See* Mink Dec. Ex. X.

7  Importantly, the operative contract itself does not contain any assumption of liability.  The

8  existence and extent of an assumption of liability is a matter of contract interpretation, governed

9  by state law.  *See Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1460 (9th Cir. 1986) (state

10  law applied to determination of contractual liability for successor on CERCLA claim; applying

11  federal common law would "undermine the stability of the state law generally governing such

12  commercial transactions"); *see also Carter v. CMTA-Molders & Allied Workers Health & Welfare

13  Tr.*, 563 F. Supp. 244, 247 (N.D. Cal. 1983), *aff'd* 736 F.2d 1310 (9th Cir. 1984) (whether party

14  who did not expressly assume liabilities can be "found to have assumed them impliedly is a

15  question of state law.").  The August 31, 1903 Indenture makes no mention of Equitable's

16  liabilities, let alone an assumption of such liabilities by SFG&E.  Nor is there any mention of

17  assumption of liability in SFG&E's Board of Directors Meeting Minutes either before or after the

18  transaction.  *See* Mink Dec. Exs. H, M, SS, TT.  The absence of contemporaneous evidence of

19  assumption of liability negates this exception to the rule of non-liability for asset purchasers.

20  When SFG&E intended to assume another entity's liabilities, it expressly said so.  For

21  example, in SFG&E's transaction with PGIC one day after its Equitable transaction, SFG&E

22  expressly assumed PGIC's bonded indebtedness.  Mink Dec. Ex. O, at 145.  Likewise, the SFG&E

23  Board of Directors Meeting Minutes reflect express approval of this specifically-assumed liability.

24  *Id.* Ex. H, at 168-170.  The absence of such expressions in the SFG&E-Equitable transaction

25  reinforce the fact SFG&E did not assume Equitable's liabilities.

26  Nor can Clarke support a claim that SFG&E impliedly assumed Equitable's liabilities.

27  Preliminarily, Clarke has not alleged any factual circumstances in the FAC that could give rise to

28  an implied assumption, which alone is fatal to such a claim.  *See No Cost Conf., Inc. v.*

*Windstream Commc'ns, Inc.*, 940 F. Supp. 2d 1285, 1300 (S.D. Cal. 2013) (plaintiff could not establish defendant's implied assumption of liability where it failed to plead factual circumstances giving rise to such an assumption); *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1037 (C.D. Cal. 2015) ("*Gerritsen I*") (*citing No Cost*).  Moreover, whether there was an assumption of liability is a question of law, determined by what the parties *did*, not by what they or others later *said*.  *See Gallegos*, 308 F.3d at 992; *Valspar*, 2013 WL 552001, at *18; *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 845 (9th Cir. 1992) (rejecting argument that purchasing company's post-asset sale statement to the California Department of Corporations that it had acquired "the business, assets and liabilities" of the selling company showed an implied intent to assume tort liability where the purchase agreement did not provide for assumption of such liability).

The Indenture did not mention assumption of liabilities, and there is no evidence that SFG&E and Equitable ever discussed such an assumption at the time of the transaction.  *See Carter*, 563 F. Supp. at 247, *aff'd* 736 F.2d 1310 (no implied assumption of liabilities where "[t]he purchase and sale agreement was silent with respect to the assumption of contractual or other liabilities, and there is no evidence that Carter and Romero discussed the matter.").

## 2.    SFG&E Was Not a "Mere Continuation" of Equitable.

"[A] corporation that purchases the principal assets of another corporation may be subject to the former corporation's liabilities if the buyer is a 'mere continuation of the selling corporation.'"  *Gofron v. Picsel Techs., Inc.*, 804 F. Supp. 2d 1030, 1037–38 (N.D. Cal. 2011) (*citing Katzir's Floor & Home Design, Inc. v. M–MLS.com,* 394 F.3d 1143, 1150 (9th Cir. 2004) and *Ray v. Alad Corp.,* 19 Cal. 3d 22, 28 (1977)).  "To prevail on such a theory, plaintiff [must] demonstrate [that] '(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [and that] (2) one or more persons were officers, directors, or stockholders of both corporations.'" *Gerritsen II*, 116 F. Supp. 3d at 1133 (*quoting CenterPoint Energy, Inc. v. Superior Court,* 157 Cal.App.4th 1101, 1120 (2007) and *Ray,* 19 Cal.3d at 28) (brackets in *Gerritsen II*).

