UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN CLARKE,<br><br>        Plaintiff,<br><br>    v.<br><br>PACIFIC GAS & ELECTRIC COMPANY, et al.,<br><br>        Defendants. | Case No. 20-cv-04629-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 55, 56 |

Plaintiff Dan Clarke contends that defendants Pacific Gas & Electric Company and PG&E Corporation (collectively "PG&E") are liable for hazardous waste created in 1903 and before by Equitable Gas Light Company ("Equitable") and San Francisco Gas and Electric Company ("SFG&E") at the Cannery manufactured gas plant ("Cannery MPG") on the San Francisco waterfront. Prior to discovery to determine if the Cannery MPG site and lands in the vicinity are in fact contaminated, the parties litigated whether PG&E could be liable on theories of direct, parent, and successor liability to claims brought under the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA"). After considering the evidence and arguments submitted on the parties' cross-motions for summary judgment, I conclude that PG&E would be liable (if contamination exists) because of SFG&E's purchase of Equitable, SFG&E's operation of the Cannery MPG, and its removal of equipment from the Cannery MPG. As a result, the parties should commence discovery to establish whether contamination exists and, if so, what its source is.

## BACKGROUND

The events that give rise to this litigation date back more than a century, when manufactured gas plants ("MGPs") dotted the San Francisco waterfront. At issue is the long-

abandoned Cannery MGP, which was in operation from on or around 1898 until at least 1906, when it was damaged in the Great Earthquake. First Am. Compl. ("FAC") [Dkt. No. 28] ¶ 48. Clarke alleges that PG&E and its predecessors, Equitable and SFG&E, handled and left behind hazardous waste created by the Cannery MGP. *Id*. at ¶¶ 62-63, 67-68, 96-102. He contends that the Cannery MGP site and lands in the vicinity thereof, including tidelands and submerged lands, remain contaminated. *Id*. at ¶¶ 109-17.[1]

After litigating two motions to dismiss, both parties now seek summary judgment on the issue of PG&E's liability. *See* Dkt. Nos. 55, 56. PG&E argues that it is entitled to judgment as a matter of law because Clarke could not establish direct or successor liability for either PG&E or SFG&E. PG&E Mot. for Summ. J. ("PG&E MSJ") [Dkt. No. 55] 3. Clarke then filed a cross-motion, arguing that PG&E is not only directly liable, but also liable as a parent and successor. Clarke Cross Mot. for Summ. J. ("Clarke MSJ") [Dkt. No. 56] 1. Because the parties' arguments are particularly fact-dependent, the facts related to this set of motions are detailed below.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* at 324. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the

---

[1] I provide more details about Clarke's allegations in my prior orders, which I incorporate by reference here. Dkt. Nos. 26, 46.

2

non-movant. *Id.* at 255. However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

# DISCUSSION

It is worth noting at the onset that the evidentiary record in this matter is limited. The events at issue date back more than a century, as do many of the documents proffered by the parties. Given the significant amount of time that has lapsed, there are understandably some gaps in the record. At oral argument, the parties agreed that the facts are not in dispute—rather, the dispute is over the legal inferences drawn from those facts and the gaps therein. The parties also agreed that because the facts are not in dispute, it was appropriate for me to make any necessary inferences to decide the motions at issue.

## I. SFG&E'S PURCHASE OF EQUITABLE

As an initial matter, I must determine whether the SFG&E-Equitable transaction was an asset purchase or stock purchase, as different potential sources of liability flow from this finding: Although PG&E contests whether it holds successor liability for Equitable directly, it concedes that "for the purposes of this action PG&E does not dispute that it succeeds to any adjudicated liability of SFG&E with respect to contamination of the site." *See* PG&E MSJ at 11 n.24. If the transaction was an asset purchase, SFG&E (and thus PG&E) did not succeed to Equitable's liabilities unless an exception to the general rule against assumption applied. *See, e.g., Beatrice Co. v. State Bd. Of Equalization*, 6 Cal. 4th 767, 778 (1993) (internal citation omitted); *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 361 (9th Cir. 1997). But if it was instead a sale of stock, then SFG&E (and thus PG&E) may be liable as Equitable's parent company. *See Santa Clarita Org. for Plan. & Env't. v. Castaic Lake Water Agency*, 1 Cal. App. 5th 1084, 1104 (2016) (noting that when a parent company "that owns all of a subsidiary's stock operates that subsidiary in a manner that renders the subsidiary merely an alter ago of its parent (and a ghost of its former, independent self), courts can pierce the so-called 'corporate veil' and treat the two as one.").