Of the two prongs of the mere continuation test, the "crucial factor" is the first prong, "whether adequate cash consideration was paid for the predecessor corporation's assets."  *Franklin*

*v. USX Corp.*, 87 Cal. App. 4th 615, 625 (2001).  The party asserting the theory of successor

liability bears the burden of establishing inadequate consideration.  *Katzir's*, 394 F.3d at 1151

(*citing Maloney v. American Pharm. Co.,* 207 Cal. App. 3d 282, 287 (1988) ("Before one

corporation can be said to be a mere continuation or reincarnation of another, it is required that

there be insufficient consideration running from the new company to the old.")).  As the *Franklin*

court noted, "[n]o California case we have found has imposed successor liability for personal

injuries on a corporation that paid adequate cash consideration for the predecessor's assets."  87

Cal. App. 4th at 625  "[T]he common denominator, which must be present in order to avoid the

general rule of successor non-liability, is the payment of inadequate consideration[.]"  *Gerritsen II*,

116 F. Supp. 3d at 1133 (*citing Franklin,* 87 Cal.App.4th at 627).  Thus, "[c]ourts have held that

common officers and shareholders alone are insufficient to establish a mere continuation."

Courts have rejected arguments for mere continuation where the defendant paid adequate

cash consideration.  *See Maloney,.* 207 Cal. App. 3d at 287 (refusing to find defendant liable as a

successor corporation, even though defendant held itself out as continuation of purported

predecessor and shared common shareholders, where defendant paid adequate consideration for

assets); *Katzir's*, 394 F.3d at 1150-51 (reversing district court's addition to judgment of purported

successor where plaintiff failed to establish that the purported successor gave inadequate

consideration for the acquired assets, the "essential ingredient" for a mere continuation claim);

*Roger D. Dahl, Inc. v. Sun Microstamping Techs.*, 242 F. App'x 433, 434 (9th Cir. 2007) (*citing

Katzir's*, 394 F.3d at 1150) (affirming grant of summary judgment in favor of defendant where

plaintiff failed to raise a triable issue as to inadequate consideration, an "essential ingredient" to

the mere continuation exception); *see also Beatrice*, 6 Cal. 4th at 778-779 ("even when the same

persons are officers or directors of the two corporations, liability is not imposed where recourse to

the debtor corporation [or the adequate consideration it received for its assets] is available.");

*Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 468 F. Supp. 3d 1236, 1241 (C.D. Cal. 2020)

(characterizing the payment of inadequate cash consideration as a "crucial factor" and finding that

it must be present to impose successor liability under a mere continuation theory; "common

officers and shareholders alone are insufficient to establish a mere continuation.").

1    As discussed below, Clarke cannot establish inadequate consideration, which alone is fatal

2    to any "mere continuation" theory.  Moreover, he cannot establish continuity of officers, directors,

3    or shareholders, so the "mere continuation" theory fails on that ground too.  Finally, the fact that

4    the corporations remained separate after the transaction precludes a mere continuation finding.

5                        **(a)      SFG&E paid adequate consideration for Equitable's assets.**

6        The undisputed evidence shows that SFG&E paid $708,850 in cash to Equitable for its

7    business and property, and that Equitable's properties were valued at $445,392.75 at the time of

8    purchase.[29]  Thus, on its face, the consideration paid for Equitable's assets was adequate.

9    Moreover, it is indisputable that the San Francisco Superior Court found that "all claims and

10   demands against said corporation, Equitable Gas Light Company, have been fully paid, satisfied,

11   and discharged[.]"  Mink Dec. Ex. X, at 5.  For the "mere continuation" exception, the relevant

12   inquiry is "whether assets were available to meet a creditor's claim at the time of dissolution," and

13   not, e.g., "whether assets were available to satisfy a claim arising some 50 years after

14   dissolution[.]"  *Franklin*, 87 Cal. App. 4th at 627, n.7 (*citing Marks v. Minnesota Mining and*

15   *Manufacturing Company*, 187 Cal. App. 3d 1429, 1436 (1986) and *Ray v. Alad,* 19 Cal. 3d at 29).