The parties dispute whether the SFG&E-Equitable transaction amounted to a purchase of

Equitable's assets or stock, offering competing narratives in support. PG&E contends that it was the former, relying heavily on the text of an August 31, 1903, Indenture summarizing the transaction. *See* PG&E MSJ at 13-14 (citing Mink Decl., Ex. D). The document transfers to SFG&E "all the business, property and assets" of Equitable. *Id.*, Mink Decl., Ex. D at 1. It also mentions that the transaction was approved by more than two-thirds (but not all) of Equitable's stockholders. *Id.* at 5. However, the Indenture makes no mention of SFG&E's shareholders. *See id.* Nor was the transaction submitted to them during the two meetings between the August 31, 1903, transaction and Equitable's dissolution in October 1904, as indicated by the minutes from those meetings. *See* PG&E MSJ, Mink Decl., Exs. K, L.

PG&E contends that this is consistent with the law at the time. PG&E MSJ at 13:14-18. Former Civil Code section 361a prohibited the sale of any "business, franchise and property, as a whole of any corporation . . . without the consent of stockholders thereof, holding of record at least two thirds of the issued capital stock." *Id.*, Mink Decl., Ex. RR. The provision made no mention of any requisite consent by the purchasing company's shareholders. *See id.* Taken together, PG&E argues, the Indenture and contemporaneous law indicates SFG&E acquired Equitable via an asset sale.

Clarke does not dispute that SFG&E purchased Equitable's business and assets on August 31, 1903. *See* Clarke MSJ at 5:17-25. Rather, he contends that SFG&E absorbed Equitable *before* this transaction, through a stock purchase deal that unfolded using an SFG&E proxy. He relies on these facts in support:

In February 1903, Frank Drum—the purported proxy, who later became a vice president of SFG&E and president of PG&E—entered into an agreement with the vice president of Equitable. *See id.* at 3:13-22 (citing in part Gross Decl., Ex. H at 164). Under that agreement, Drum obtained an option to purchase Equitable stock shares that holders placed into an escrow account for $5 per share, provided that a majority of the shares were tendered.[2] *Id.*, *see also id.*, Gross Decl., Exs. I,

---

[2] Neither party has a copy of this agreement. *See* Clarke MSJ at 3 n.2. However, its terms are sufficiently described in contemporaneous newspaper articles and minutes of the SFG&E board of directors. *See, e.g.*, *id.*, Gross Decl., Ex. H at 164-165 (Aug. 12, 1903, minutes naming Drum as

4

1  J, K.  Over the next few months, Equitable shareholders did just that, placing their shares into the
2  account.  *See id.*, Gross Decl., Exs. L, M.  Drum made two initial payments: $75,000 in February
3  1903, then another $90,000 three months later to extend the option by 90 days.  *See id.*, Gross
4  Decl., Ex. K (February 1903 news article describing initial $75,000 payment), Ex. L (May 1903
5  news article describing extension).  This resulted in two payments of $0.70 per share each to
6  Equitable shareholders, with the remaining $3.60 to be paid if and when the option was exercised.
7  *See id.*, Gross Decl., Ex. M (August 1903 news article describing payments to Equitable
8  shareholders).