16       Clarke has not plead, and cannot establish, "inadequate consideration," an essential

17   element for the mere continuation exception to non-liability in an asset purchase.

18                        **(b)      There was no continuity of officers or directors.**

19       Clarke likewise has not pled, nor can he prove,  continuity of officers or directors between

20   Equitable and SFG&E.  As an initial matter, continuity of directors would require a significant

21   overlap in directorships.  *See Maloney,* 207 Cal.App.3d at 288 ("a mere continuation typically

22   involves continuity of employees beyond [a] single officer"); *Stanford Hotel Co. v. M. Schwind*

23   *Co.*, 180 Cal. 348, 354 (1919) (mere continuation exception applies where a new corporation has

24   "practically the same stockholders and directors); *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C

25   05 0553 MHP, 2007 WL 2462142, at *10 (N.D. Cal. Aug. 29, 2007) (*citing Maloney*); *Ferguson*,

26   2004 WL 2600471, at *5 (requiring "identity" of stockholders and directors).

27       Although SFG&E's Secretary Charles L. Barrett served as Equitable's Secretary for

28   _____

[29] Mink Dec. Exs. H, at 166-167; I, at 6; UU, at 815.

purposes of *effecting its  dissolution*, there is no indication he ever served as an Equitable officer during its corporate existence.  Nor did any other SFG&E officer serve as an Equitable officer.

There is no continuity of directorship at all.  None of the individuals who served on Equitable's Board of Directors at any point during the period from May 21, 1903 through its dissolution on October 18, 1904 became SFG&E Directors at any point during the period from April 21, 1903 through April 7, 1904—let alone as a result of the transaction.  As a result, Clarke cannot allege or establish continuity of directors for purposes of the mere continuation exception.[30]

### (c)      There was no continuity of shareholders.

As with continuity of officers and directors, the exception requires more than a de minimis overlap in shareholders between the two companies.  The mere fact that one or more persons were officers, directors, or stockholders of both corporations is "insufficient to justify imposition of liability" under this exception.  *Maloney*, 207 Cal. App. 3d at 287-288; *see also Stanford Hotel*, 180 Cal. at 354.  Moreover, continuity of shareholders occurs only where the shareholders of the purchased company become shareholders *as a result of the asset purchase*.  *Louisiana-Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264 (9th Cir. 1990) (upholding ruling finding no continuity of shareholders where no stock of purchasing corporation was exchanged as part of sale) *overr'd on other grounds*, *Atchison*, 132 F.3d 1295.  Obtaining shares of the purchasing company on the open market is not sufficient.  *See Louisiana Pacific*, 909 F.2d at 1264 (that some former shareholders of purchased corporation later obtained stock of purchasing company on open market did not create genuine issue of material fact re continuity of shareholders).

Here, of the 24 known Equitable shareholders, only two held any shares in SFG&E in their

---

[30] PG&E anticipates that Clarke may argue he can show continuity of directors because one of Equitable's directors later became one of *PG&E's* directors.  Specifically, Frank Drum was an Equitable director from August through October 1903, but was no longer an Equitable director by September 1904.  Equitable dissolved in October 1904.  When PG&E was incorporated in October 1905, its board of directors consisted primarily of directors of California Gas & Electric Company, one of whom was Frank Drum.  There is no indication that Drum became a director of PG&E as a result of SFG&E's transaction with Equitable, more than two years earlier.  Moreover, "[c]ourts have held that common officers and shareholders alone are insufficient to establish a mere continuation."  *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 468 F. Supp. 3d 1236, 1241 (C.D. Cal. 2020) 468 F. Supp. 3d at 1241; *see also CenterPoint*, 157 Cal. App. 4th at 1121 ("it is not dispositive that some of the same persons may serve as officers or directors of the two corporations").  In any event, Clarke cannot establish that PG&E, which was not incorporated for a year after Equitable's dissolution, was a "mere continuation" of Equitable.

own name before Equitable dissolved in 1904, but neither of them obtained their SFG&E shares as a result of the Equitable transaction.  To the contrary, they continued to hold the same number of Equitable shares after they acquired the SFG&E stock as before they acquired it—holding their Equitable stock until its dissolution in October 1904.[31]  Thus, there is not significant overlap in shareholders, and *none* of the known Equitable shareholders obtained SFG&E shares in exchange for Equitable shares, or as a result of the transaction.  Thus, Clarke cannot allege or establish continuity of shareholders for the "mere continuation" exception.