9  On June 30, 1903, Drum "sold, assigned, transferred and set over . . . for the benefit of this
10 corporation [SFG&E], all the rights of the said Drum under the said option."  Clarke MSJ, Gross
11 Decl., Ex. H at 164.  In exchange, SFG&E gave Drum a $100,000 promissory note.  *Id.*

12 On August 12, 1903, SFG&E's board voted to exercise the option, authorizing the
13 purchase of all of the Equitable shares that had been placed into escrow.  *Id.* at 164-165 ("Whereas
14 this corporation proposes to exercise said [option] and purchase the said stock in accordance with
15 the conditions thereof.").  Less than a week later, on August 17, Drum exercised the option,
16 paying Equitable's vice president $600,000 to cover the remaining $3.60 per share owed to
17 shareholders.  Clarke MSJ, Gross Decl., Ex. M (Aug. 18, 1903, news article stating that the $3.60
18 per share had been "paid out to shareholders"), Ex. N (Aug. 18, 1903, news article reporting that
19 Drum exercised the option and was "now controller of the Equitable.").  Equitable's board of
20 directors then resigned, with "Drum and his friends" making up the new board.  *Id.*, Gross Decl.,
21 Ex. N.

22 A day after Drum exercised the option, a newspaper reported that an August 24, 1903,
23 meeting of Equitable's stockholders had been called "to vote upon a resolution consenting to the
24 sale of the property, etc., of the company to the San Francisco Gas and Electric Company."  *Id.*,
25 Gross Decl., Ex. M.  But on August 19—before that meeting took place—SFG&E's board of
26 directors met and reported that Equitable had accepted its offer of $708,850 for "the business and

---

the holder of the option); Exs. I, J, K (February and March 1903 newspaper articles describing the terms of the agreement without naming the prospective buyer).

5

property of said corporation as a whole." *Id.*, Gross Decl., Ex. Q at 166.  Clarke notes that the $708,850 was "equal to the number of Equitable shares outstanding in August of 1903, 141,770, multiplied by $5 per share."  Clarke MSJ at 5:3-5 (citing Gross Decl. Ex. O at 7).  This chain of events, Clarke contends, indicates that a stock purchase occurred.

        Clarke's reading of the transaction is more persuasive.  Multiple contemporaneous sources—primarily the newspaper articles and SFG&E board minutes—describe a months-long effort by Drum to acquire Equitable stock.  It is admittedly unclear from the record whether Drum acted on his own accord or on SFG&E's behalf when he first entered into the agreement with Equitable for the option in February 1903.  However, one can conclude from the evidence that by the end of June, he was working on SFG&E's behalf.  Drum sold the rights of his option to SFG&E on June 30, 1903, as indicated in the board minutes.  On August 12, SFG&E voted to exercise that option, setting into a motion a series of events that further supports the theory that Drum was working as an SFG&E proxy.  Drum exercised the option on August 17, buying the majority of Equitable's shares and installing himself "and his friends" as Equitable's new board of directors.  *See* Clarke MSJ, Gross Decl., Ex. N.  Within days, a meeting of Equitable's shareholders was scheduled to vote upon a sale to SFG&E.  But before that meeting could take place—a mere two days after Drum exercised the option to purchase Equitable's stock—SFG&E's board reported that Equitable had accepted the $708,850 offer.

        Critically, there is no evidence of a separate sale of stock.  SFG&E's 1903 Annual Report ("Annual Report") mentions only the $708,850 payment along with the $100,000 paid "to the parties holding an option on the Equitable stock."  *See* Clarke MSJ, Gross Decl., Ex. E at 6-7.  PG&E points to a 1906 history of SFG&E, which notes that Equitable sold its property to SFG&E in August 1903 "at a price equaling five dollars ($5.00) per share for the 141,770 issued shares or $708,850.00 in money."  *See* PG&E Reply [Dkt. No. 57] 3:27-4:6 (citing Clarke MSJ, Gross Decl., Ex. D at 25).  The document later states that SFG&E purchased 138,452 Equitable shares.  *Id.*  But there is no record of how much SFG&E purportedly paid for those 138,452 shares, despite (relatively) significant accounting of the $708,850 payment and the $100,000 paid to Drum.

        What is evident is that SFG&E paid $708,850 for Equitable.  PG&E makes much of the

language used in the Indenture, the Annual Report, and the SFG&E's August 19 board minutes. *See* PG&E MSJ at 13; PG&E Reply at 3.  The first conveys to SFG&E "all the business, property and assets" of Equitable.  PG&E MSJ, Mink Decl., Ex. D at 1.  The second lists the "actual cost to the respective companies of the properties and asserts taken over," with Equitable's as $445,392.75.  *Id.*, Mink Decl., Ex. I at 6.  It then states that SFG&E "made payments therefor" of $708,850.  *Id.*  The board minutes report that Equitable had accepted $708,850 for "the business and property of said corporation as a whole."  Clarke MSJ, Gross Decl., Ex. Q at 166.  These documents, PG&E argues, make clear that the $708,850 was paid for Equitable's assets.