                **(d)**      **The two corporations remained separate after the transaction.**

      Although there are two prongs to the mere continuation test, California courts also generally hold that successor liability based on continuation is not established 'where the selling and purchasing corporations were completely separate and distinct entities both before and after sale.'" *Sunnyside Dev.*, at \*10 (*quoting Tidewater Oil Co. v. Workers' Comp. Appeals Bd.,* 67 Cal.App.3d 950, 955-56 (1977)); *Ferguson*, 2004 WL 2600471, at \*4 (plaintiff must plead that only one corporation remained after the transfer of assets).  The undisputed evidence shows that Equitable and SFG&E remained separate corporations before and after the asset purchase.

### 3.      There Was No De Facto Merger.

      "De facto merger" is defined as a transaction where "one corporation is absorbed by another, but without compliance with the statutory requirements for a merger." *Arnold Graphics Industries, Inc. v. Independent Agents Center, Inc.*, 775 F.2d 38, 42 (2d Cir. 1985); see also *Marksy*, 187 Cal. App. 3d at 1437 ("The result of the transaction was exactly that which would have occurred had a statutory merger taken place, and we are accordingly convinced of the necessity and fairness of transferring liability...").  Thus, an essential predicate for a de facto merger is a statute that provides the requirements for a merger. "Corporations must have legal authority to consolidate or merge.  Consequently, where there is no law authorizing the particular consolidation or merger neither a de jure nor a de facto consolidation or merger results."

---

[31] Mink Dec. Exs. Z, at 3-5 (Ames purchased 100 shares of Equitable stock in 1901); AA, at 4 (Ward got 5 shares of Equitable stock in September 1903); K (Ames, but not Ward, held SFG&E stock in October 1903); L, at 60, 85 (Ames and Ward held SFG&E stock in April 1904); DD, at 1 (Ames and Ward held 100 shares and 5 shares of Equitable stock, respectively, at the time of its dissolution in October 1904).

15 Fletcher, Cyclopedia of the Law of Private Corporations (rev. vol. 1990) § 7153.  Moreover,

the de facto merger doctrine is of modern origin,[32] and so it could not be applied to the 1903

transaction under the principles announced in *Swenson v. File*, 3 Cal. 3d 389, 394 (1970) ("parties

are presumed to have 'existing law' in mind at the time of execution of their agreement"); *see also*

*Cal. Ass'n of Highway Patrolmen v. Cal. Dept. of Personnel and Admin.* 185 Cal. App. 3d 352,

364 (1986) ("'Existing law' includes decisions of the appellate courts interpreting statutes").  As

discussed above, there was no statutory authorization for merger of gas corporations in 1903.  As a

result, the SFG&E-Equitable transaction cannot constitute a de facto merger.

Even if the de facto merger exception could apply, however, its elements are not met here.

To establish a de facto merger, Clarke must show all of the following:

a.  Equitable's assets were transferred without consideration that could be made available to satisfy claims of creditors, or that the consideration paid was solely stock of SFG&E, which was promptly distributed to the Equitable shareholders;

b.  the Equitable shareholders became SFG&E shareholders;

c.  SFG&E continued the same enterprise as Equitable after the sale;

d.  Equitable liquidated as soon as legally possible; and

e.  SFG&E assumed the liabilities necessary to carry on the business of Equitable.

*See Marks*, 187 Cal. App. 3d at 1435-1436 (*citing Ray v. Alad*, 19 Cal. 3d 22).