But this evidence is not as dispositive as PG&E contends.  The Indenture makes no mention of the $708,850.  *See* PG&E MSJ, Mink Decl., Ex. D.  As explained above, the Annual Report introduces another wrinkle: why SFG&E paid well over the actual cost of Equitable's properties and assets.  And by the time of the August 19 meeting, Drum had already procured the Equitable stock and installed himself and his friends as its board.  *See* Clarke MSJ, Gross Decl., Ex. N.  The argument is not that SFG&E did not acquire Equitable's property and assets, it is that SFG&E purchased Equitable's stock (via Drum) before doing so.  None of these documents establish definitively that the $708,850 was for Equitable's assets.

PG&E also fails to provide a compelling counter to Clarke's basic math: that $708,850 equaled the amount of Equitable's outstanding shares, multiplied by a price of $5 per share.  This is supported by the 1906 document, which lays out the same calculation.  *See* Clarke MSJ, Gross Decl., Ex. D at 25.  That amount is also significantly higher than the "actual cost" of Equitable's "properties and assets" at the time of the SFG&E takeover, as listed in the Annual Report: $445,392.75.  *See id.*, Gross Decl., Ex. E at 6.  The documented amount that SFG&E paid for Equitable—$708,850, as confirmed in multiple sources—aligns with the value of its stock, not its assets.

The lack of evidence of a separate stock sale, then, supplements the evidence that: (1) Drum acted as a proxy for SFG&E to acquire Equitable's stock and (2) the amount of money SFG&E paid for Equitable tracked the prices of its stock, rather than its assets.  Taking all of this into account, I find that the evidence indicates that SFG&E's acquisition of Equitable amounted to

7

a stock purchase rather than an asset purchase.

## II. SUCCESSOR LIABILITY

Because SFG&E purchased Equitable's stock rather than its assets, successor liability does not apply as a matter of law. "[S]uccessor liability under California law requires the purchase of assets, not merely the purchase of stock." *Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No-C-05-0553-MHP, 2007 WL 2462142, at *6 (N.D. Cal. Aug. 29, 2007) (quoting *Potlatch Corp. v. Superior Ct.*, 154 Cal. App. 3d 1144, 1150-51 (1984)). PG&E's motion for summary judgment is therefore GRANTED with regard to successor liability. Clarke's motion is DENIED for the same reasons.

## III. PARENT LIABILITY

"It is a general principle of corporate law . . . that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). However, the Supreme Court has held that a parent corporation may have environmental liability for a subsidiary's actions "when (but only when) the corporate veil may be pierced." *Id.* at 63-64. That veil may be pierced and the two entities treated as one when a parent company that "owns all of a subsidiary's stock operates that subsidiary in a manner that renders the subsidiary merely an alter ago of its parent (and a ghost of its former, independent self)." *Santa Clarita*, 1 Cal. App. 5th at 1104.

In determining whether to treat a subsidiary company as an alter ego of its parent, "courts must assess whether (1) there is such unity of interest and ownership that the separate personalities of the subsidiary corporation and its parent corporation . . . no longer exist and (2) if the acts are treated as those of the subsidiary alone, an inequitable result will follow." *Id.* at 1105. (internal quotation marks and citations omitted). "The plaintiff must show specific manipulative conduct by the parent toward the subsidiary which relegates the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former." *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 305 (2018) (internal quotation marks and citation omitted). Courts must consider factors such as: whether the companies have comingled funds or assets; whether the parent has represented liability for the subsidiary's debts; whether the parent owns 100 percent of the subsidiary's stock; whether the companies use the same offices and employees; whether they have

identical directors and officers; whether the subsidiary is "used as the 'mere shell or conduit' for the affairs of the parent;" whether the subsidiary is adequately capitalized; and "whether the parent has diverted the subsidiary's assets to the parent's uses." *Santa Clarita*, 1 Cal. App. 5th at 1105-06. No single factor is determinative of alter ego; rather, courts must consider the totality of circumstances. *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 539 (2000).