As with the "mere continuation" exception, the first factor is dispositive.  *Franklin*, 87

Cal.App.4th at 625 ("The crucial factor in determining whether a corporate acquisition constitutes

either a de facto merger or a mere continuation is the same: whether adequate cash consideration

was paid for the predecessor corporation's assets.")  In *Ray*, the California Supreme Court upheld

the trial court's determination that no issue of material fact was shown as to de facto merger,

because the assets were paid for in cash and there was "no contention that this consideration was

inadequate[.]"  19 Cal. 3d at 28-29.  The court did not even discuss any of the other factors

---

[32] The de facto merger theory was still being rejected in the early 1920s.  In *Globe Oil Mills v. Van Camp Seafood Co.*, 52 Cal. App. 781 (1921), the plaintiff argued that the defendant was "in effect, a consolidation or merger of two corporations," and thus succeeded to the liabilities of one of those corporations.  *Id.* at 786.  The court rejected this argument, noting the general non-liability of asset purchasers, with three exceptions:  actual consolidation, assumption of liability, or fraud in the transaction.  *Id.* at 786-787.  The first federal reference to the term "de facto merger" appears in *Helvering v. Pennsylvania Water & Power Co.*, 306 U.S. 522, 525 (1939).

1    required for the de facto merger exception.  "As our Supreme Court noted in *Ray v. Alad,* the de

2    facto merger exception to the general rule of non-liability 'has been invoked where one

3    corporation takes all of another's assets *without providing any consideration* that could be made

4    available to meet claims of the other creditors....'"  *Franklin*, 87 Cal. App. 4th at 626 (*citing Ray,*

5    19 Cal. 3d at 28, italics added by *Franklin* court).

6          As discussed below, even if the de facto merger exception could be applied to a transaction

7    predating California's general merger statute, Clarke cannot satisfy the first and most important

8    element, because SFG&E paid adequate consideration for Equitable's assets, in cash.  Nor could

9    Clarke establish the other elements of de facto merger.

10                    **(a)    More than adequate consideration was paid, in cash.**

11         Where a court finds that adequate consideration was paid for purposes of the mere

12   continuation exception, it should also find consideration to have been adequate for the de facto

13   merger exception.  *Orthotec, LLC v. Reo Spineline, LLC*, 438 F. Supp. 2d 1122, 1134 (C.D. Cal.

14   2006) (granting defendant's motion for summary judgment based on lack of successor liability).

15   As discussed above, the undisputed evidence shows that SFG&E paid $708,850—in cash—for

16   assets valued at $445,392.75 at the time of purchase.  For that reason, Clarke cannot establish

17   inadequate consideration for purposes of the de facto merger exception.  This alone is fatal to any

18   claim of de facto merger.  *Franklin*, 87 Cal. App. 4th at 626; *Ray,* 19 Cal. 3d at 28; *see also*

19   *Sunnyside Dev.*, 2007 WL 2462142, at *9 (plaintiff failed to establish that assets were exchanged

20   for stock, rather than cash, or that inadequate consideration was paid, and thus could not establish

21   de facto merger); *Louisiana-Pacific*, 909 F.2d at 1265 (applying federal common law, fact that

22   assets were purchased for cash was fatal to de facto merger theory).

23                    **(b)    The shareholders of Equitable did not become shareholders of
                              SFG&E as a result of the transaction.**

24

25         In order to find a de facto merger, "courts have consistently required continuity of

26   shareholders, accomplished by *paying for the acquired corporation with shares of stock*."

27   *Louisiana-Pacific*, 909 F.2d at 1264 (emphasis added).  The SFG&E-Equitable transaction was for

28   all cash; the assets were not acquired with shares of stock, and Clarke cannot establish continuity

1   of shareholders.  *See* Sections VI.B.2.(a) and VI. B.2.(c), above.

2                    **(c)      SFG&E Did Not Continue Equitable's Business.**

3           Clarke has not alleged, nor can he establish, the element of continuation of the same

4   business.  This factor is usually described in terms of continuity of (1) management; (2) personnel;

5   (3) physical location; (4) assets; and (5) general business operations.  *Louisiana-Pacific*, 909 F.2d

6   at 1264.  Clarke cannot establish these sub-elements.