The available evidence indicates that after SFG&E acquired the Equitable stock via Drum, Equitable functioned merely as SFG&E's alter ego. Three pieces of evidence weigh heavily in my decision. First, after Drum purchased the Equitable stock on SFG&E's behalf, he almost immediately installed himself and his friends on the Equitable board. *See* Clarke MSJ, Gross Decl., Ex. N. Next, also almost immediately after Drum purchased the stock, Equitable called a meeting of its shareholders to vote on whether to sell "the property, etc., of the company" to SFG&E. *See id.*, Gross Decl., Ex. M. Before that meeting occurred, SFG&E's board reported that Equitable had accepted its offer. *See id.*, Gross Decl., Ex. Q at 166.

This indicates that, at the time SFG&E acquired Equitable's property and assets, Equitable was being used as a shell or conduit for SFG&E's affairs. It also shows that SFG&E diverted Equitable's assets—primarily using Drum—to SFG&E's uses. As soon as Drum purchased Equitable's stock on August 17, 1903, Equitable was manipulated in such a way that it became a mere instrument of SFG&E's bidding. The companies' interests essentially became one. PG&E notes that Equitable had $708,850 upon its dissolution in October 1904, indicating that it was adequately capitalized. *See* PG&E Reply at 23:5-8; *see also* Clarke MSJ, Gross Decl., Ex. KK). However, evidence of one of the factors identified in *Santa Clarita* is not enough to outweigh the totality of the circumstances, which show that Equitable functioned as SFG&E's alter ego.

For these reasons, Clarke's motion for summary judgment is GRANTED on the issue of parent liability.

**IV.   DIRECT LIABILITY**

There is another potential source of liability for PG&E: direct liability under both the RCRA and CWA.

The RCRA holds liable any person "who has contributed or who is contributing to the past

9

1    or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste
2    which may present an imminent and substantial endangerment to health or the environment." 42
3    U.S.C. § 6972(a)(1)(B). The Ninth Circuit has held that this language "requires that a defendant
4    be actively involved in or have some degree of control over the waste disposal process to be
5    liable." *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011).

6    A similar issue arises under the CWA, which prohibits "the discharge of any pollutant by
7    any person" except as authorized by specific provisions of the law. 33 U.S.C. § 1311(a). To state
8    a claim under the CWA, a plaintiff must allege: "(1) the ongoing addition of (2) a pollutant (3) to
9    the navigable waters of the United States (4) from a point source (5) without a permit (or in
10   violation of a permit)." *Woodward v. Goodwin*, No. C-99-1103-MJJ, 2000 WL 694102, at *5
11   (N.D. Cal. May 12, 2000). In my prior order, I noted that the case law indicates that "CWA
12   violations cannot result for 'purely passive activity.'" Second MTD Order [Dkt. No. 46] 10
13   (citing *Froebel v. Meyer*, 217 F.3d 928, 938-39 (7th Cir. 2000)).

14   PG&E's direct liability under the RCRA and CWA turns on two questions: whether
15   SFG&E ever operated the Cannery MGP, and whether SFG&E's removal of equipment from the
16   Cannery MGP constituted the handling of waste. Again, the parties use the available evidence to
17   proffer competing answers.

18   **A. SFG&E's Operation of Cannery MGP**

19   The parties agree that SFG&E acquired the Cannery MGP on August 31, 1903, as
20   evidenced by the Indenture. *See* PG&E MSJ at 4:13-14 (citing Mink Decl., Ex. D); Clarke MSJ at
21   5:22-27 (citing Gross Decl., Ex. O). PG&E argues that there is no evidence that SFG&E operated
22   the Cannery MGP after that point and that instead, it effectively shuttered the plant so that no gas
23   was manufactured or supplied to customers. *See* PG&E MSJ at 10:11-21. PG&E relies primarily
24   on the Annual Report, where SFG&E stated that "[w]hen the Equitable Gas Light Company was
25   taken over, its distributing system was connected to our own in such manner that we were enabled
26   to shut down the plant." *Id*., Mink Decl., Ex. I at 12. The same report notes that SFG&E only
27   operated one of the three MGPs it acquired that year: the Independent MGP. *Id*. In addition, the
28   report stated, SFG&E removed gas generators from the Cannery MGP to use at the Independent

10

1   MGP. *Id*.  PG&E asserts that at that point, the Cannery MGP "was no longer even capable of
2   being operated to manufacture gas."  PG&E MSJ at 10:17-18.