7           Here, there was no continuity of management.  Prior to the August 31, 1903 transaction,

8   Allan Pollok was the Manager of SFG&E.[33]  After the transaction, Pollok went on to become the

9   manager of the new St. Francis Hotel.[34]  Pollok's replacement, J.F. Lawless, did not come from

10  Equitable, but rather from the Pacific Steamship Company.[35]

11          There is no evidence of any continuity of personnel, and given that the CAN MGP was

12  shut down, such continuity would not have been needed.  Although SFG&E took over Equitable's

13  lease to the physical location of the MGP, it did not use that location to manufacture gas.  To the

14  contrary, SFG&E shut down the Equitable MGP once it had access to it.  Thus, there was no

15  continuity of physical location.  Regarding continuity of assets, SFG&E did purchase Equitable's

16  assets, but that is a threshold requirement for analysis of the asset-purchase exceptions, and thus

17  cannot by itself support a claim of de facto merger.  Moreover, SFG&E did not preserve the assets

18  as a functioning MGP, but rather disassembled the MGP and used its parts at other facilities.

19          SFG&E did sell its own gas to Equitable's former customers, but this is not sufficient to

20  establish the continuity of business element for a de facto merger.  The fact that the purchasing

21  company continues its own pre-existing business in the same industry as the selling company does

22  not give rise to successor liability for continuing the selling company's business, even if the

23  purchasing company uses some of the selling company's facilities to do so.  *See Acheson v.*

24  *Falstaff Brewing Corp.*, 523 F.2d 1327, 1330 (9th Cir. 1975) (no continuation of same business

25  where former owner's plant was shut down and brewery was not used; purchasing company

26  continued its own, pre-existing brewing business, and "simply moved the site of some plant

27

28  [33] *See* Mink Dec. Ex. HH, col. 5 ("One Dollar Gas May Continue").
    [34] *See* Mink Dec. Exs. II, col. 3 ("Personal Mention"); JJ, col. 1 ("Receives Presents From…").
    [35] *See* Mink Dec. Ex. KK, col. 2 ("Personal Mention").

1  operations" to former owner's site); *Orthotec*, 438 F. Supp. 2d at 1131 (no continuation of same

2  business, despite operation out of same office space, where purchasing company sold its own

3  products, rather than those of selling company).  Accordingly, Clarke cannot establish SFG&E

4  continued Equitable's enterprise after the asset sale.

5                    **(d)     Equitable did not dissolve "as soon as legally possible."**

6            The de facto merger exception requires that the selling corporation dissolve as soon as

7  legally possible, so that only one corporation remains after the transfer of assets.  Here, Equitable

8  continued to exist as a corporation for more than a year after the transfer of its assets to SFG&E.

9                    **(e)     SFG&E did not assume any of Equitable's liabilities.**

10           As discussed above, SFG&E did not assume any of Equitable's liabilities.  Moreover,

11 Equitable's business—manufacturing and selling gas from the CAN MGP—was not continued

12 after the asset purchase.  The fact that SFG&E began serving former customers of Equitable, from

13 its own separate MGPs in San Francisco and not the Equitable MGP, indicates only that SFG&E

14 eliminated a competitor, not that it assumed liabilities necessary to carry on Equitable's business.

15                   **4.     The fraudulent purpose exception does not apply.**

16           There is no evidence—and Clarke does not allege in the FAC—that the Equitable-SFG&E

17 transaction was entered into for the purposes of defrauding Equitable's creditors.  To the contrary,

18 the San Francisco Superior Court found that Equitable had, in fact, settled all of its debts by the

19 time of its dissolution in October 1904.  Mink Dec. Ex. X, at 5.  Thus, Clarke cannot now assert

20 nor establish the fraud exception to asset purchaser non-liability.

21 **VII.    CONCLUSION**

22           For the foregoing reasons, PG&E requests that summary judgment be entered in its favor.

23 Dated:  August 4, 2021

24

25 WFBM, LLP                                          ALLEN MATKINS LECK GAMBLE
                                                          MALLORY & NATSIS LLP
26 By:_____*/s/ James L. Mink*_____
      SCOTT D. MROZ                                 By:_____*/s/ Sandi L. Nichols*_____
27 JAMES L. MINK                                       SANDI L. NICHOLS
   Attys for PACIFIC GAS AND ELECTRIC                Attys for PACIFIC GAS AND ELECTRIC
28 COMPANY & PG&E CORPORATION                        COMPANY & PG&E CORPORATION