3         Clarke contends that after SFG&E acquired the Cannery MGP, it operated the plant until at
4   least sometime before November 1, 1903.  *See* Clarke MSJ at 14:18-15:1.  He relies on three
5   pieces of evidence in support.  First, Clarke notes that the Annual Report included earnings from
6   Equitable from September 1, 1903, and stated that SFG&E's "absorption of the plant and
7   business" of Equitable was completed on November 1, 1903.  *See id*., Gross Decl., Ex. E at 5, 7.
8   Next, he cites the testimony of PG&E's person most knowledgeable, who stated that he did not
9   "have any evidence" that Equitable customers went without gas after SFG&E took over the
10  Cannery MPG on August 31, 1903, and before SFG&E connected its mains to a different MGP by
11  November 1, 1903.  *See id*., Gross Decl., Ex. A at 173:3-176:5.  Finally, Clarke contends that
12  SFG&E had a statutory duty to provide gas to its new customers under former section 629 of the
13  California Civil Code, which required gas companies to supply gas to buildings located within 100
14  feet of the companies' gas mains.  *See id*. at 21:16-20, Gross Decl., Ex. GG at 105.  Clarke argues
15  that this shows that SFG&E necessarily operated the Cannery MGP after August 31, 1903,
16  because "Equitable's former customers became customers of SFG&E [and] SFG&E needed to
17  use the [Cannery MGP] to produce the gas distributed to those customers until Equitable's former
18  distribution could be connected to a different MGP."  Clarke MSJ at 14:21-26.

19        Given the available evidence, and the reasonable inference one can draw from it, I find that
20  SFG&E operated the Cannery MGP after August 31, 1903.  There is no evidence that SFG&E
21  immediately shut down operations at the Cannery MGP once it acquired the plant from Equitable.
22  Rather, the Annual Report includes earnings from Equitable beginning on September 1, a day after
23  SFG&E took over the plant.  Although the report notes that the Cannery MGP's distribution mains
24  were eventually disconnected and its gas generators taken to the Independent MGP, there is no
25  indication that occurred on, or even near, August 31.  Instead, the Annual Report states that the
26  "absorption of the plant" was completed on November 1, 1903, indicating that it took up to two
27  months for SFG&E to complete the process.  *See* Clarke MSJ, Gross Decl., Ex. E at 5.
28  Importantly, there is no evidence that Equitable customers went without gas during that time.  And

while I agree with PG&E that this lack of evidence is not dispositive, when considered alongside other evidence (including SFG&E's statutory duty to provide gas to customers living within 100 feet of the Cannery MGP's mains) it supports the conclusion that SFG&E continued to operate the Cannery MGP after August 31, 1903—at least for some period of time.

The exact shut-off date is not relevant, as the evidence shows that any operation of the Cannery MGP by SFG&E inherently involved generating or handling waste, as well as creating potential source points of contamination. The evidence proffered by Clarke—the declaration of geohydrologist Anne Farr—is persuasive. *See* Clarke MSJ at 15:1-4 (citing Farr Decl. ¶¶ 7, 34-35). Farr opined that the "[g]eneration of waste products, many of which were hazardous, was intrinsic to operation of a MGP," and that "[c]onsequently, operating a MGP involved generating and handling hazardous waste." *Id*., Farr Decl. at ¶ 6. She further stated that the operation of the Cannery MGP also "would have generated a variety of wastes which would have been deposited throughout the production process, including in discrete pieces of equipment, and disposed of on the plant property and proximate to the plant." *Id*. at ¶ 7.

Farr has more than 30 years of experience in geohydrologic studies, including evaluating groundwater contamination sources. *See id*. at ¶ 4. Her declaration discussed MGP-generated contamination generally but also with respect to the Cannery MGP, based on her review of case materials and secondary sources prepared by others in her field that she testified were reliable sources of information. *See id*. at ¶¶ 11, 23-32. Notably, PG&E provides no evidence countering Farr's conclusions that compel me to think otherwise.

Farr's testimony also supports the finding that any operation of the Cannery MGP by SFG&E would have created point sources of contamination, establishing liability under the CWA. Importantly, the statutory definition of a "point source"—"any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . or vessel or other floating craft, from which pollutants are or may be discharged"—is "extremely broad." *See* 33 U.S.C. § 1362(14); *Borden Ranch P'Ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 815 (9th Cir. 2001). Farr testified that she had reviewed pictures and maps of the Cannery MGP, identifying "furnaces, scrubbers, purifiers, gasholders, a

1   pipe shop and tool house," a "large refuse fill area," and a "coal wharf" with a crude oil tank. *See*
2   Clarke MSJ, Farr Decl. at ¶ 18. This, she said, indicates that "MGP operations occurred across the
3   property," noting the site's "easy access to dispose wastes into the San Francisco Bay." *Id*.
4   Again, PG&E offers no evidence to rebut Farr's opinions, instead attacking her testimony as
5   general and not specific to the Cannery MGP. *See* PG&E Reply at 27-28. But it views her
6   testimony too narrowly. Farr's opinion supports that operating the Cannery MPG necessarily
7   generated waste, and establishes a variety of point sources, based on her specific review of the
8   photographs and maps.
9   For these reasons, I find that SFG&E operated the Cannery MGP, which would have
10  involved generating or handling waste and created point sources of contamination. If
11  contamination exists, PG&E may therefore be held directly liable under both the RCRA and
12  CWA. Accordingly, Clarke's motion for summary judgment is GRANTED on these grounds.
13  PG&E's motion is similarly DENIED.

### B. SFG&E's Removal of Equipment from Cannery MGP

15  The parties agree that sometime before the end of 1903, SFG&E removed gas generators
16  from the Cannery MGP and relocated them to the Independent MGP. *See* PG&E MSJ at 10:15-17
17  (citing Mink Decl. Ex. I at 12-13); Clarke MSJ at 10:2-5 (citing Gross Decl. Exs. BB, Z). The
18  same is true for SFG&E's removal of two gasholders in 1905. *See* PG&E MSJ at 10:18-20 (citing
19  Mink Decl. Exs. Q at 324, R); Clarke MSJ at 10:2-5 (citing Gross Decl. Exs. BB, Z). What the
20  parties dispute is whether the removal of those parts necessarily constituted the "handling, storage,
21  treatment, transportation, or disposal of any solid or hazardous waste" to establish liability under
22  the RCRA. *See* 42 U.S.C. § 6972(a)(1)(B).
23  Clarke again points to the declaration of Farr, who stated that "these components would
24  have had MGP waste within them at the time" given the nature of gas production and the parts
25  used. *See* Clarke MSJ at 15:13-15, Farr Decl. at ¶¶ 16, 25, 36-37 (describing waste in MGP
26  components including gas generators and gasholders). PG&E attacks Farr's testimony on the
27  same grounds described above. Again, it offers no other evidence rebutting her statements.
28  The parties do not dispute that SFG&E removed some parts of the Cannery MGP; the only

issue is the impact of that act.  I find Farr's testimony persuasive, particularly given her experience and specific testimony regarding the waste contained within the parts that were removed from the Cannery MGP.  Without evidence to the contrary, I agree that by removing the gas generators and gasholders from the Cannery MGP, SFG&E necessarily handled or transported waste, again establishing direct liability for PG&E under the RCRA.  Clarke's motion for summary judgment is GRANTED on these grounds, and PG&E's motion DENIED.

## CONCLUSION

For the reasons stated above, PG&E is potentially liable for Clarke's CWA and RCRA claims.  A Case Management Conference is set for **February 1, 2022**, at 2 p.m. to discuss and set the schedule for the remainder of the case.

**IT IS SO ORDERED.**

Dated: January 11, 2022



William H. Orrick
United States District Judge

14